**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AURORA PRIDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. _____ |
| CITY OF AURORA; KEITH CROSS, in | ) | |
| his official capacity as Chief of the | ) | **JURY TRIAL DEMANDED** |
| Aurora Police Department; and MIKE | ) | |
| NELSON, in his official capacity as | ) | |
| Aurora Community Events Coordinator, | ) | |
| | | |
| Defendants. | | |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiff Aurora Pride brings this Complaint against Defendants City of Aurora (the "City"), Chief of the Aurora Police Department ("APD") Keith Cross, and City Community Events Coordinator Mike Nelson (collectively, the "Defendants").

## <u>INTRODUCTION</u>

1. This case is about the City of Aurora's unconstitutional actions against Aurora Pride based on the content and viewpoint of Aurora Pride's protected speech, and the unconstitutional Special Events Ordinance ("Ordinance") (attached hereto as Exhibit 1) that enabled City officials to wreak havoc on the 2022 Aurora Pride Parade based on the whims of police officers who disagreed with Aurora Pride's constitutionally protected message.

2. The City granted Aurora Pride a permit for the 2022 Aurora Pride Parade after the organization complied with all of the City's application requirements, including a down payment for the salaries of APD officers working the day of the parade. But after the Mayor publicly criticized part of Aurora Pride's message, things fell apart.

3.      First, a substantial number of officers who had signed up to work the parade dropped out because they disagreed with Aurora Pride's decisions about the parade's content. Then, Defendants told Aurora Pride that *it* was responsible for finding police officers from other jurisdictions to replace them. When it was unable to do so, Defendants told Aurora Pride that it had violated the permit by failing to "retain the requisite number of law enforcement officers to close the streets, provide for traffic control, and to manage the crowds along the parade route," even though Aurora Pride had no power or authority to "retain" or otherwise compel APD officers to show up for work, and were barred from retaining private security to replace most police functions. *See* June 7 Revocation Letter, attached hereto as Exhibit 2.

4.      At the last minute, and after significant public pressure, Defendants agreed to reinstate the permit. Without Aurora Pride's consent or authorization, however, the City resolved the policing issue by offering "triple time" wages to the additional officers, then forwarding the bill to Aurora Pride.

5.      Defendants violated Aurora Pride's First Amendment right to freedom of speech and assembly by revoking its permit for reasons that Aurora Pride did not cause and was powerless to remedy, then billing Aurora Pride thousands of dollars to "fix" a problem of Defendants' own creation. Worse, the Defendants' harmful actions were content-driven; they came about as a result of APD officers' disagreement with Aurora Pride's message.

6.      Defendants' unconstitutional actions were made possible because Aurora's Special Events Ordinance lacks clear, definite, and content-neutral standards for permitting decisions and vests local officials with undue discretion to discriminate against special event organizers based on the content of their speech. Likewise, many Ordinance provisions are not narrowly tailored

"time, place, and manner" restrictions and do not leave open ample alternative means of communication.

7.      This lawsuit is a facial and as-applied challenge to the Ordinance and the Defendants' implementation of it, both of which damaged Aurora Pride in 2022 and continue to harm Aurora Pride and other future permit applicants. Aurora Pride seeks preliminary and permanent injunctions prohibiting enforcement of the Ordinance and damages for their injuries related to Defendants' violation of their rights in connection with the 2022 Pride Parade.

## JURISDICTION AND VENUE

8.      Aurora Pride brings this action pursuant to the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Aurora Pride's claims occurred in the Northern District of Illinois.

## PARTIES

10.      Plaintiff Aurora Pride is a volunteer-run 501(c)(3) organization formed in 2019 to plan events celebrating the LGBTQ community in the Aurora, Illinois area. Aurora Pride organized the 2022 Pride Parade, and it intends to hold a 2023 Pride Parade and similar events thereafter.

11.      Defendant City of Aurora is a municipal corporation, as defined in the Illinois Municipal Code, 65 ILCS 5/1-1-2(1). The City is organized into various departments, including APD. The City operates, manages, directs, controls, and is responsible for APD, which is the City's primary law enforcement agency. Aurora Pride seeks damages and injunctive relief against the City.

12. Defendant Keith Cross is Chief of the APD and is the official who oversees the functioning of the APD and supervises, directly or indirectly, all APD officers and other APD employees. Among other things, Chief Cross oversees APD officers' participation in special events, including the 2022 Aurora Pride Parade, and is the City's final policymaker on matters of personnel and deployment for APD. Aurora Pride seeks only injunctive relief against Chief Cross in his official capacity.

