### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF
### ILLINOIS EASTERN DIVISION

| | |
|---|---|
| AURORA PRIDE, )<br>)<br>    Plaintiff, )<br>)<br>  v. )<br>)<br>CITY OF AURORA; KEITH CROSS, in )<br>his official capacity as Chief of the )<br>Aurora Police Department; and MIKE )<br>NELSON, in his official capacity as )<br>Aurora Community Events Coordinator, )<br>)<br>    Defendants. ) | Case No. 1:23-cv-00259<br><br>Honorable Judge Martha T. Pacold |

### **STATUS REPORT BY DEFENDANTS, CITY OF AURORA, ET AL.**

#### Introduction

Since August 2022, legal representatives for the City have been meeting with attorneys representing Aurora Pride, including those from the American Civil Liberties Union (ACLU), to review what occurred at the June 2022 Pride Parade and respond to concerns expressed regarding the City's special events ordinance (more simply, the "Ordinance"), as well as the invoice the City delivered to Aurora Pride following the parade. The attorneys agreed that the substance of these discussions were covered under FRE 408(a)(2), and that the City would take no action to collect any outstanding amounts owed by Aurora Pride with respect to the parade, including amounts that were not in dispute.

As part of these discussions, the City furnished Aurora Pride's attorneys with data regarding its calculation of police costs. In October, the ACLU offered commentary on the City's existing Ordinance and identified areas it believed created constitutional problems.

The two teams again met the week following Thanksgiving. During that meeting, Aurora

Pride's attorneys stated that they expected the City to amend the Ordinance to address their concerns before the end of the year because their client was concerned about applying for a permit (as it had done successfully on each prior occasion) under what it now viewed to be an unconstitutional ordinance. The City's attorneys explained that the proposed deadline was unrealistic given that neither side had yet drafted specific amendatory language, and even if language existed, the city council's legislative process ordinarily requires a month to complete and its schedule for December was abbreviated due to the holidays and devoted to matters related to adoption of the annual budget. Nevertheless, the City's representatives, despite numerous competing obligations, agreed to prepare and provide Aurora Pride with a draft ordinance by mid December with the goal of introduction in early January.

On December 21, 2022, the City provided the ACLU with a complete draft of an amendment to the Ordinance. The proposed amendment clarified several of the City's special event processes and was designed to address the constitutional concerns the ACLU perceived with the Ordinance. While the amendment did not contain language compelling the participation of off-duty employees to staff special events, it did provide for additional options, short of total cancellation, when an event host is unable to retain sufficient personnel to staff an event of its desired size and scope. The amendment maintained a balance between the rights of those wishing to host a special event and the limits on the City's ability to adequately staff them, including, but not limited to the Pride Parade. The draft was accompanied by a memorandum that requested the ACLU's commentary and proposed dates to reconvene after the first of the year.

On January 3, 2023, the Aurora City Council's Rules, Administration and Procedures Committee reviewed and recommended approval of several amendments to the Ordinance. These amendments were nearly identical to the draft shared with the ACLU nearly two weeks earlier

with some limited refinements. One of the committee members requested slight adjustments to the proposed amendment, but the committee agreed to advance the proposal to the city council's committee of the whole meeting scheduled for January 17, following the city council's ordinary legislative process. The committee also asked staff to provide an update on these requested changes at its next meeting on January 17.

On Friday, January 6, the ACLU requested a meeting with the City's attorneys and proposed dates early the following week. On Wednesday, January 11, the attorneys again met.

Having not previously responded to the City's December 21 draft in any manner, the ACLU legal team used the January 11 meeting to state the amendments were insufficient and were, in effect, counterproductive. During this final session, the ACLU's attorneys said <u>not one word</u> about its preparation and imminent filing of what this Court can see is a massive multi-pronged attack on the Ordinance, including a 117 paragraph complaint, a motion for preliminary injunction, and a motion to file an over-sized brief. The City received notice of the suit via e-mail late in the afternoon of January 17.

In preliminary discussions held between the parties' respective counsel, counsel for Plaintiff stated Plaintiff's position that this case presents purely questions of law, and Plaintiff would be requesting a briefing schedule on the preliminary injunction motion which would be complete by the end of February so this Court would have time to issue a ruling.

With respect, the City adamantly disagrees with this approach. What occurred in 2022 in relation to Pride is an extremely fact-sensitive matter requiring full explication to the Court. To defend itself in this case, the City is entitled to both document production and depositions prior to any hearing on a motion for preliminary injunction. The City does not believe this matter can be decided just "on the papers."