13. Defendant Mike Nelson is the Community Events Coordinator for the City and is the official who oversees the functioning of the City's Office of Community Events and supervises, directly or indirectly, all Office of Community Events employees. Among other things, Mr. Nelson implements the Special Events Ordinance; is the final authority to grant, deny, and revoke special event permits in Aurora; and oversees the City's coordination with special event organizers regarding City-permitted special events (including the 2022 Aurora Pride Parade). Aurora Pride seeks only injunctive relief against Mr. Nelson in his official capacity.

## FACTS

### I. Background

14. Pride is an annual celebration of lesbian, gay, bisexual, transgender, and queer (LGBTQ) identity. Among other things, Pride commemorates the Stonewall riots, which began in the early hours of June 28, 1969, after police raided the Stonewall Inn bar in New York City's Greenwich Village neighborhood. The raid sparked a riot among bar patrons and neighborhood residents as police roughly hauled employees and patrons out of the bar, leading to six days of protests and clashes with law enforcement outside the bar on Christopher Street, in neighboring streets and in nearby Christopher Park. Many consider the Stonewall Riots a catalyst for the modern gay rights movement in the United States and around the world. Pride typically involves

a series of events and often includes a parade involving marchers and floats from the LGBTQ community and its supporters. Pride is celebrated each year across the United States with public parades and celebrations, including many "Pride Parades" in cities and towns throughout Illinois.

15. Aurora's first Pride Parade took place in 2018. In both 2018 and 2019 the Aurora Pride Parade was organized by a group called Indivisible Aurora. In 2019, those within Indivisible Aurora who were responsible for planning the parade formed their own non-profit entity – Aurora Pride – to focus exclusively on the Pride Parade and related events celebrating the Aurora LGBTQ community.

16. There was no Aurora Pride Parade in 2020 or 2021 due to the COVID-19 pandemic. Aurora Pride organized more limited celebratory events in downtown Aurora during those years in consultation with the City.

17. Aurora Pride was excited to bring the Pride Parade back in 2022 after its two-year hiatus. As in past years, Aurora Pride wanted its parade to express pride in Aurora's LGBTQ community and communicate a message of inclusion to other marginalized communities in Aurora and to the public at large.

**II.     Aurora Pride Applies for a Parade Permit, Which is Duly Granted.**

18. On January 24, 2022 Aurora Pride applied to the City Office of Community Events for a Pride Parade to be held in downtown Aurora on June 12, 2022.

19. Aurora Pride complied with all application requirements as directed by Office of Community Events staff and the City's Special Event Planning Guide. Among other things, Aurora Pride was required to meet with representatives of various City departments, including APD, secure portable toilets, ensure that food vendors were appropriately licensed, provide accommodations needed under the Americans with Disabilities Act, develop an emergency action plan, obtain an insurance certificate, and sign an indemnification clause.

20.     Additionally, Aurora Pride had to make a deposit in the amount of $5,401.86, which was 25% of the City's estimated "recovery of costs" for City the services of APD officers. Aurora Pride timely paid the deposit in full, with the understanding it would pay the remaining 75% of the policing costs ($16,205.58) after the Pride Parade.

21.     On May 3, 2022 the City issued a Special Events Permit for the Aurora Pride Parade. On the same date, the City invited Aurora Pride to participate in a City-sponsored Pride flag raising at One Aurora Plaza, and suggested meeting in the coming weeks to plan the agenda for the flag-raising event.

22.     Based on the permit and approvals from the City, Aurora Pride began to make financial and other commitments for its first Pride Parade in downtown Aurora since 2019. This included securing vendors, working with groups that wished to participate in the parade, and notifying nearby residents and businesses about the parade.

23.     Aurora Pride also pressed forward with fundraising for the event, ultimately raising over $35,000 to pay for parade expenses – including the estimated $21,607.44 for the services of APD officers. Aurora Pride relies almost entirely on private donations for all of its operations and events.

III.    **Government Officials and Police Officers Take Umbrage at Aurora Pride's Message**

24.     In April 2022, a group of LGBTQ police officers from Aurora and Elgin sent an email to Aurora Pride asking to participate in the Aurora Pride Parade (as they had in past Pride parades), and also asking whether Aurora Pride had any concerns about "anti[-]police sentiment" at the event.

25.     Aurora Pride's Board and leadership considered the officers' inquiry. The group discussed Pride's roots in protests against police brutality toward the LGBTQ community, the

significant presence of armed, uniformed police along the parade route, complaints from community members during past parades about the volume of uniformed police presence, and the fact that many members of the LGBTQ community and other marginalized communities had suffered traumatic encounters with police.