The City therefore provides the Court this status report, not as evidence, but in the nature of an opening statement, advising the Court as to what we expect the evidence to show as to what happened in 2022, and why the Ordinance is a content-neutral, reasonable time, place, and manner regulation.

In addition, we will outline what we expect the evidence to show in terms of the planning for the Aurora Pride's proposed 2023 parade. Indeed, Pride has just applied for its 2023 Parade permit and the City's special events division is processing that application. This matter is not ripe for adjudication on Pride's as-applied injunctive claim.

## Background

Aurora Pride, originally part of an organization called "Indivisible Aurora" hosted its first Pride Parade in June of 2018. A second parade followed in 2019 before COVID-19 suspended most special events in 2020 and 2021. The City, its residents, and its downtown businesses were looking forward to the return of the Pride Parade in 2022.

In accordance with the Ordinance, the City and Aurora Pride representatives began planning for the 2022 Parade in late January, 2022. This is no small event. The parade route spanned nearly a half mile through dense downtown Aurora. As planned, the 2022 Parade anticipated the inclusion of 54 units accounting for approximately 2,000 individuals participating in the parade, including many marchers with floats. Aurora Pride estimates that there were somewhere between 6,000 – 7,000 people in attendance. To give the Court a sense of the size of this undertaking, we invite the Court to visit the Aurora Pride Facebook page and see the video of the event.

**Exhibit 1** to this status report is the City's running communication narrative with Aurora Pride relative to the 2022 Parade in accordance with the Ordinance. This narrative shows the

extraordinary efforts the City took to accommodate this event. These efforts ran the gamut – providing security, street closures, barricades, police intelligence, port-a-potties, mobile stage placement, and designated parking facilities. The list goes on.

### The Challenges Associated with a Large-Scale Parade in 2022 and 2023

An event of this magnitude also presents extraordinary challenges to the host municipality. The June 2022 event occurred just six months after the attack on a Christmas Parade in Waukesha, which involved vehicle breaking through barricades, and less than a month before the attack on Highland Park's 4th of July parade, perpetrated by a shooter armed with a firearm prohibited by local ordinance.

A municipality has the right and obligation to control a major event like this based on many risk management factors, including whether it has a sufficient number of police officers and other employees available to protect both the participants and non-participants from all sorts of hazards. *MacDonald v. City of Chicago*, 243 F.3d 1021,1024, 1027-28 (7th Cir. 2001).

A municipality may also "recoup the extraordinary expenses borne by its police department in the course of facilitating private public assemblies." *Yate v. Norwood*, 841 F.Supp.2d 934, 937 (E.D. Va. 2012). In addition, a municipality can require a large-scale event sponsor to provide insurance, provided the cost of that insurance is based on matters such as the size of the event, and the nature of facilities involved such as stages, tents, and the like. *Thomas v. Chicago Park District*, 227 F.3d 921 (7th Cir. 2000) aff'd, 534 U.S. 316 (2002).

### The Unexpected Series of Events on the Eve of the Parade

**A.  The No-Uniform Decision and the Withdrawal of Police Officer Volunteers.**

With that background, we turn to the events shortly preceding the 2022 Pride Parade. As it had done in previous years, the City planned to staff the parade with a combination of on-duty

officers and volunteers. Many officers were assigned various responsibilities along the parade route. These officers were "controlled" by the City, meaning they were on duty and assigned to work the parade. Beyond these officers, the City communicated to Aurora Pride, and Aurora Pride understood, that additional volunteers would be required to safely staff the event, including off-duty police officers, signed up to work the event at their overtime rate.

Within Aurora's Police Department is a relatively large and cohesive group of officers who are members of the gay and lesbian community. In fact, the Police Department has taken significant efforts to highlight this aspect of diversity among its ranks. As they had in past years, some of these officers wished to participate in the parade by marching in full police uniform.

Exercising their rights under *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 555 U.S. 577 (1995), the Pride organizers told these officers that they could march in the parade, but <u>not</u> in their police uniforms. This about-face was not communicated until about May 25, 2022, just two and a half weeks before the parade.

A short time later, a number of the off-duty Aurora police officers who had previously volunteered for this assignment canceled their volunteer participation. For purposes of this initial submission to the Court, we can assume that at least some of these volunteer officers chose not to participate in response to what they considered to be an insult ("We're good enough to protect you, but not good enough to march with you in uniform?") or did so in solidarity with other officers.

This decision was made by individuals exercising their own First Amendment rights. These were not actions ordered or encouraged by the City. There was no action taken by the City under color of law, and therefore, no action was taken by the City government against Pride based on content.