26. Based on its internal discussion, Aurora Pride determined that a contingent of armed and uniformed police officers marching with squad cars – added to the large uniformed police presence along the route – would undermine the parade's message of welcome and inclusion, but that officers without uniforms presented as part of the community would be consistent with that intended message.

27. Accordingly, on April 29, 2022, Aurora Pride sent the officers an email welcoming them to march in the parade, but asking them to march out of uniform and without official vehicles.

28. After the officers expressed disagreement with this decision, Aurora Pride explained that the request was not designed to exclude them, and that Aurora Pride hoped the officers would identify themselves as police officers by means other than uniforms or other official signifiers. Aurora Pride explained that uniforms and other indicia of police authority would conflict with their message of welcome and inclusion. Aurora Pride also made clear that the request extended only to participants in the parade, not to the officers working on or near the parade route.

29. A member of the Aurora Pride leadership team also spoke by telephone with one of the law enforcement officers on the email exchange to discuss the organization's request. As a result of these communications, Aurora Pride considered the matter resolved as of early May 2022.

30. Aurora Pride was therefore surprised to receive an email from State Senator Linda Holmes on May 20, 2022, expressing displeasure with Aurora Pride's request to the group of

7

officers. A reporter from a local press outlet inquired about the same issue shortly after Senator Holmes's email.

31.     Realizing that its previously private communications with a small group of officers had been disclosed to the press and elected officials, Aurora Pride issued a press release on May 24, 2022 explaining its request to the officers and the reasoning behind it.

32.     On May 25, 2022, Richard Irvin, the Mayor of Aurora and then a candidate for governor of Illinois, sent a letter to Aurora Pride expressing his displeasure with the organization's request to the LGBTQ officers. The letter stated that "[t]o now exclude [the officers] is disheartening, offensive and unacceptable," and "strongly urge[d] [Aurora Pride] to reconsider this decision immediately and advise [Mayor Irvin] on how [Aurora Pride] plan[ned] to proceed by the close of business [that] Thursday."

33.     Mayor Irvin apparently disclosed this letter to the press as well. A few minutes after Aurora Pride received Mayor Irvin's letter, a reporter contacted Aurora Pride seeking comment on the letter, which the reporter already had in his possession.

34.     On May 26, 2022, Aurora Pride responded to Mayor Irvin with a letter explaining that the organization had no intention of "excluding" the officers, but rather adopted the "soft uniform" policy in response to community input and to "provide the most welcoming environment possible for the largest number of participants we can."

35.     On May 27, 2022 Aurora Pride representatives held a meeting with defendant Mike Nelson and an APD representative to discuss various details surrounding the planning of the Parade. During that meeting, the City and APD communicated that planning was moving forward in a manner consistent with past Pride Parades and did not indicate any problems with the City's ability to staff the event.

36. Also on May 27, 2022, Mayor Irvin publicly announced that he was "still disheartened and deeply disappointed" and that his "sentiments [were] shared by impacted officers and the command staff of the Aurora Police Department – and many others in our community." He promised to "share the City's plan of action next week."

37. Upon learning of Mayor Irvin's intention to create a "plan of action" to address his disagreement with Aurora Pride, the American Civil Liberties of Illinois sent him a letter explaining that Aurora Pride's decision about police uniforms was part of its message and protected by the First Amendment, and that any retaliation for that message would be unconstitutional. The letter specifically noted that unconstitutional retaliation could include "[r]evoking or altering Aurora Pride's parade permit"; "[r]aising Aurora Pride's expenses, including by increasing . . . security requirements . . . or any other fees and costs"; and any "official act against Aurora Pride . . . that is motivated by disagreement with [its] message."

38. On May 31, 2022, Mayor Irvin made another public statement, reading, in relevant part: "The impacted officers and the command staff of the Aurora Police Department are not in agreement with [Aurora Pride's position], and I stand with our officers. As a result, I will not participate in this year's Aurora Pride Parade, as I did in previous years. Furthermore, I am withdrawing the City of Aurora's float from the parade, and the Pride Flag Raising Ceremony - initially planned to be held in collaboration with Aurora Pride - will now be presented solely by the City."

39. Also on May 31, 2022, Mayor Irvin called the former chair of Indivisible Aurora, Chuck Adams, and asked Adams to convince Aurora Pride to change its request regarding the participating officers. Irvin warned Adams that he understood that the APD officers who were scheduled to provide security for the parade were also upset about Aurora Pride's policy.

9

40.     Also on May 31, 2022, Aurora Pride was notified that the City was calling a meeting for the following day among Aurora Pride, Chief Cross, Mike Nelson, and other City representatives.