### B. The City's Response to This Unanticipated Challenge.

This sudden loss of volunteer security staff presented an unprecedented and imposing challenge. Without these volunteers, there was insufficient manpower to adequately and safely protect the event. A scramble for volunteers from other police departments ensued.

When it became clear that this effort would not be successful, and with less than a week remaining before the parade, the City revoked the parade permit and promptly scheduled and convened a due process hearing required under the Ordinance, so that Aurora Pride could contest the revocation. This hearing was held on June 9, 2022, just three days before the event. Attached to this submission as **Exhibit 2** is a transcript of the proceedings. The hearing officer upheld the revocation by way of a written order. **Exhibit 3.**

But the City didn't rest there. The City wanted the event to proceed. So later in the day on June 9, Chief of Police Keith Cross (who now finds himself a named defendant in this case), convened a meeting with the leaders of the two police unions to tackle the question: "What can we do to get this parade adequately staffed?"

At the conclusion of this meeting, and facing the very real prospect of third parties attempting to conduct an unpermitted parade, the City accepted the necessity of ensuring the parade occurred safely, and made the difficult decision to offer officers an unprecedented triple-time incentive (instead of the typical time-and-a-half overtime pay) if they would work the event. The City communicated this decision to Aurora Pride, including the method by which the City was attempting to secure participation.

Fortunately, this approach worked. Enough City officers committed to the event at the triple-time rate. The parade proceeded as scheduled the following Sunday due to these efforts of the City to save the event. See **Exhibit 4** news article.

7

A disagreement then developed between the parties as to who should pay for the additional extraordinary police cost. Aurora Pride had previously agreed to pay the anticipated police costs but refused to pay the additional time and a half increment. Aurora Pride tendered a check to the City for the amount it believed it owed, but only on the basis that the City accept it as full satisfaction of Aurora Pride's obligations. Though it declined to accept the check under Aurora Pride's terms, the City agreed to put the matter on hold while the parties were discussing the Ordinance. While the check remains uncashed in the custody of the City's Finance Department, the dispute responsibility for this extra cost is not a matter of constitutional dimension.

### City Scheduling Proposal

This entire course of action indicates the exact opposite of what Plaintiff is portraying in this lawsuit and demonstrates a need for fact development. The City has the right to elicit all of these facts and more in defense of its Ordinance and in response to the motion for preliminary injunction. This is not a "law only" case.

Accordingly, the City proposes the following schedule in response to the complaint and motion for preliminary injunction:

    A.    Answer to the complaint and preliminary injunction motion due in 21 days.

    B.    Written discovery to issue by the parties in 10 days. Responses to such written discovery due 21 days after issuance.

    C.    Oral discovery to be completed within 30 days after written discovery due date.

    D.    Court to set the matter down for hearing after completion of oral discovery.

### There is No Emergency, and the Pride Injunctive Claim is Not Ripe

There is a final important threshold issue as to Aurora Pride's as-applied challenge – ripeness. Aurora Pride has just applied for its 2023 Parade permit. It is being processed as in prior

years. As the process moves forward, the parties will work through the logistical issues of size of the event, street closures, number of floats, entertainment, barricades, – and yes – the potential need for extra security in light of Waukesha and Highland Park. At that point, in accordance with the Ordinance, the City will once again determine how many officers are needed to adequately protect the event based on size and scope and then determine how many officers it has available to work this event, keeping in mind that the City has 200,000 other people to serve and protect during the parade. If there is a shortage and volunteers are needed, Aurora Pride will have ample time to either obtain volunteers on its own, or perhaps the event would need to be scaled back a bit. The Court would need these facts before determining anything relative to a potential First Amendment violation.

      For all of these reasons, the City respectfully submits that the Court enter the schedule as proposed by the City.

      Respectfully submitted,

      CITY OF AURORA, et al., Defendants

      By: /s/John B. Murphey
          Their Attorney

John B. Murphey
Odelson, Sterk, Murphey, Frazier & McGrath, Ltd.
3318 W. 95th Street
Evergreen Park, Illinois 60805
708-424-5678
jmurphey@osmfm.com

**CERTIFICATE OF SERVICE**

       I, John B. Murphey, an attorney, hereby certify that I served the foregoing **Status Report by Defendants, City of Aurora, et al.,** on all parties of record through the Court's CM/ECF filing system on January 23, 2023, which will send notification of said filing to all parties of record.

                                                                                /s/John B. Murphey

John B. Murphey
Odelson, Sterk, Murphey, Frazier & McGrath, Ltd.
Attorneys for Defendants
3318 West 95th Street
Evergreen Park, Illinois 60805
Tel. 708-424-5678
jmurphey@osmfm.com