41.     During the June 1, 2022 meeting, which included APD Chief Keith Cross and a member of the City Attorney's office (in addition to Office of Community Events personnel and other City officials), the City informed Aurora Pride that it had determined 56 officers were required for the event, and that the Department was short approximately eleven officers. No one explained how APD arrived at the number 56 or why APD had not found the necessary officers.

42.     On information and belief, the City was "short" officers because many had withdrawn from their duties due to the public controversy surrounding Aurora Pride's uniform request.

**IV.     The Defendants Revoke Aurora Pride's Permit Days Before the Parade.**

43.     On or about June 3, 2022, City officials informed Aurora Pride that the Pride Parade – scheduled to occur in nine days – might be canceled.

44.     The City informed Aurora Pride that even more police officers were pulling out of the event, and the City was now 22 officers short of the number it had determined was required. Aurora Pride representatives asked how APD had determined how many officers were needed, but APD representatives refused to provide that information.

45.     APD suggested that Aurora Pride reach out to law enforcement authorities in other jurisdictions to drum up other police officers to make up the shortfall. Aurora Pride asked about retaining private security officers, but APD rejected this suggestion.

46.     Aurora Pride worked diligently to contact police officers from surrounding communities to convince them to stand in for APD officers at the scheduled Pride Parade, despite

the short notice the City provided. Through an intensive and time-consuming outreach campaign, Aurora Pride was able to secure three officers from Highland Park and two from the Kane County Sheriff's office, though these were not nearly enough to make up the supposed shortfall.

47. On June 7, 2022, Mike Nelson sent Aurora Pride a letter on behalf of the City notifying Aurora Pride that the Office of Community Events would revoke the permit for the Pride Parade the following day pursuant to the City Code of Ordinances Section 41.5-180(a)(5). *See* Ex. 2.

48. According to the letter, the revocation was due to Aurora Pride's "fail[ure] to retain the requisite number of law enforcement officers to close the streets, provide for traffic control, and to manage the crowds along the parade route you have designated." The letter also stated that Aurora Pride's "deficiency" constituted a "threat to the public health and safety." *Id.*

49. The letter invited Aurora Pride to "correct [its] violation" by securing an additional 18 police officers by noon the next day. It also notified Aurora Pride that it could appeal the City's decision pursuant to Section 41.5 of the Ordinance and Article 3 of the City Code. *Id.*

50. On the same day, Aurora Pride filed its administrative appeal of the City's decision.

**V.     The Press and the Public React to the Permit Cancellation and the Appeal.**

51. The cancellation of the Pride Parade garnered significant public attention. Multiple local press outlets – which had begun covering the controversy when Mayor Irvin made his series of public statements – reported that the parade was being canceled, leading to an outpouring of community support for the parade and outrage at its cancellation.

52. The City scheduled Aurora Pride's appeal for an administrative hearing on June 9, 2022 – three days before the Pride Parade. Many members of the print and broadcast media attended. Both Aurora Pride and the City appeared at the hearing.

53.     Aurora Pride's president, Gwyn Ciesla, testified at the hearing about the events leading to the City's revocation of the parade permit. Aurora Pride argued, among other things, that the revocation of the permit, and the process outlined in the Special Events Ordinance, gave the Aurora Police Department a "heckler's veto" over the parade's message, thus restricting speech based on content in violation of the First Amendment of the United States Constitution. Aurora Pride's counsel announced that the organization would seek to enforce its constitutional rights in federal court if necessary.

54.     The City called one witness at the hearing: Lieutenant Chris Whitfield, the Aurora Police Department officer assigned to act as "incident commander," meaning he was to be "the officer in charge of the parade essentially from soup to nuts." Chief Cross was apparently on vacation the date of the hearing and unavailable to testify on behalf of APD.

55.     Lieutenant Whitfield testified that the APD had been on track to fully staff the Aurora Pride Parade and that, prior to June 1, 2022, he did not think there would be any staffing problems. During the week before the June 9 hearing, however, he learned that multiple officers who had previously volunteered to staff the parade were withdrawing their commitments.

56.     Lieutenant Whitfield testified that the APD did not have a written protocol for determining the number of officers needed for a special event.

57.     Lieutenant Whitfield further testified that in determining the staffing of the parade, the APD considered that "the Pride Parade obviously is different from other parades due to politicization of the – you know, everything going on with Roe versus Wade that's going on right now, pro-life, pro-choice."

58.     Similarly, the City's counsel argued: "We know from the past parades that among other matters, there have been intense First Amendment expressions by pro-life and pro-choice.

We know the elevated atmosphere we face in the summer of 2022…" Counsel further argued: "There are crazies on both sides of the aisle out there. And the enormity of the risk that inheres in an inadequately policed parade with a lot of people and a lot of views – a lot of viewpoints being expressed is an unacceptable risk."

59. A few hours after the hearing, the Administrative Officer ruled that the City had the authority under the Special Events Ordinance to revoke the permit, ruling that "the practical reality is simply that the Aurora Police Department cannot staff the event to ensure public health and safety, they have the authority under the law to revoke the permit, and the Petitioner's appeal of the revocation of the permit is hereby denied."

60. The hearing officer's decision was based solely on the propriety of the permit revocation under the terms of the Ordinance, and did not take into account any constitutional issues.

## VI. The City Relents, but Inflates Aurora Pride's Parade Costs.

61. Later on the day of the hearing, the City announced that it had secured enough police officers to allow the Pride Parade to go forward. The City reinstated Aurora Pride's parade permit that same day, June 9, 2022.

62. The Aurora Pride Parade occurred on June 12, 2022 as scheduled.

63. It transpired that the City had offered officers "triple time" pay to persuade them to police the parade. The City had not notified or consulted Aurora Pride about this decision.

64. Nonetheless, on June 28, 2022, the City sent Aurora Pride an invoice purporting to saddle the nonprofit entity with responsibility for the increased pay. This brought the total cost for the APD's services for the event to $40,427.93, nearly double the $21,607.44 Defendants originally estimated Aurora Pride would pay for policing.

65.     In addition to this inflated charge, Aurora Pride had to pay for the Highland Park and Kane County law enforcement officers the Defendants forced them to recruit, totaling $2,065.35 and $1,008.00, respectively.

66.     Including the inflated wages and the outside officers, Aurora Pride was ostensibly liable for $43,501.28 for policing alone, which was $21,893.84 more than the policing total the City indicated Aurora Pride would have to pay.

67.     Aurora Pride offered to resolve the issue with a payment based on the originally estimated policing cost in full satisfaction of the invoice.

68.     The City refused Aurora Pride's offer, and the invoice remains pending.

69.     In addition to the invoice for police services, the City issued a separate invoice for other parade-related services, which Aurora Pride has paid in full.

70.     On January 17, 2023, Aurora Pride submitted an application for a special events permit for its 2023 Pride Parade.

**VII.    Aurora's Unconstitutional Special Events Ordinance Enabled the Defendants' Violations of Aurora Pride's First Amendment Rights.**

71.     As explained above, a contingent of Aurora police officers walked away from their commitment to police the 2022 Pride Parade, but the City imposed the consequences for those acts on Aurora Pride. First, Defendants decided that the *officers*' actions constituted a permit violation by *Aurora Pride*. Then, they demanded that Aurora Pride replace those officers, and revoked the parade permit when it could not do so. Although Defendants later "fixed" that problem by offering triple time to the additional officers needed to make up the difference, they purported to do so at Aurora Pride's expense.

72.     The Defendants' actions were unconstitutional because they imposed unreasonable obstacles to Aurora Pride's right to free speech in a public forum. This

unconstitutional conduct stemmed from the Mayor's and the APD officers' disagreement with Aurora Pride's viewpoint, specifically its determination that a unit of uniformed officers marching in the parade with squad cars would send the wrong message.

73. Regardless of the officers' motivations, the incident demonstrated that Aurora's Special Events Ordinance, which requires a City-issued permit for "organized, nonpermanent, public or private gathering or assembly that utilizes public spaces, such as public roads, greenways, city services and public parks or plazas," (*see* Ex. 1 Secs. 41.5-102(a-b); 41.5-110) does not include sufficient safeguards to prevent government actors from taking arbitrary or discriminatory actions, including a "heckler's veto" over free speech and assembly in Aurora's public spaces.

74. **First**, the Ordinance lacks sufficient standards for determining the level and type of city services required for an event and the charge to the applicant for those services.

75. For example, the Ordinance requires that the number of police and other emergency personnel must be "based on guidelines established by each separate department," but provides no standards as to what factors may or may not be considered. Ex. 1 Sec. 41.5-160(c). Nor does it require departmental guidelines to be publicly available, (the APD apparently did not have written departmental guidelines at the time of the 2022 Pride Parade at all), so applicants have no way to know whether decisions are made according to neutral criteria.

76. The Ordinance is also unclear about the kinds of police services to be provided and billed, using words like "police services," "traffic control," "security," "crowd control," and "public safety" inconsistently across various provisions, and without defining any of them. *See, e.g.*, Ex. 1 Secs. 102(h), 111(a)(4), 134(b)(3), 134(c)(2), 134(f)(5), 161(a),(d), 162(a)(8). This

ambiguity masks any content or viewpoint-based factors used in determining the "public safety," "security," or "crowd control" needs of a given event.

77. Even after the number of officers required for the event is determined, "the supervising police officer at or prior to a special event may, at his or her discretion, reduce or increase the number of peace officers posted at a special event." Ex. 1 Sec. 41.5-161(c). The City may then bill the organizer for the additional officers. *Id.* Sec. 114(b)(1),(4).

78. The Ordinance requires applicants to pay the "actual costs" of "the wages or salaries as set by departments for city personnel." Ex. 1 Sec. 114(b)(1). As implemented by the City in 2022, this includes wages that are "set" solely for the purpose of the event itself, based on officers' opinions about the organizer's message.

79. **Second**, the Ordinance fails to ensure that the Defendants provide the City services that it has deemed necessary for an event.

80. The Ordinance provides that "[i]ssuance of a special events permit or the approval of a special event permit application does not obligate or require the city to provide services, equipment, or personnel in support of an event," (Ex. 1 Sec. 114(a)), but does not indicate how or when officials decide to provide (or not provide) services. Nor does the Ordinance distinguish between services that the City considers "necessary" and those that it does not, or between services that can be provided only by the City and those that can be provided by others. Thus, the Ordinance allows Defendants to cancel a parade by deeming a particular City service "necessary" and then declining to provide it.

81. The City does not provide adequate alternatives for speakers when it does not provide the services it has determined to be necessary for an otherwise permitted event.

16

82.     With respect to police services in particular, an event organizer "may hire private security," but only to "supplement the services provided by the Aurora Police Department." Ex. 1 Sec. 161(a).

83.     The Ordinance also limits the functions that may be performed by private security to "personal safety [or] property security," *id.*, neither of which is defined, except that "traffic control" is specifically excluded. Ex. 1 Sec. 161(d).

84.     These limited and confusing provisions aside, Aurora Pride's experience shows that in practice, event organizers are instructed not to rely on private security at all.

85.     Exacerbating these deficiencies, APD appears to have a policy, practice, or procedure of relying on officers to volunteer to work overtime or off-duty for an event; it will not compel officers to work or otherwise assume responsibility for securing actual officer participation in special events. A sufficient number of officers may therefore effectively cancel an event for any reason, including the event's content or viewpoint.

86.     **Third**, the Ordinance allows Defendants to deny or revoke permits for reasons that are not clear, neutral, or narrowly tailored, including for circumstances that are the fault of the Defendants rather than the event organizer.

87.     For example, the Community Events Coordinator "shall deny" an application if the applicant fails to "[p]rovide sufficient crowd control and safety measures," (Ex. 1 Sec. 134(b)(3)), even though neither of these terms are defined, and it is unclear whether anyone other than sworn peace officers may provide these measures.

88.     Similarly, the Community Events Coordinator "may revoke" a permit for noncompliance with the special events permit, even if the alleged failure results from the City's own actions. Ex. 1 Sec. 180(a)(4). Thus, the permit was revoked purportedly because Aurora

Pride did not "provide" sufficient police officers, when it was the officers themselves who declined to work.

89.     The Ordinance also allows revocation of a permit if the "event poses a threat to public health or safety," regardless of the scope, cause, or nature of the threat, even if the alleged threat is the result of Defendants' own actions, as in this case. Ex. 1 Sec. 180(a)(5).

90.     Moreover, the Ordinance fails to provide reasonable alternative means of communication when it believes there are grounds to revoke a permit. That is, the Ordinance does not require officials to consider less speech-restrictive alternatives to cancelling an event that has successfully run the gauntlet of the City's permit requirements. Nor did the Defendants consider such alternatives in this case, although they were certainly available.

91.     In these ways, the Ordinance and Defendants' implementation of it violated Aurora Pride's rights in 2022, and will continue to violate its rights and the rights of other permit applicants without relief from this Court.

## VIII.   Other Parts of the Ordinance have Similar Flaws and Create Similar Problems.

92.     In addition to those described above, Aurora's Special Events Ordinance contains other provisions that fail First Amendment standards for restrictions on speech in a public forum, including content neutrality, narrow tailoring, alternative channels of speech, and clear and definite criteria to guide official discretion. These provisions create unnecessary burdens on permit applicants, promote arbitrary or content-based decision making, and chill a substantial amount of protected speech.

93.     **First,** as discussed above, many of the problems related to the 2022 Pride Parade arose from Defendants' practice of treating their own failures as permit violations by Aurora Pride, obligating Aurora Pride to correct and pay for those failures in order to exercise its rights to free speech and assembly in a public forum. Other Ordinance provisions similarly assign blame and

18

costs to event organizers for matters beyond their responsibility or control, including the unforeseeable acts of others.

94.     For example, the Ordinance allows the City to charge event organizers, without limitation, the "actual cost" of "extra resources that were needed but not originally designated for the special event," and "[a]ny loss or damage to city property," regardless whether the organizers played any role in incurring those costs. Ex. 1 Sec. 41.5-114 (b)(4), (5). Similarly, the Ordinance requires the sponsor to hold harmless and indemnify the City from all liability "result[ing] from the operation or maintenance of the special event," regardless of who or what caused the damages. *Id.* Section 41.5-116.

95.     **Second**, additional provisions open the door to arbitrary decisions, including content or viewpoint discrimination, due to their lack of clear standards or narrow tailoring.

96.     For example, the Ordinance makes room for content-based decisions by allowing waiver of costs when the City co-sponsors an event, because it does not define "co-sponsor" or explain what responsibilities the City assumes when it undertakes co-sponsorship. Further, the Aurora City Council has unfettered discretion to decide when to waive costs for sponsored events. Ex. 1 Sec. 41.5-114(c).

97.     The Ordinance requires applicants to purchase insurance for their event without specifying the type of insurance or standards for setting policy amounts—leaving those questions to the City Law Department. Ex. 1 Sec. 41.5-115(a). The City "may" also require "additional insurance," but the Ordinance does not provide any criteria for imposing such a requirement. *Id.* Sec 41.5-115(b). Further, the policy must, without limitation, include the City as an additional insured, despite the City's immunity from most tort liability.

98. The Ordinance provides that events that receive an "unsatisfactory" post-event evaluation "may" have additional requirements imposed for future events or "may" be denied a permit for future event; but the Ordinance does not explain what the evaluations measure, what may make them "unsatisfactory," or what kind of adverse consequences should apply in which circumstances. *See also* Ex. 1 Secs. 41.5-112(c); Sec 41.5-134(c)(6); Sec 41.5-153(b). Indeed, the Ordinance is unclear about which events will even *receive* an evaluation. *Id.* Sec 41.5-153(a) (requiring evaluations for "the majority of" Tier 1 and Tier 2 events that have "issues" or use "numerous" city resources, without defining any of those terms). Government officials thus retain discretion to scrutinize some events according to impossible standards but give other events a pass on the entire evaluation process.

99. **Third**, the Ordinance imposes burdens on applicants that are unreasonable and not narrowly tailored. For example, the Ordinance requires organizers to submit their applications 30 to 90 days before the event—an unusually long period. Ex. 1 Sec. 41.5-130. It also prohibits any application to be submitted before January 1 of the year of the event, thereby barring any events for the first 30 to 90 days of the year, depending on the event. *Id.* Sec. 41.5-131(c)(2)(e).

100. The Ordinance remains in effect and will subject Aurora Pride and other applicants to considerable uncertainty and unreasonable burdens, financial and otherwise. Moreover because of its overbreadth and lack of clear standards, the Ordinance allows such burdens to be distributed arbitrarily or based on the content or viewpoint of the speech.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983

### VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS BEFORE, DURING, AND AFTER THE 2022 PRIDE PARADE

### (Claim for Damages against City of Aurora)

101. The allegations set forth above are realleged and incorporated by reference as if fully set forth in this paragraph.

102. The Aurora Pride Parade constitutes protected speech and assembly under the First Amendment.

103. Aurora Pride's decision not to include police uniforms, weapons, or vehicles in the 2022 Pride Parade was part of the parade's message.

104. Aurora's Special Events Ordinance governs speech and assembly in Aurora's traditional public forums, such as parks, streets, and sidewalks. Pursuant to the City's policies, including the overbroad and standardless provisions in the Ordinance, the City and its final policymakers required Aurora Pride to find and compensate officers from other jurisdictions, threatened to and did in fact revoke Aurora Pride's parade permit when it failed to do so, and billed Aurora Pride tens of thousands of dollars in additional costs the City incurred without Aurora Pride's consent, all because APD failed to recruit the number of officers that APD itself had set.

105. Due to the lack of clear and definite standards in City policies, including the Ordinance, to constrain official discretion, the City and its final policymakers discriminated against Aurora Pride based on the content and viewpoint of its speech.

106. Due to the lack of clear and definite standards in the Ordinance, the City and its final policymakers were allowed to consider the "controversial" nature of the Pride Parade message in determining police staffing of the event, then revoke Aurora's Pride permit the City and its final policymakers failed to satisfy its own staffing requirements.

107. Due to the lack of clear standards in the Ordinance, the City and its final policymakers allowed police officers to exert a "heckler's veto" over the Pride Parade by refusing to staff an event whose message they disliked.

108. Pursuant to the Ordinance, the City and its final policymakers dramatically raised Aurora Pride's costs by billing Aurora Pride for extra police officer pay after officers declined to work the parade because of its message. The City and its policymakers incurred and assessed these additional costs without notifying Aurora Pride or gaining its consent to incur the extra charge.

109. The City's Ordinance and policies, and the actions taken pursuant to them, violated Aurora Pride's right to freedom of speech and assembly protected by the First Amendment of the U.S. Constitution, as incorporated by the Fourteenth Amendment.

110. The City's unconstitutional Ordinance and policies, and the actions taken pursuant to them, harmed Aurora Pride in at least the following ways: Aurora Pride's expenditure of money, time, and other resources on recruiting and paying outside peace officers and on appealing the revocation of its permit; Aurora Pride's financial uncertainty due to the pending bill for thousands of dollars for APD officers who had previously refused to work; and injury to Aurora Pride's First Amendment rights.

111. Aurora Pride is entitled to damages from the City of Aurora to compensate them for their injuries.

## COUNT II – 42 U.S.C. § 1983

### THE ORDINANCE VIOLATES THE FIRST AMENDMENT OF THE U.S. CONSTITUTION ON ITS FACE AND AS APPLIED TO PLAINTIFF
**(Injunctive Relief against All Defendants)**

112. The allegations set forth above are realleged and incorporated by reference as if fully set forth in this paragraph.

113. Aurora's Special Events Ordinance lacks clear, definite, and content-neutral standards to constrain official discretion to grant, deny, or revoke a permit for speech and assembly in a traditional public forum; to provide or withhold City services and resources; and to bill parade organizers for those services and resources.

114. The Ordinance imposes requirements, restrictions, and costs on permit applicants that are not narrowly tailored to a substantial government interest and do not leave open ample alternative means of communication.

115. The Ordinance imposes responsibility and costs on permit holders for the independent acts and omissions of others who are beyond their control.

116. The Ordinance provides plentiful opportunities for government actors to impose burdens and costs based on the content or viewpoint expressed in a special event.

117. For these reasons, the Ordinance violates the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment, on its face and as applied, and has caused and continues to cause irreparable harm to Aurora Pride and other speakers.

### **JURY TRIAL DEMANDED**

Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiff demands a trial by jury.

23

**PRAYER FOR RELIEF**
**(All Counts)**

Aurora Pride respectfully requests that the Court grant the following relief:

a.  Declaratory relief, including the following relief against the City:

  1.  A declaration that the City unconstitutionally revoked Aurora Pride's permit for the 2022 Pride Parade.

  2.  A declaration that the City imposed unconstitutional restrictions and costs on Aurora Pride's speech.

  3.  A declaration that the City unconstitutionally acted against Aurora Pride based on the content and viewpoint of its speech; and

  4.  A declaration that the Ordinance violates the First Amendment of the United States Constitution on its face and as applied to Aurora Pride.

b.  Preliminary relief against all Defendants enjoining them from enforcing the Ordinance, or, alternatively, from enforcing the Ordinance provisions, policies, and practices that led to cancellation, reinstatement, and financial penalty in 2022 and similarly unconstitutional provisions that will affect Aurora Pride's 2023 permit application;

c.  Permanent injunctive relief against all Defendants, including a permanent injunction enjoining Defendants from enforcing the Ordinance, or, alternatively, from enforcing the Ordinance provisions, policies, and practices that led to cancellation, reinstatement, and financial penalty in 2022 and similarly unconstitutional provisions that will affect Aurora Pride's future permit applications;

24

d.  Compensatory and nominal damages (as against the City only), including for violating Aurora Pride's constitutional rights;

e.  Pre-judgment and post-judgment interest (as against the City only);

f.  Costs and expenses, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 (as against the City only); and

g.  Any other relief the Court deems just and proper.

DATED: January 17, 2023                    Respectfully submitted,

/s/  *Theodore R. Scarborough*
Rebecca K. Glenberg
Kevin M. Fee, Jr.
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
rglenberg@aclu-il.org
kfee@aclu-il.org

Theodore R. Scarborough
tscarborough@sidley.com
Eric S. Mattson
emattson@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Phone: 312.853.7000
Facsimile: 312.853.7036

.

**VERIFICATION**

I, Gwyn Ciesla, on behalf of Aurora Pride, have read the foregoing Verified Complaint, and under penalty of perjury, state that the facts alleged in the above instrument are true and correct to the best of my knowledge and recollection.

Date: January 17, 2023                 _____

                                        Gwyn Ciesla, on behalf of Aurora Pride