## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AURORA PRIDE,

        Plaintiff,

        v.

CITY OF AURORA; KEITH CROSS, in
his official capacity as Chief of the
Aurora Police Department; and MIKE
NELSON, in his official capacity as
Aurora Community Events
Coordinator,

        Defendants.

Case No. 23-cv-00259

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

Aurora Pride has moved for a preliminary injunction challenging certain provisions of the City of Aurora's special events ordinance. [31]. The motion for preliminary injunction is granted in part and denied in part. A separate preliminary injunction order will be entered simultaneously.

## BACKGROUND

Aurora Pride's lawsuit concerns both past and ongoing events. In part, the lawsuit concerns the 2022 Aurora Pride Parade. In 2022, the city temporarily revoked Aurora Pride's permit and charged Aurora Pride certain police overtime costs, for which Aurora Pride seeks damages and declaratory relief. In part, the lawsuit challenges the ongoing application of certain provisions of Aurora's special events ordinance. The ordinance establishes special event permit application requirements. Aurora Pride has applied for a permit for a June 11, 2023 Pride Parade. The lawsuit seeks preliminary and permanent injunctions against the application of various provisions of the ordinance. This decision addresses only the request for a preliminary injunction.

The special events ordinance is Chapter 41.5 of the Aurora Code of Ordinances. The ordinance defines "special event" (as relevant) as "an organized, nonpermanent, public or private gathering that utilizes public spaces, such as public roads, greenways, city services and public parks or plazas." Aurora Code of

Ordinances § 41.5-102(bb).[1]  Special events include events of a variety of sizes and types.  They include parades but also include (for example) festivals, races, carnivals, musical events, and film production.  They "range from small neighborhood-level events to large-scale productions."  § 41.5-100(a).

Aurora amended its special events ordinance on January 24, 2023.  Thus, the current ordinance (also called the 2023 ordinance or the amended ordinance), which applies to the pending 2023 permit application, differs from the prior version of the ordinance, which applied to the 2022 parade.  The preliminary injunction motion concerns only the current (2023) ordinance.  The background discussion below provides an overview of the salient provisions of the current ordinance.

Nonetheless, the 2022 parade provides context for the preliminary injunction motion and some of the terms of and amendments to the 2023 ordinance.  Thus, the background discussion begins by addressing the 2022 parade.

The parties conducted expedited discovery in preparation for the preliminary injunction hearing.  But full discovery has not yet been conducted.  The background discussion below thus does not preclude the parties from further factual development during merits discovery.

## I.  The 2022 Parade

In January 2022, Aurora Pride applied for a permit to conduct its 2022 Pride Parade.  Stipulated Facts, [38] ¶ 11.[2]  The last Pride Parade had been held in 2019; Aurora Pride did not conduct parades in 2020 or 2021 due to covid.  Aurora Pride's 2022 application contemplated that the parade would include 54 marching "units" (including various organizations and businesses) and an approximate total of 2,000 individual participants.  *Id.* ¶¶ 5, 15.

---

[1] Unless otherwise noted, citations to "§ 41.5-___" refer to the current ordinance: Ordinance No. 023-004, amending Ch. 41.5 of the Code of Ordinances pertaining to Special Events, dated January 24, 2023.  Ordinance No. 023-004 is attached to this opinion as an appendix. It is the complete version of Chapter 41.5 passed on January 24, 2023.  It shows the changes made in the January 24, 2023 amendments by striking through deleted language and underlining added language.  The court has identified some discrepancies in the numbering of provisions between this version of Chapter 41.5 (Ordinance No. 023-004) and the online version available at https://aurora-il.municipalcodeonline.com.  However, the City's online Code of Ordinances clearly indicates that Chapter 41.5 was amended by Ordinance No. 023-004 and includes a link to the copy of Ordinance No. 023-004 attached as an appendix.  The court therefore treats the language from Ordinance No. 023-004 as the controlling version of Chapter 41.5, consistent with the parties' practice in this case.  *See* [28-2]; [47-6]; [57-2].

[2] Bracketed numbers refer to docket entries and are followed by page and/or paragraph numbers.  Page numbers refer to the CM/ECF page number.

The city's then-operative special events ordinance required permittees to pay for the cost of the city services required for their events, including the cost of city personnel to work the event. *See* Prior Special Events Ordinance, § 41.5-114, [28-1]. The city personnel costs included the cost of paying off-duty police officers to work the event.

The Aurora Police Department determined that the 2022 Pride Parade required 55 police officers to be held safely. [38] ¶ 16. Consistent with historical practice in Aurora, the parties expected that the officers required to staff the Pride Parade would come entirely from officers who otherwise would have been off-duty volunteering to take overtime shifts. *Id.* ¶¶ 9, 16. The officers would volunteer to take the overtime shifts in the sense that they would voluntarily sign up for the overtime shifts. That is, the overtime would be voluntary rather than mandatory. But they would be paid at an overtime hour-and-a-half rate. *See* Cross Aff., [39-1] ¶ 4 ("Volunteers who work overtime are paid at the hour-and-a-half rate"). In April 2022, Aurora Pride paid a deposit of $5,401.86, which the city estimated would be 25% of the cost of paying the off-duty officers required for the parade (implying that the total estimated cost was $21,607.44). Ciesla Decl., [42-1] ¶ 5.

On April 19, 2022, the Aurora Police Department's LGBTQ+ liaison, Lee Catavu, sent an email to Aurora Pride regarding plans for Aurora police officers to march in the parade. *Id.* ¶ 19; [61-4]. These officers would be participants, distinct from the officers staffing the event. Responding a week later, Aurora Pride told Catavu that the group of officers were welcome to march in the parade, but Aurora Pride asked that the officers "participate out of uniform and without official vehicles." [42-1] ¶ 20; [61-4]. Catavu responded on April 30, 2022, expressing that the officers wished to participate in uniform to communicate the community's and police department's commitment to diversity. Catavu further explained that the officers found Aurora Pride's request insulting, and Catavu urged Aurora Pride to reconsider its position. [61-4]. Aurora Pride responded further on May 2, 2022, explaining the reasons for its decision and encouraging the police unit to participate. *Id.*

The city issued the permit on May 3, 2022. *Id.* ¶ 11. The city approved a parade route through downtown Aurora, similar to the route for the 2019 parade. [38] ¶ 12.

On May 20, 2022, a state senator emailed Aurora Pride to express disagreement with its choice to request that officers march out of uniform and without official vehicles. Stipulated Facts, [38] ¶ 21. Between May 25 and May 31, the mayor of Aurora sent a letter to Aurora Pride and made two public statements expressing disagreement with the decision regarding the marching officers. *Id.* ¶¶ 24–27; [61-9] at 1. News outlets, including the Chicago Tribune, reported on the controversy. *Id.* ¶¶ 22–27.

Amid the controversy, Aurora police officers who had previously volunteered to work the Pride Parade (i.e., signed up to work overtime shifts) withdrew their participation, causing a shortfall in the number of officers working the parade and ultimately leading the city to revoke Aurora Pride's parade permit.

Specifically: On May 31, 2022, Sgt. Hillgoth, the operations supervisor for the 2022 parade, was notified that five officers who had previously signed up for the overtime assignment had withdrawn their acceptance of the assignment.  *Id.* ¶ 28.  The next day, Sgt. Hillgoth was notified that twelve officers were withdrawing their participation.  *Id.* ¶ 29.  Sgt. Hillgoth stated that the officers who withdrew from working the parade collectively indicated that their unwillingness to work was to support the officers who wanted to participate in the parade by marching in full uniform.  Hillgoth Dep. Tr., [61-38] at 11:13–14:12.

After those withdrawals, the Aurora Police Department determined that the parade could not be held safely because an insufficient number of volunteer officers had committed to staffing it.  Stipulated Facts, [38] ¶ 30.  On June 8, 2022, Defendant Mike Nelson—the city's Community Events Manager (or "coordinator" as used in the amended ordinance)—provided Aurora Pride with written notice of the proposed revocation of its parade permit.  *Id.* ¶ 31.  Aurora Pride requested an administrative hearing to appeal the revocation, and an administrative hearing officer held the hearing on June 9.  *Id.* ¶¶ 32–33.  In a written order issued that day, the hearing officer upheld the city's revocation of the 2022 parade permit.  *Id.*

However, later the same day, June 9, the Aurora Police Department offered a one-time, non-precedential, triple-time incentive to officers to volunteer to staff the parade.  *Id.* ¶ 34.  Enough officers volunteered, and the parade proceeded as scheduled three days later, on June 12, 2022.  *Id.* ¶ 35.

After the parade, on July 28, 2022, the city sent an invoice to Aurora Pride for $35,026.07 for off-duty police services for the parade, including the triple-time paid to officers.  *Id.* ¶ 37; [61-13].  Aurora Pride disputes the portion of these charges attributable to the triple-time incentive.  (The court infers that the portion of the charges attributable to the triple-time incentive is $13,418.63.)[3]  Aurora Pride sent a letter to the city explaining its objection and enclosed, as "full satisfaction," a check for 75% of the city's original estimate for off-duty police services (because the $5,401.86 deposit that Aurora Pride had already paid was 25% of the city's original

---

[3] This number is the difference between the city's original estimate of off-duty police costs (without the incentives) and the amount the city ultimately billed Aurora Pride (with the incentives).  *See* [61-3] (25% of estimated off-duty police costs before the parade, without the incentives, was $5,401.86, so total estimated off-duty police costs would have been $21,607.44); [61-13] (off-duty police costs after the parade, including the incentives, was $35,026.07).

estimate for off-duty police services). [61-14]. The city has not cashed the check. *See* [42-1] ¶ 24. Other than sending the invoice, the city has not otherwise attempted to collect the invoiced amount or the portion attributable to the triple-time incentive. [38] ¶ 37.

## II.    The 2023 Parade Application and Lawsuit

On January 17, 2023, Aurora Pride filed with the city its application for a permit for a 2023 Pride Parade to take place on June 11, 2023 and simultaneously filed this lawsuit, asserting that the Aurora special events ordinance violates the First Amendment. The complaint sought damages, declaratory relief, and injunctive relief. [1]. Aurora Pride also moved for a preliminary injunction, [7], seeking to enjoin "all defendants and any of their agents, officers, or employees from applying any of the unconstitutional permitting requirements" of the ordinance to Aurora Pride or other applicants for permits to conduct special events in Aurora.

On January 24, 2023, the city amended the special events ordinance. *See* [47-6]. In light of the revised ordinance, Aurora Pride filed an amended complaint on February 8, 2023, [28], and an amended motion for a preliminary injunction on February 9, 2023. [31]. The parties conducted limited expedited discovery in preparation for a preliminary injunction hearing, which the court held on March 28, 2023. [55]. The parties filed posthearing briefs and exhibits. [57]–[59]; [61].

## III.    Voluntary Overtime

The city and the Aurora patrol officers' union have a collective bargaining agreement. Cross Aff., [39-1] ¶ 3. Subject to limited circumstances specified in the collective bargaining agreement that do not apply here (such as holding over an entire shift for unforeseen circumstances such as natural disasters), the Aurora Police Department has never mandated overtime. [39-1] ¶¶ 4, 7–8. Overtime is for the most part voluntary rather than mandatory.

The city contends that it has the management right to order officers to work overtime assignments; but the union disagrees and has successfully opposed the city's proposed amendments to the collective bargaining agreement recognizing mandatory overtime (i.e., specifying that the city has the right to require officers to work overtime shifts and officers cannot refuse such overtime assignments). [39-1] ¶¶ 9–11.

The Aurora Police Department has experienced staffing challenges, even for regular (non-overtime) shifts. The Chief of Police explained: "In the first half of 2022, there were approximately 286 officers employed by the Aurora Police Department (24 less than our authorized strength of 310), including approximately

220 patrol officers, with the other spots filled by the supervisory ranks." [39-1] ¶ 6. "The City has 3 patrol areas which are broken up into districts. Optimum staffing to cover all 3 areas during a dayshift is 25 officers. Given staffing challenges, at times we have fallen below these minimum manpower requirements." [39-1] ¶ 13. Further, the officers assigned to the downtown area, where the 2022 parade took place, "are responsible for patrol coverage of that area and are not available to work a special event such as a parade." [39-1] ¶ 14.

As to overtime assignments (which, again, are for the most part voluntary rather than mandatory): The Chief of Police explained that in recent years, the police department "has experienced difficulty in getting enough volunteers to work overtime assignments." [39-1] ¶ 5. "On many occasions in 2020 to the present, the lack of volunteer sign-up for available overtime has resulted in the Department staffing the streets with less than ideal manpower." [39-1] ¶ 5. In addition:

> The City has had problems obtaining enough volunteers to work other special events. Because of this staffing shortage, the City had to curtail the size and scope of its annual [2022] Fourth of July Parade. Instead of having a traditional parade, the City had to alter its normal celebration to a procession because of several factors, including staffing. Of the six positions that were required to police the event, we were only able to hire five people to work.

[39-1] ¶ 20. The Chief of Police explained that due to a lack of officers voluntarily signing up to work, "we had to completely pivot our plans from a traditional parade and take it to a small vehicular procession throughout the town, which included tons of pivoting, tons of last-minute work, but we were able to do it. And it was a great example of our staffing shortage." Hr'g Tr., [56] at 139:7–18.

A summary table shows that for calendar year 2022, 1,731 voluntary overtime jobs were filled but 669 jobs were unfilled. [39-1] at 15.

The Chief of Police testified credibly that "it's becoming increasingly more difficult to get officers to work just regular overtime on the street, as well as special events. I think that – personally, I think it's a change in mindset where officers just value their time more now than money." [56] at 110:3–25.

## IV. The 2023 Amended Ordinance

The preliminary injunction motion challenges four aspects of the 2023 amended ordinance: (1) that the existence, scope, or cost of an event turns on the

discretion of off-duty officers voluntarily signing up for overtime to staff the event, (2) that costs due to listeners' reactions ("heckler's veto" costs) may be passed on to the permittee, (3) that the ordinance affords the city undue discretion in requiring additional insurance (beyond a fixed amount based on the tier), and (4) that the ordinance requires a permit applicant to indemnify the city for liability caused by actions beyond the applicant's control.

Various provisions throughout the ordinance address these issues. Below is an overview of the ordinance to provide context for and highlight the relevant provisions. Many of the provisions of the ordinance discussed here predate the 2023 amendments, although the city added or amended some of the provisions in 2023. The court has identified the specific provisions Aurora Pride challenges based on Aurora Pride's proposed injunction order, [57-1], and the highlighted copy of the 2023 amended ordinance in the record showing the portions of the ordinance Aurora Pride challenges, [57-2]. Provisions that Aurora Pride challenges are in *italics*, while provisions that are useful for context but that Aurora Pride does not challenge are <u>underlined</u>.

### A.    City Council Findings

The city council's findings at the beginning of the ordinance recognize both the value of special events and the city's responsibilities to ensure public safety and to manage competing uses of public spaces to ensure access for all. The findings also explain that a unified permit application process will streamline the application process by providing a single point of contact (the special events division) for organizers:

(a) The city council finds that the city's festivals, races, parades, and other special events contribute to the unique character of the city. Special events throughout the city range from small neighborhood-level events to large-scale productions and these events held in the city can impact public safety and the flow of pedestrian and vehicular traffic. As such, allowing a special event permit application, would allow public safety personnel the ability to plan and manage public safety personnel and resources.

(b) A unified special event permit application process will allow the city to manage the competing uses of its public spaces and ensure that members of the public are able to access public space for their events. The city council finds that it is desirable to allow applicants to submit a single application that will embrace all municipal approvals required by this code and allow the special events division to serve as a "one stop shop" for special events that will provide a single point of contact for event organizers and the public.

§ 41.5-100(a)–(b).

### B.   Permit Requirement

With exceptions not relevant here (governmental events, spontaneous events, and other events specified in the ordinance), the ordinance requires a special event permit to conduct a special event.  § 41.5-110; *see also* §§ 41.5-112(a), 41.5-151.

As conditions of a permit, the permittee must, among other things, be present at all times during the special event, provide the coordinator with contact information for an individual who is responsible for set-up and take-down of the special event; ensure compliance with all applicable ordinances, statutes, rules, laws, and the special event permit; provide an emergency operations plan as outlined in the ordinance; and attend any required meetings with city personnel. § 41.5-112(d).

### C.   Tiers

#### 1.   Tier system

The ordinance categorizes special events "by a tier system . . . ."  § 45-102(bb). There are six tiers of special events.  § 41.5-111.  Generally, the tiers range from the largest and most logistically complex events (tier 1) to the smallest and logistically simplest events (tier 6, which as discussed below was added in the 2023 amendments).  A tier 1 event, for example, is defined as follows:

> (b) A tier 1 event is a special event that:
>> (1) Is a special event that includes the use of City streets, sidewalks, or right-of-ways; or
>> (2) Is a multi-day event; or
>> (3) Is a special event that estimates more than one thousand (1,000) attendees per day; or
>> (4) Has an estimated need, based on its permit application, for additional city services, staff time, security or police services and equipment; or
>> (5) Is a special event that will use fireworks.

§ 41.5-111(b).  Examples of tier 1 events include musical events, private parades, carnivals, circuses, and large runs.  § 41.5-111(b)(7).

The ordinance's definition section defines "[p]arade" as "an activity consisting of persons, animals, vehicles or things, or any combination thereof, upon any public street, sidewalk, alley or other public place, which requires a street closing or otherwise requires authorized city employees to stop or reroute vehicular traffic because the parade will not or cannot comply with normal and usual traffic regulation or controls." § 41.5-102(t).

There is no dispute that the 2023 Pride Parade, based on the route for which Aurora Pride applied, would be a tier 1 event. *See* [52] at 5; [34] at 21.

The other tiers are defined by similar types of criteria. Examples of tier 2 events include smaller musical events, smaller parades, and larger run/walks. § 41.5-111(c)(4).

### 2. New tier 6

The 2023 amendments added a new tier, tier 6. Tier 6 events are the smallest and logistically simplest type of event. They provide a backstop when a larger event is unavailable.

To walk through the relevant provisions, the findings at the beginning of the ordinance explain:

> (c) The city council finds that certain classes of special events, specifically processions and assemblies as described in this ordinance, require substantially less involvement by city staff, require fewer volunteers to adequately support the event while providing adequate alternative fora for other expressions of speech. The city council further finds that such alternative fora provide a more accessible and affordable means of permitting special events that do not require the formality of larger, more complex special events.

§ 41.5-100(c).

A tier 6 event is defined as follows:

> A tier 6 event is an assembly or procession, as those terms are defined by this chapter, that requires only basic city support services and does not contemplate the need for traffic control or is not anticipated to interfere with the normal use of public property upon which it occurs. . . . As used in this paragraph, "basic city support services" means city services provided through previously scheduled and available personnel

9

and resources or such additional personnel and resources as may be required to protect the event and persons attending from disruption or interference.

§ 41.5-111(g).

The tier 6 definition references "assembly or procession, as those terms are defined by this chapter." Turning to those definitions:

"Assembly" is defined as "a gathering of one or more persons on a sidewalk or city property, other than a right-of-way by the city that does not interfere with the regular use of such sidewalk or park property, including pedestrian or vehicular traffic." § 41.5-102(hh).

"Procession" is defined as "a movement of persons in an orderly, formal manner, other than a parade, from a point of origin to a point of termination on a sidewalk, that does not impede the normal flow or regulation of pedestrian or vehicular traffic." § 41.5-102(ff).

The provisions above indicate that tier 6 events rely on "city services provided through previously scheduled and available personnel," § 41.5-111(g), as well as "require substantially less involvement by city staff, [and] require fewer volunteers to adequately support the event," § 41.5-100(c). That is, tier 6 events generally can proceed with regularly scheduled city personnel and generally do not require voluntary overtime staffing.

The ordinance makes tier 6 events widely available, requiring issuance of a tier 6 permit except in limited circumstances:

(e) Tier 6 site time, date, and location determinations:

(1) The coordinator shall annually prepare a list of sites that he or she determines are generally appropriate for tier 6 events, the dates and times that each site is typically available and not otherwise in use for public purposes, and the capacity of each site.

(2) The coordinator shall issue a permit for a tier 6 event at the date, time, and location requested by the applicant unless the coordinator has previously issued a special event permit that conflicts with the pending application or the site is not otherwise available on the date or time requested or the police department determines that it is unable to provide a sufficient number of officers to protect the event and its attendees from disruption or interference due to circumstances specific to the particular time,

10

date or site requested. The coordinator or the police department, as the case may be, shall provide the applicant with a factual basis for their determination in writing.

(3) Whenever a permit cannot be issued in accordance with paragraph (2) above, the coordinator or the police department, as the case may be, shall make reasonable efforts to assist the applicant in scheduling its proposed event at an alternate time, date, or location as consistent with its initial application as practicable.

§ 41.5-112(e) (emphasis added).

Other provisions reflect that under the terms of the ordinance, a tier 6 event is a backstop if other tiers are unavailable. For example, as discussed below, in lieu of denying an application for a special event permit (other than a tier 6 event) to an otherwise qualified applicant who has failed to demonstrate that it is able to comply with the requirements of the ordinance, the coordinator must, upon the request of the applicant, issue the applicant a permit authorizing a tier 6 event. And, as discussed below, if the coordinator issues a notice of intent to revoke an existing permit, the notice must afford the permittee the opportunity to request that the coordinator cancel the existing permit and issue a permit for a tier 6 event.

### D. Permit Applications

#### 1. Requirements and process

The ordinance establishes application requirements, including fees and deadlines, § 41.5-130, and application contents, § 41.5-131. The application must contain detailed information about the proposed event spanning a variety of topics; examples (for tier 1 and 2 events) include the number of bands or other musical units, the distance from any residential districts and how noise will affect those districts, the types of non-emergency vehicles to be used for the event, and the proposed location of portable sanitation facilities. § 41.5-131(c)(1)–(2). Among the information the application must contain is detailed information about public safety and emergency preparedness, including an emergency action plan:

(c) Detailed information concerning <u>public safety and emergency preparedness</u> including, but not limited to:

1. Provisions for queuing event attendees on streets, sidewalks, or other city right-of-ways;

11

      2. An <u>emergency action plan</u> described in section 41.5-160 (emergency action plan); and

      3. Other equipment or services necessary to conduct the event with due regard to public health and safety.

§ 41.5-131(c)(2)(c) (emphases added).

During the application review process, the coordinator serves as a liaison internally with city departments and externally with the applicant. "Coordinator" is defined as "the head of the division of special events." § 41.5-102(i). "Special events review" is defined as "the process undertaken by the coordinator to submit a permit application for review by the appropriate departments for their recommendations thereupon." § 41.5-102(cc). The coordinator manages the process and serves as a single point of contact for the applicant. "During the application review period, the coordinator will engage in an interactive process with the applicants." § 41.5-132(7). The coordinator resolves the application as discussed below.

## 2. Disposition

Section 41.5-134 specifies how the coordinator must resolve an application (whether by outright approval, approval of a provisional permit, requiring application modifications, or denial). More complete excerpts of this section appear below for context, but in summary, the section:

- lists 19 grounds (in subsections (b) and (c)) on which the coordinator "shall deny" an application;
- requires that if none of those conditions exists the coordinator "shall approve" the application;
- allows the coordinator to require application modifications based on specified considerations;
- through a 2023 amendment, allows the coordinator to issue a provisional permit (other than for a tier 6 event) if an applicant cannot at the time of application demonstrate that it can immediately satisfy all the requirements of the ordinance but is likely to do so by the date of the special event; and
- through a 2023 amendment, requires that in lieu of denying an application (other than for a tier 6 event) to an otherwise qualified applicant, the coordinator "shall," upon the applicant's request, issue a permit for a tier 6 event.

Aurora Pride challenges two of the 19 grounds for denial. The challenges to these two provisions are best understood in the context of Aurora Pride's challenge

12

to a different provision concerning volunteer availability, discussed later. But to note briefly at this point these two grounds for denial, they are: (1) "the applicant fails to . . . [p]rovide sufficient crowd control and safety measures," § 41.5-134(b)(3); and (2) "[t]he applicant demonstrates an inability or unwillingness to conduct an event in compliance with the requirements of this chapter or a condition to a permit issued under this chapter," § 41.5-134(c)(5).

Below are more complete excerpts of § 41.5-134, with emphases on both the two provisions that plaintiff challenges and other significant provisions.

### Sec 41.5-134 Approval Or Denial Of A Special Event Application

(a) If the coordinator determines that none of the conditions specified in subsection (b), (c), or (d) of this section apply, the coordinator <u>shall approve</u> a special event application.

(b) The coordinator <u>shall deny</u> a special event application if the applicant fails to:

   (1) Provide a complete application;

   (2) Provide the documentation required in section 41.5-131 (contents of special events application);

   (3) *Provide sufficient crowd control and safety measures*;

   (4) Provide sufficient safety, health, or portable sanitation equipment, services, or facilities that are reasonably necessary to ensure that the event will be conducted with due regard for safety and ADA accessibility;

   (5) Provide sufficient waste management and recycling services (community events coordinator may provide formula);

   (6) Provide sufficient off-site parking or shuttle service, or both, when required to minimize any substantial adverse impacts on general parking and traffic circulation in the vicinity of the event;

   (7) Meet the requirements for submitting an application for a special event permit;

   (8) Obtain the approval of any other public agency within whose jurisdiction the special event or a portion of the special event will occur;

(9) Provide a <u>sufficient emergency action plan based on event risk factors</u>;

(10)   Obtain all other required city permits or approvals;

(11)   Meet the conditions set forth in section 41.5-132 (special event application review); or

(12)   Provide a sufficient plan to accommodate individuals with disabilities at the event; or

(13)   Make revisions to a pending application that the coordinator requires consistent with this chapter.

(c) The coordinator <u>shall deny</u> a special event application if it determines that:

(1) The event will violate any local, county, state, or federal law or regulation or administrative rule;

(2) The resources required to ensure public safety within the special event venue or impact area will prevent the police, fire, or emergency medical services departments from providing reasonable protections to the remainder of the city;

(3) The concentrations of persons, animals, or vehicles within the special event venue or impact area will unduly interfere with the movement of police, fire, ambulance, or other emergency vehicles;

(4) The event will substantially interfere with:

a.  Any other special event for which a permit or application has already been approved; or

b.  The provision of city services required to support scheduled or unscheduled government functions.

(5) *The applicant demonstrates an inability or unwillingness to conduct an event in compliance with the requirements of this chapter or a condition to a permit issued under this chapter*; or

14

(6) The applicant conducted a prior special event in a manner that failed to receive a positive post event evaluation in the past three (3) years.

(d) The coordinator <u>shall approve</u> an application if:

(1) None of the conditions in subsection (b) and (c) apply.

. . .

(f) <u>The coordinator may require application modifications. In exercising this authority, the community events coordinator will consider</u>:

(1) <u>Scope of events</u>;

(2) <u>Traffic</u>;

(3) <u>Parking</u>;

(4) <u>Other events or activities previously scheduled in close proximity</u>; and

(5) <u>Public safety concerns</u>.

. . .

(i) Whenever an applicant for a special event, other than a tier 6 special event is unable to demonstrate at the time of application that it is able to immediately satisfy all of the requirements of this chapter, but is likely to do so by the date of the special event, the coordinator may issue a <u>provisional permit</u> to the applicant to facilitate the ongoing planning of the event. The issuance of a provisional permit reserves the time, place, and location of a proposed special event to the applicant, and may authorize particular aspects of the application, but does not guarantee the subsequent approval of all aspects of the application unless the coordinator is satisfied that the applicant can comply with all of the requirements of this chapter. A provisional permit is subject to ongoing modification and review by the coordinator based on the applicant's demonstration, or failure to demonstrate, its ability to comply with all of the requirements of this chapter.

(j) <u>In lieu of denying an application for a special event permit, other than a tier 6 special event, to an otherwise qualified applicant who</u>

15

> has failed to demonstrate that it is able to comply with the requirements of this chapter, the coordinator shall, upon the request of the applicant, issue the applicant a permit authorizing a tier 6 special event. A permit for a tier 6 special event issued by the coordinator under this paragraph shall convey no additional rights or privileges, nor impose greater obligations on the permittee than otherwise authorized by this chapter.[4]

§ 41.5-134 (emphases added).

A permit denial is appealable to an administrative hearing officer through procedures specified in the ordinance. § 41.5-135.

### 3. Consequences of failure to comply with permit requirements

Failure to comply with permit requirements may have consequences, including permit revocation, and / or denial of future permit applications.

First, one of the grounds for permit denial is that "the applicant conducted a prior special event in a manner that failed to receive a positive post event evaluation in the past three (3) years." § 41.5-134(c)(6). Following the conclusion of a special event, the coordinator

> shall undertake a performance review of the event if (1) the event was a tier 1 or tier 2 event, (2) the city or the permittee experienced problems staging the event, including those related to crowd or traffic control, responses to emergency situation, or acts or omissions by the permittee; (3) the city or the permittee were required to devote greater resources to the event than anticipated or (4) the permittee engaged in or permitted the violations of the conditions of the permit by persons under its control.

§ 41.5-153(a). In conducting the evaluation, "the coordinator shall determine, based on the totality of circumstances whether the special event materially complied with the requirements of the permit, was appropriately managed, that appropriate communication was maintained among the permittee, the coordinator, and relevant city personnel throughout the process, and that the permittee has fully reimbursed the city for any costs it agreed to reimburse the city." § 41.5-153(b). If the coordinator determines that the special event or permittee did not materially comply with the ordinance, the coordinator may impose additional requirements on subsequent applications or limit the permittee to a tier 6 event. § 41.5-153(c).

---

[4] Subsections (i) and (j) were added in the 2023 amendments.

16

Third, as discussed below, the coordinator may revoke a permit if the coordinator determines that (among other specified grounds) the permittee is conducting the event in a manner that does not comply with the terms of its permit or the event poses a threat to public health or safety.

### 4. Revocation

Section 41.5-180 allows for permit revocation. Following are first a summary and then the full section with the challenged provisions highlighted:

- The coordinator may revoke a permit if the coordinator determines that one of five specified grounds exists.
- Aurora Pride challenges two of those grounds. Like the two grounds for denial discussed above, the challenges to these two provisions are best understood in the context of Aurora Pride's challenge to a different provision concerning volunteer availability, discussed later. But to note briefly at this point these two grounds for revocation, they are: "[t]he permittee is conducting the event in a manner that does not comply with the terms of its permit," § 41.5-180(a)(2), and "[t]he event poses a threat to public health or safety" (with narrower grounds for revocation of tier 6 events), § 41.5-180(a)(5).
- Absent a threat to public health or safety requiring immediate revocation, the coordinator must issue a written notice of intent to revoke setting forth the reasons, corrective measures required, and a time period for compliance. The notice of intent to revoke sets off other steps (several of which Aurora Pride challenges, but again these challenges are connected to its challenge to another provision, discussed later):
  - The notice shall afford the permittee an opportunity to propose alternative corrective measures.
  - The notice shall also afford the permittee the opportunity to request that the coordinator cancel the existing permit and issue a permit for a tier 6 event.
  - If a permittee fails to take the corrective measures identified in the notice within the time period provided or to propose alternative means of mitigating the effects of noncompliance, the permit will be revoked without further action by the coordinator.

The full section provides:

### Sec 41.5-180 Revocation Of Special Event Permit

(a) *The coordinator may revoke a special event permit if the coordinator determines*:

17

(1) The coordinator issued the special event permit in material violation of this chapter;

(2) *The permittee is conducting the event in a manner that does not comply with the terms of its permit*;

(3) The permittee fails to maintain insurance as required in this chapter;

(4) The permittee has failed to obtain any other permit required by the city; or

(5) *The event poses a threat to public health or safety.* In the case of a tier 6 special event, a permit shall not be revoked pursuant to this subparagraph unless the threat to public health or safety is imminent and the risk thereof cannot be effectively mitigated by the city or the permittee, including instances of severe or extreme weather conditions, emergencies or disasters requiring diversion of city resources, and specific and credible threats of violence or terrorism.[5]

(b) Except as provided in subsection (c), the coordinator may revoke a special event permit after he or she issues a notice of intent to revoke. The notice of intent will be in writing; specifically set forth the reasons for revocation; specify the corrective measures required for compliance and to prevent revocation; and provide a time period for compliance. *The notice shall afford the permittee an opportunity to propose alternative corrective measures to mitigate the effects of its failure to comply with the provisions of this chapter or the terms of its*

---

[5] Aurora Pride has narrowed its challenge to this provision (§ 41.5-180(a)(5), the provision allowing the city to revoke a permit if the event poses a threat to public health or safety). In its prehearing brief in support of its amended motion for a preliminary injunction, Aurora Pride made a general challenge to this provision as granting defendants unduly broad discretion; the challenge did not turn specifically on the availability of volunteers. [34] at 26. However, in its proposed preliminary injunction order, filed after the hearing, Aurora Pride only challenged this provision "to the extent it allows Defendants to revoke a permit for reasons related to City employees' refusal to work, or unwillingness to affirmatively volunteer to work, the event or to require a permittee to take corrective measures to mitigate such a failure." [57-1] at 2. Aurora Pride thus has narrowed its challenge to this provision such that the challenge tracks its challenge to a different provision concerning volunteer availability, discussed later.

18

*permit. The notice shall also afford the permittee the opportunity to request that the coordinator cancel the existing permit and issue as a permit for a tier 6 event.*

(c) Verbal notification by the coordinator to the permittee is sufficient if an emergency that poses a threat to public health or safety requires immediate revocation. The coordinator may provide a warning to the permittee prior to an immediate revocation.

(d) *If a permittee fails to take the corrective measures identified in the notice of intent within the time period provided, or propose alternative means of mitigating the effects of its failure to comply with the provisions of this chapter or the terms of its permit, the special event permit will be revoked without further action by the coordinator.*

(e) If the coordinator revokes a special event permit prior to the start of the event, the permittee may request an appeal hearing in the same manner as set forth in section 41.5-135.

(f) A revocation described in subsection (c) that occurs during a special event is effective until the condition causing a threat to public health or safety is remedied and the special event no longer poses a threat to public health or safety.

(g) Whenever a permittee requests, pursuant to the notice set forth in paragraph (b) of this section, that the coordinator cancel its existing permit and issue a permit for a tier 6 in lieu thereof, the permittee shall conduct its special event in accordance with the requirements of this chapter. A permit for a tier 6 special event issued by the coordinator under this paragraph shall convey no additional rights or privileges, nor impose greater obligations on the permittee than otherwise authorized by this chapter.

§ 41.5-180 (emphases added).

### E. Staffing

#### 1. Number of officers required

The ordinance contains a provision addressing the determination of the number of police officers required for a special event. Aurora Pride initially

challenged this provision but no longer does.  *Compare* [34] at 23, *with* Hr'g Tr., [56] at 18:1–7.  Nonetheless, a brief review of the provision is helpful for context.

The provision is part of Article 41.5-V of the ordinance, entitled "Public Safety."  That article includes sections regarding the emergency action plan, personal security and property security, fire safety, and medical service.  The section concerning the emergency action plan is § 41.5-160.[6]

As discussed earlier, an emergency action plan is one of the application requirements.  § 41.5-131(c)(2)(c)(2).  Failure to "[p]rovide a sufficient emergency action plan based on event risk factors" is grounds for denial of the application.  § 41.5-134(b)(9).

The section concerning the emergency action plan, § 41.5-160, appears below, with emphasis on the provision addressing the number of police officers and other city employees required for a special event.

### Sec 41.5-160 Emergency Action Plan

(a) An emergency action plan is required for any special event and must be approved by the coordinator.

(b) A permittee shall prepare an emergency action plan for a special event that is based on the estimated number of attendees and, at a minimum, includes:

(1) On-site security for attendees and property;

(2) On-site medical coverage, number of a level of certification of emergency medical responders, and the 911 access that will be utilized for the special event;

(3) Fire safety plan;

(4) Weather related evacuation and cancellation plans; and

---

[6] The ordinance also defines "[e]mergency action plan" as "a plan that is submitted during the application process that identifies emergency exits, crowd managers, emergency notification methods, and how organizers will deal with emergencies.  These plans must also include consideration for cancellation of an event due to weather conditions that create a hazard."  § 41.5-102(l).

(5) Documents required in section 41.5-131 (Contents of Special Events Application).

(c) <u>When required for a special event, the number of police officers, emergency medical providers, and fire department employees required for a special event must be based on guidelines established by each separate department. Each department's guidelines shall be reduced to writing and available for public inspection. In developing such guidelines, a department shall consider the size and nature of the proposed special event; the anticipated number of attendees; available staffing on the date and time proposed; traffic conditions, including the number of intersections required to be closed; security threats associated with special events regardless of their nature; and any other objective law enforcement or public safety consideration.</u>[7]

(d) At least thirty (30) days prior to the start of a tier 1 or tier 2 special event, a permittee shall provide the coordinator a written description of all non-city public safety resources that the permittee has retained for the special event.[8]

---

[7] The first sentence of this provision predates the 2023 amendments; the rest of the provision was added in the 2023 amendments.

At the preliminary injunction hearing, the coordinator, Mike Nelson, testified that he was not aware of the city adopting any written guidelines or regulations with respect to any of the 2023 amendments to the ordinance. Hr'g Tr., [56] at 131:5–13.

Aurora Pride initially challenged this provision, but no longer challenges this provision or the city's ability to consider the factors listed in the provision (or any other factors) in determining the number of officers required to staff an event. That is, Aurora Pride no longer challenges the city's determination of the number of officers required. Rather, Aurora Pride challenges the city's ability to make permitting decisions based on whether sufficient off-duty officers have signed up to meet the required number, to charge permittees the costs of paying off-duty officers financial incentives to sign up, and to charge permittees police and security costs that may include the costs necessary to prevent disruption of or interference with an event.

[8] This provision—which plaintiff does not challenge—contemplates that a permittee may retain "non-city public safety resources." As discussed below, another provision of the ordinance (§ 41.5-161) expressly provides that an applicant may retain private security for personal safety or property security to supplement the police department's services, but the police department retains authority over security, and generally (although there are exceptions) only peace officers or police cadets commissioned by the city may be used for traffic control.

§ 41.5-160 (emphasis added).

### 2. Officers' voluntary overtime

Aurora Pride's principal challenge is to portions of the statute that refer to city employees voluntarily signing up for overtime to staff an event. (The parties have focused exclusively on police officers, as opposed to other city employees.) The key provisions at issue appear in § 41.5-114(c). Section 41.5-114 sets limitations on the provision of city services and provides for the assessment of costs to the applicant. More complete excerpts of the section appear below for context, but to summarize:

- The issuance of a permit does not obligate the city to provide services or personnel in support of an event.
- However, subject to the availability of city services or personnel, the permittee, at its own cost, may contract with the city to provide city services or personnel.
- With a specific exception for tier 6 events only, the city does not guarantee the participation of its personnel if the size or scope of the event requires city employee volunteers (discussed further below).
- The city will charge permittees for the actual costs of city services, including:
  - wages or salaries for city personnel involved in traffic control, event security, and police services; and
  - any costs for provision of additional city services beyond those contemplated by the original permit or provisional permit.
- With respect to city employee volunteers:
  - The ordinance does not define "volunteer." The term can refer to both city employees and non-city employees, depending on the context.
  - With respect to city employees, there is no indication in the text that "volunteer" has any meaning other than the city's established practice of voluntary rather than mandatory overtime. That practice involves city employees who would otherwise be off-duty *voluntarily* signing up to work overtime shifts (rather than being *required* to work overtime) and receiving overtime pay at the rate set by collective bargaining agreement.
- If the event requires the participation of city employee volunteers:
  - As noted above, with a specific exception for tier 6 events only, the city does not guarantee the participation of its personnel to provide services in support of the event if the size or scope of the event requires the provision of city volunteers.
  - The applicant is responsible for the recruitment and retention of volunteers.

22

- The applicant is responsible for the full hourly cost for the services of city employee volunteers, set by the applicable collective bargaining agreement or pay plan adopted by the city council (in the past, an hour-and-a-half rate, *see* Cross Aff., [39-1] ¶ 4).
- If there is a volunteer shortage:
  - the coordinator must make reasonable efforts to encourage a sufficient number of city employees to volunteer for the event and present the applicant available options to increase participation or to narrow the scope of the event.
  - The coordinator and the applicant will negotiate in an interactive process the costs and scope of the event.
  - The coordinator must provide the applicant with a cost estimate (potentially including additional financial incentives to city employees).
  - The applicant must either agree to assume responsibility for the costs, or if the applicant declines to do so, the coordinator may reduce the scope of the permit to conform to the anticipated availability of volunteers. The coordinator may, for example, shorten the duration of the event or change the location, route, or manner of the event.

Below are more complete excerpts of § 41.5-114, with emphases on both the provisions that plaintiff challenges and other significant provisions.

### **Sec 41.5-114 Limitations On The Provision Of City Services; Costs And Fees**

(a) *Issuance of a special events permit or the approval of a special event permit application does not obligate or require the city to provide services,*[9] *equipment, or personnel in support of an event, however, subject to the availability of the same, the permittee, at its own cost, may contract with the city to provide such services, subject to availability, in accordance with this Section.* Except when required in the case of a tier 6 event for the purpose of protecting an event and its attendees from interference or disruption, *the city does not guarantee the participation of its personnel to provide services in support of the event if the size or scope of the event requires the provision of city volunteers.*

(b) Except as provided in subsection (c) of this section, if the city or its personnel provides services, equipment, or personnel in support of a

---

[9] "City services" are defined as "any services provided by or through the use of city personnel including, but not limited to[,] members of the community affairs, fire, police, public works or other department or agency required by a special event." § 41.5-102(h).

23

special event, *the city will charge the event organizer the actual cost of*:

> (1) *The wages or salaries for city personnel involved in traffic control, event security, police services*, fire safety, medical safety, and any other facility or event support as established by the applicable collective bargaining agreement or pay plan adopted by the city council. The coordinator will provide an applicant with a current copy of applicable salary rate schedules. With respect to a tier 6 event for which traffic control is not required, a permittee shall be responsible only for the actual costs incurred by the city for clean-up or trash collection related to the special event. The city shall bear the costs of the personnel and equipment it determines is necessary to prevent the disruption of or interference with a tier 6 event.;

> (2) The use of city equipment, city-contracted services, and other non-personnel expenses;

> (3) Any damage caused by or site restoration directly related to the special event, not otherwise provided by the event organizer that is required to restore the area to the same condition that existed prior to the special event;

> (4) *Any costs associated with the provision of additional city services beyond those contemplated by the original permit or provisional permit.* Whenever it appears to the coordinator that city services will be required beyond those contemplated by the original permit or provisional permit, the coordinator shall promptly notify the permittee to discuss the need for the additional services and afford the permittee an opportunity to respond or propose alternatives;

> (5) *Any loss or damage to city property*; and

> (6) Any other agreed upon service.

(c) Subject to advance city council approval, if the event is a governmental event or a special event which the city actively participates as a co-sponsor or is otherwise substantially involved in the organization and planning of city services, equipment or personnel may be provided to support a special event without charge.

(1) The city may also assess any other fees as set by separate ordinances or resolutions to recover costs associated with special events.

(2) If a permittee requests an estimate of the charges or fees described in subsection (b), coordinator will provide an estimate at least twenty (20) days before the start of the special event.

(3) A permittee shall pay to the city:

    a. At least ten (10) days prior to the date of the special event, twenty-five (25) percent of the costs estimated by the coordinator or up to one thousand dollars ($1,000.00), whichever is less, to be the direct and reasonable costs which will be incurred by the city to provide services and equipment for the special event.

    b. Within thirty to forty-five (30 – 45) days from the date of the conclusion of the permitted event, the direct and reasonable costs incurred shall be billed to the permittee in an itemized bill. This amount shall include compensation for any loss/damage or site restoration to city property. Failure to remit payment in full in accordance with this ordinance and Code may impact the ability to hold future events.

(4) *Whenever the scope of a permitted special event requires or contemplates the recruitment of volunteers,* including, but not limited to, *city employees* not otherwise assigned to the event by the city, *the applicant shall bear all responsibility for the recruitment and retention of such volunteers, and in the case of city employee volunteers, shall be responsible for the full hourly cost for their services.*[10]

(5) *Whenever it appears to a permittee that it will be unable to recruit sufficient volunteers in connection with a special event, it shall promptly notify the coordinator. Willful failure by the permittee to promptly notify the coordinator of a reasonably anticipated volunteer shortage shall constitute cause to restrict or deny a subsequent special event application.*[11]

---

[10] This provision was added in the 2023 amendments.
[11] This provision was added in the 2023 amendments.

(6) <u>Whenever it appears to a city employee that a sufficient number of employees have not volunteered in connection with a special event, the city employee shall promptly notify the coordinator and the permittee of the anticipated shortage.</u>[12]

(7) Upon notice of an anticipated volunteer shortage, the coordinator shall make reasonable efforts to encourage a sufficient number of city employees to volunteer for the event and *present to the applicant such options as may be available to increase participation or to narrow the scope of the event*, as the case may be. Prior to the offering of any *financial incentive beyond which the applicant has already agreed* to[,] the coordinator shall provide the applicant with an estimation of the cost involved and *the applicant shall agree in writing to assume full responsibility for such costs. If the applicant declines to incur additional expenses, the coordinator may reduce the scope of the permit to conform to the anticipated availability of volunteers. In reducing the scope of the permit, the coordinator may require that the permittee shorten the duration of the special event; conduct the special event in a different location, along a different route, or in a different manner than originally contemplated; or make other such adjustments, based on the anticipated availability of volunteers.*[13]

§ 41.5-114 (emphases added).

### 3. Private security

The ordinance has a provision allowing a permittee to hire private security for certain purposes. The full provision is quoted below with key language emphasized, but in summary:

- A permittee may hire private security for personal safety or property security to supplement the police department's services.
- The police department has the final authority for security measures.
- Under a provision that Aurora Pride challenges, the supervising police officer at or prior to a special event may reduce or increase the number of peace officers posted at the event. When the cost of such peace officers is

---

[12] This provision was added in the 2023 amendments.
[13] This provision was added in the 2023 amendments.

to be borne by the permittee, the supervising peace officer shall explain the objective basis for the change in posting in accordance with departmental guidelines.

- Generally, only peace officers or police cadets commissioned by the city shall be used for traffic control, although the police chief may, based on an evaluation of the safety and security concerns unique to an event, allow volunteers trained by the police department or by the Aurora Emergency Management Agency to participate in traffic control.

The full provision states:

### Sec 41.5-161 Personal Security And Property Security

(a) <u>A permittee may hire private security, for personal safety or property security during a special event to supplement the services provided by the Police Department.  The Police Department will have the final authority for security measures.</u>  Additionally, if the permittee elects to hire private security, the permittee shall ensure that its contractors work with the Police Department on a safety plan prior to the event and provide whether the guards will be armed or not armed.

(b) Private security employed pursuant to subsection (a) must:

    (1) Be in uniform and provide special events application with a description and photo of their uniform;

    (2) Be able to contact city police, fire, or emergency medical services if necessary;

    (3) Remain on-site during the special event, including while the special event is completed and through the take-down process;

    (4) Be licensed by the State of Illinois and provide a copy of said license in the special events application;

    (5) Provide necessary documents to show they have been insured and bonded in the special events application;

    (6) Not consume any alcoholic beverages or participate in the special event; and

27

(7) Meet and confer with the Police Department prior to the start of the event to establish guidelines and point of contact.

(c) *The supervising police officer at or prior to a special event may reduce or increase the number of peace officers posted at a special event. When the cost of such peace officers is to be borne by the permittee, the supervising peace officer shall explain the objective basis for the change in posting in accordance with departmental guidelines.*[14]

(d) Unless a peace officer has been authorized by the police chief or is otherwise on duty and acting in an official capacity of their agency, only peace officers or police cadets commissioned by the city shall be used for traffic control on city streets or in city right-of-way for special events, as defined by this chapter. In making a determination for authorization, the police chief shall consider the officer's familiarity with local ordinances and rules of the city, and the proximity of the officer's primary jurisdiction to the city. Additionally, the police chief may, based on an evaluation of the safety and security concerns unique to an event, allow volunteers trained by the police department or by the Aurora Emergency Management Agency, to participate in traffic control.[15]

(e) Volunteers under the supervision of the Aurora Emergency Management Agency may work under the supervision of the Police Department to assist at special events.

§ 41.5-161.

## F.    Insurance

The amended ordinance requires permittees to obtain insurance. The ordinance has two provisions regarding insurance coverage. First, all applicants must obtain an insurance policy in an amount based on the event tier. Second, the

---

[14] Aurora Pride challenges this provision "to the extent it authorizes Defendants to charge permittees for additional peace officers as a result of City employees' refusal to work, or unwillingness to affirmatively volunteer to work, the event." [57-1] ¶ 1. Thus, the challenge derives from the challenge to the volunteer provisions in § 41.5-114.

[15] It is not clear whether the volunteers mentioned in the last sentence must be city employees.

28

city may require additional insurance based on considerations within the same tier. Aurora Pride challenges only the second provision.

Specifically, the ordinance provides:

**Sec 41.5-115 Insurance Required**

(a) An applicant for a special event shall secure an insurance policy for the event that includes the City of Aurora as an additional insured (as primary, non-contributory additional insured[]). The law department shall determine, annually, and based on the tier, the appropriate insurance amounts required for special events held in the city. The event organizer(s) shall purchase and maintain this insurance, providing coverage for the event with an insurance company authorized to do business in the State of Illinois. Excluded from the insurance requirements of this section are events that take place solely on private property.

(b) *The city may require additional insurance coverage due to the specific scope or nature of a proposed special event that distinguish it from other special events categorized in the same tier. As part of the permit process, the coordinator will advise event organizers if additional insurance is required, and the basis upon which the determination was made prior to the issuance of the permit. Notwithstanding the foregoing, no permittee shall be required to obtain coverage to insure against any injury caused or threatened by third parties in response or reaction to the special event.*

§ 41.5-115 (emphasis added).

As noted above, Aurora Pride does not challenge subsection (a), but it provides helpful context. Subsection (a) predates the 2023 amendments except for nonsubstantive changes. Subsection (a) requires an applicant to obtain insurance that includes the city as an additional insured; it ties the insurance amount required to the "tier" of an event and provides that the city's law department will determine annually (i.e., in advance) the appropriate amount of insurance coverage for particular tiers of events.

Aurora Pride does challenge the insurance requirement in subsection (b), which was amended in 2023. Subsection (b) allows the city to require additional insurance "due to the specific scope or nature of a proposed special event that

29

distinguish it from other special events categorized in the same tier"; requires the coordinator to advise the organizer if additional insurance is required and the basis for that determination before the issuance of the permit; and carves out coverage for injury caused or threatened by third parties in response to the special event.

### G. Indemnity

The ordinance requires permittees to indemnify the city for certain types of liability:

### Sec 41.5-116 Indemnity Of City Of Aurora

(a) Except with respect to a tier 6 event, *an applicant shall, in addition to the application provided under this division [sic], deliver to the city an agreement, as contained in the permit application, in writing holding the city harmless from all liability resulting from the operation of the special event, and, further, shall agree to indemnify the city from all liability resulting from any injury to patrons, bystanders, passerby or any individual as a result of the operation or maintenance of the special event, within the management, direction or control of the permittee, its invitees, or agents.*

§ 41.5-116(a) (emphasis added).

This provision requires applicants to (1) deliver to the city a written agreement "holding the city harmless from all liability resulting from the operation of the special event" and (2) "agree to indemnify the city from all liability resulting from any injury to patrons, bystanders, passerby or any individual as a result of the operation or maintenance of the special event, within the management, direction or control of the permittee, its invitees, or agents." § 41.5-116(a).

Under a separate provision, when the city provides services in support of an event, the city will charge the organizer the actual costs of (among other things) "[a]ny loss or damage to city property." § 41.5-114(b)(5).

## V. Other Developments

Other facts have developed with respect to ongoing planning for the proposed 2023 parade.

The city has represented that there are three potential options for Aurora Pride's requested event, the availability of which depends on the number of police

officers who volunteer to staff the event. [38] ¶ 39. (As noted above, the parties have focused exclusively on police officers, as opposed to other city employees.) The first option is that the parade would follow Parade Route B through downtown Aurora. This is the plan proposed by Aurora Pride, and it is the route the parade has taken in past years. *Id.* ¶ 39. The second option is a shortened parade route, Route C, which would require fewer officers. *Id.* ¶ 40. The third option is a stationary event in the city's Wilder Park & Promenade.

The city has made a commitment to the event going forward at least in the Wilder Park format. The parties' stipulated facts state that the Wilder Park event would be classified as a tier 6 event, [38] ¶ 41, although the city's brief in opposition to the preliminary injunction raises some question as to that assertion. *See* [52] at 3, 6 (implying Wilder Park is not a tier 6 event). The city's presentation at the hearing likewise left the impression that the Wilder Park event might be larger than a tier 6 event—more like a large festival (in a 3.85-acre park, easily accessible to attendees arriving by train, with space for food trucks, vendors, and parking)— than a small assembly. *See* Hr'g Tr., [56] at 123–25. The President of Aurora Pride, Gwyn Ciesla, testified at the preliminary injunction hearing that a stationary event at Wilder Park would send a significantly different message than a Pride Parade, and that Aurora Pride does not consider it an equivalent substitute for the Pride Parade. *See id.* at 32:6-14, 63:19-64:8.

## LEGAL STANDARD

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged except in a case clearly demanding it." *Lukaszcyk v. Cook County*, 47 F.4th 587, 598 (7th Cir. 2022) (quoting *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021)). "The moving party bears the burden of showing that a preliminary injunction is warranted." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis[.]" *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

In cases involving preliminary injunctions and First Amendment claims:

The "likelihood of success on the merits is usually the determinative factor when a preliminary injunction is sought on First Amendment grounds." *Higher Soc'y of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1118 (7th Cir. 2017). In First Amendment cases, "once a likelihood of success on the merits has been established,

irreparable harm necessarily follows." *Ayres v. City of Chicago*, 966 F. Supp. 701, 717 (N.D. Ill.), *aff'd*, 125 F.3d 1010 (7th Cir. 1997). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (*per curiam*) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

As to the public interest, "[a]n injunction protecting First Amendment rights is always in the public interest." *Christian Legal Soc'y*, 453 F.3d at 867.

And on the balance of equities, if "the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012).

At the same time, there are significant potential harms from enjoining a municipality's enforcement of a permitting scheme that promotes the safe and orderly administration of public spaces, including the risk of exposure to losses from uninsured and unindemnified claims. *MacDonald v. Chi. Park Dist.*, 132 F.3d 355, 359–61 (7th Cir. 1997) (per curiam) ("*MacDonald I*").

## ANALYSIS

## I. Likelihood of Success on the Merits

As noted earlier, Aurora Pride challenges four aspects of the ordinance: (1) that the existence, scope, or cost of an event turns on the discretion of off-duty officers voluntarily signing up for overtime to staff the event, (2) that costs due to listeners' reactions ("heckler's veto" costs) may be passed on to the permittee, (3) that the ordinance affords the city undue discretion in requiring additional insurance (beyond a fixed amount based on the tier), and (4) that the ordinance requires a permit applicant to indemnify the city for liability caused by actions beyond the applicant's control.

### A. Volunteer Discretion

Aurora Pride contends that under the ordinance, the existence, scope, and cost of an event—while ultimately decided by the coordinator—turn on the discretion of off-duty officers to sign up for overtime shifts. The court first addresses the coordinator's permitting decisions (to grant, deny, modify, or revoke a permit) and then turns to cost assessments.

### 1. Permitting decisions

The government may promulgate reasonable time, place, and manner regulations to coordinate competing uses of limited public space. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1032 (7th Cir. 2001) ("*MacDonald II*"). "Regulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties but are one of the means of safeguarding the good order upon which civil liberties ultimately depend." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002) ("*Thomas II*") (quoting *Cox*, 312 U.S. at 574) (internal quotation marks and alterations omitted). Such regulations serve entirely permissible purposes of coordinating multiple uses, assuring the preservation of public space, preventing uses that are dangerous or unlawful, and assuring financial accountability for damage caused by an event. *Thomas II*, 534 U.S. at 322. Indeed, "to allow unregulated access to all comers could easily reduce rather than enlarge" the availability and effectiveness of limited public space as a forum for speech. *Thomas v. Chi. Park Dist.*, 227 F.3d 921, 924 (7th Cir. 2000) ("*Thomas I*"); *Thomas II*, 534 U.S. at 353; *Cox*, 312 U.S. at 574.

Time, place, and manner restrictions are valid if they "are justified without reference to the content of the regulated speech," "are narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information.'" *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (quoting *Ward*, 491 U.S. at 791).

However, "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Thomas II*, 534 U.S. at 323. "Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Id.* (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). The Supreme Court has "thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* The grounds for granting or denying a permit must be "reasonably specific and objective," "not leave the decision to the whim of the administrator," and "provide narrowly drawn, reasonable and definite standards to guide the licensor's determination." *Id.* at 324 (citations and internal quotation marks omitted).

The paradigmatic unlawful permitting scheme confers impermissible discretion directly on a government agency or official responsible for administering the scheme. *E.g.*, *Forsyth County*, 505 U.S. at 132–36; *City of Lakewood v. Plain*

*Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 681 (7th Cir. 2003); *cf. Thomas II*, 534 U.S. at 323. Here, the coordinator makes the permitting decision; but the volunteer city employees' individual decisions determine the coordinator's decision. The volunteer city employees effectively stand in the shoes of the permitting official because their decisions can and in fact do determine the availability and scope of permits. *Cf. Marsh v. Alabama*, 326 U.S. 501, 507–09 (1946) (private company effectively acts as the government in a company town). Aurora's system likely violates the First Amendment because it lacks the narrowly drawn, objective criteria necessary to avoid content-based considerations determining the existence or scope of permits. *See Forsyth County*, 505 U.S at 132–33.

Under the ordinance, when an event requires the participation of volunteer city employees, the scope of the permit varies with the willingness of the city employees to sign up to work the event. Section 41.5-114(c)(7) makes this explicit. If there is an anticipated volunteer shortage (if insufficient employees have signed up for voluntary overtime), this provision directs the coordinator to "make reasonable efforts to encourage a sufficient number of city employees to volunteer for the event and present to the applicant such options as may be available to increase participation or to narrow the scope of the event, as the case may be." § 41.5-114(c)(7). Those options may include offering financial incentives beyond the standard overtime rate. If financial incentives are necessary, before the city offers them, "the applicant shall agree in writing to assume full responsibility for such costs." *Id.* But "[i]f the applicant declines to incur additional expenses"—that is, if the standard overtime rate plus any financial incentives the applicant is willing to incur does not persuade the employees to take the assignment—"the coordinator may reduce the scope of the permit to conform to the anticipated availability of volunteers." *Id.* This scope reduction allows the coordinator to shorten the event's duration, change its location, alter the route, or make "other such adjustments," again "based on the anticipated availability of volunteers." *Id.*

If a permit applicant refuses to comply with the proposed scope reduction, other sections of the ordinance allow the coordinator to deny the permit application. Section 41.5-134(b)(3) requires the coordinator to deny a permit application "if the applicant fails to provide sufficient crowd control and safety measures." And if the coordinator "determines that the applicant [has] demonstrate[d] an inability or unwillingness to conduct an event in compliance with the requirements of [Chapter 41.5] or a condition to a permit," the coordinator "shall" deny the permit as well. § 41.5-134(c)(5).

34

In lieu of denying an application due to an otherwise qualified applicant's failure to demonstrate an ability to comply with the requirements of the ordinance, upon the applicant's request, the coordinator "shall" issue a permit authorizing a Tier 6 event. § 41.5-134(j). Ultimately, this provision can create the same outcome as the provisions allowing the coordinator to reduce an event's scope based on the willingness of city employees to volunteer to staff it.

Nothing in the ordinance provides standards to guide the off-duty officers' individual decisions on whether to sign up to staff an event overtime. *See City of Gary*, 334 F.3d at 681 ("[T]he subjectivity of [a fee's] calculation is another objection to it given the Supreme Court's hostility to regulations of speech that allow broad discretion ('unbridled discretion' is the favored formula) to the regulators.") (citing *Thomas II*, *Forsyth County*, and *Plain Dealer Publishing*). The parties agree that officers are free to refuse to staff an event for any reason at all, including personal schedules, the value they place on their leisure time, and content-based considerations. *Compare* [52] at 12 (Defendants' Br.), *with* Hr'g Tr., [56] at 149:1–6 (plaintiff's counsel's argument). The volunteers' individual decisions in turn drive the coordinator's decision.

Taking a different approach to the issue, under Supreme Court precedent, "[l]isteners' reaction to speech is not a content-neutral basis for regulation"—so the city cannot deny a permit or vary the costs charged for a permit on the ground that those who disagree with the parade might threaten the safety of its participants, amounting to a "heckler's veto." *Forsyth County*, 505 U.S. at 134; *see also City of Gary*, 334 F.3d at 680–81. It follows logically that the government cannot alter the existence or scope of a parade due to its potential popularity or unpopularity among those whose presence is required for the parade to go forward.

In response, the city argues that the ordinance is constitutional because it is content-neutral and the city has no hostility to Aurora Pride's message. The defendants and witnesses sincerely and credibly hold no hostility toward Aurora Pride. But under the relevant caselaw, the First Amendment concern with the ordinance's volunteerism arrangement is not that those who drafted or implement it are in fact hostile to Aurora Pride's message. *See Forsyth County*, 505 U.S. at 133 n.10 ("The District Court's finding that in this instance the Forsyth County administrator applied legitimate, content-neutral criteria . . . is irrelevant to this facial challenge."). The constitutional issue is that the discretion inherent in allowing volunteer city employees to choose which events to staff allows for the type of content-based discrimination at which the First Amendment is directed. *See Regan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984).

### 2. Costs

As with permitting decisions, the cost for an event may vary based on volunteer officers' discretion. The amended ordinance codifies the city's ability to charge permittees for financial incentives that the city may offer to recruit employees to staff an event if there is a volunteer shortage. § 41.5-114(c)(7).

The Supreme Court and the Seventh Circuit have explained that cost-based fees are permissible: "There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated," that is, "not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Cox*, 312 U.S. at 577 (internal quotation marks omitted). "[A] concern with the burden on public services that parades and other open-air assemblies impose . . . would be entirely legitimate and would permit the charging of a cost-based fee." *City of Gary*, 334 F.3d at 682 (citing *Cox* and other cases).

But ordinances that charge variable fees for event permits must contain "narrowly drawn, reasonable and definite standards" for determining the level of the fee. *Forsyth County*, 505 U.S. at 133 (quoting *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951)); *see also City of Gary*, 334 F.3d at 680–82. As noted above, the city cannot raise the cost charged for a parade on a basis that constitutes a "heckler's veto," that is, on the ground that those who disagree with the parade might threaten the safety of its participants. *See Forsyth County*, 505 U.S. at 134; *City of Gary*, 334 F.3d at 680–81. The costs charged cannot turn on the popularity or unpopularity of the speech.

Here, the potential financial incentives to volunteers have no content-neutral guardrails. § 41.5-114(c)(7). The financial incentives permit individual volunteer employees, and in turn the city, to increase the charge for a disfavored speaker to hold an event of similar size and scope as one of a favored speaker. *See City of Gary*, 334 F.3d at 681–82. This arrangement likely violates the First Amendment.

### B. Costs Due to Listeners' Reactions ("Heckler's Veto" Costs)

Aurora Pride makes two arguments concerning costs. The first relates to the ordinance's volunteer staffing system—that the ordinance shifts to a permit applicant the costs of financial incentives to recruit volunteers. The section immediately above addresses this argument.

36

The second argument is that the ordinance requires the city to charge the event organizer costs based on listeners' reactions, that is, "heckler's veto" costs. This section addresses the latter argument.

The principal provision Aurora Pride challenges under this theory is § 41.5-114(b)(1). That provision states:

> (b) Except as provided in subsection (c) of this section, if the city or its personnel provides services, equipment, or personnel in support of a special event, *the city will charge the event organizer the actual cost of*:
>
> (1) *The wages or salaries for city personnel involved* in traffic control, *event security, police services*, fire safety, medical safety, and any other facility or event support as established by the applicable collective bargaining agreement or pay plan adopted by the city council. The coordinator will provide an applicant with a current copy of applicable salary rate schedules. <u>With respect to a tier 6 event for which traffic control is not required, a permittee shall be responsible only for the actual costs incurred by the city for clean-up or trash collection related to the special event. The city shall bear the costs of the personnel and equipment it determines is necessary to prevent the disruption of or interference with a tier 6 event.</u>; . . .

§ 41.5-114(b)(1) (emphases added).

The question is whether the italicized language impermissibly shifts to an event organizer the costs of protection from listeners' reactions.

To review the governing law: As noted above, under Supreme Court and Seventh Circuit precedent, a city *may* charge a cost-based fee for the burden on public services from an event. *See Cox*, 312 U.S. at 576–77; *MacDonald I*, 132 F.3d at 362–63; *City of Gary*, 334 F.3d at 682. Further, in determining the personnel, resources, and costs needed for public safety and convenience (and in determining whether a permit should issue), the government may properly consider the professional judgments of police and other officials about the personnel, resources, and costs needed for public safety and convenience, including for traffic control and clean-up. *See Sullivan v. City of Augusta*, 511 F.3d 16, 37 (1st Cir. 2007). The city's assessment of the services required for an event may reasonably vary. "Parades and marches obviously vary enormously in terms of size, timing, duration and location, resulting often in quite different traffic control needs." *Id.* at 36.

37

Put another way, under Seventh Circuit caselaw, municipalities may make permitting determinations based on metrics like traffic control that "lack[] any content-based consideration." *MacDonald II*, 243 F.3d at 1033. It follows that the cost of a permit may vary with those metrics as well. *See Sullivan*, 511 F.3d at 35–36 (upholding a parade ordinance that allowed permittees to be billed for traffic control but "expressly excluded" the "cost of police protection for public safety").

However, the fee may not vary based on hostile reactions to the event. "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County*, 505 U.S. at 134. "Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Id.* at 134–35. "[A] permit for a parade or other assembly having political overtones cannot be denied because the applicant's audience will riot. To allow denial on such a ground would be to authorize a 'heckler's veto.'" *City of Gary*, 334 F.3d at 680–81. "It follows pretty directly that a city cannot in lieu of denying the permit charge the applicant for the expense to the city of reining in the hecklers." *Id.* at 681.

Here, Aurora Pride does not challenge the city's ability to assess costs related to "crowd size, the length of the event, location, route, date, or time of day." *See* Pl.'s Reply Br., [53] at 13. Aurora Pride only challenges the assessment of costs (whether based on the city's initial assessment of those needs or based on subsequent increases to the services required or expenses incurred) for event security and police services to the extent those costs would be unique to the Pride Parade as opposed to other parades of a "similar size, nature, and route." *Id.*

Turning to the language of the challenged provision, § 41.5-114(b)(1) provides that "if the city or its personnel provides services, equipment, or personnel in support of a special event, *the city will charge the event organizer the actual cost of . . . [t]he wages or salaries for city personnel involved* in traffic control, *event security, police services*, fire safety, medical safety, and any other facility or event support as established by the applicable collective bargaining agreement or pay plan adopted by the city council." § 41.5-114(b)(1) (emphasis added). The provision then carves out certain costs for tier 6 events only: "With respect to a tier 6 event for which traffic control is not required, a permittee shall be responsible only for the actual costs incurred by the city for clean-up or trash collection related to the special event. The city shall bear the *costs of the personnel and equipment it determines is necessary to prevent the disruption of or interference with a tier 6 event*." *Id.* (emphasis added).

Aurora Pride argues that "traffic control" is sufficiently content-neutral but that "event security" and "police services" are not. Aurora Pride argues that,

38

without an appropriate limitation, "event security" and "police services" shift to the organizer costs based on listeners' reactions.  (Aurora Pride does not challenge shifting the costs of traffic control, and last year, "the bulk" of the officers assigned were there for traffic control.  Hr'g Tr., [56] at 52:18–24.)

It is true that "event security" and "police services" are not confined to "traffic costs," since the ordinance also expressly lists "traffic costs."  "Event security" and "police services" thus present a closer question than the ordinance the Seventh Circuit upheld in *MacDonald II*, where police costs were expressly limited to traffic costs.  243 F.3d at 1032 (requiring official to determine whether "[t]here are available . . . a sufficient number of peace officers to police and protect lawful participants in the activity and non-participants from traffic related hazards in light of the other demands for police protection at the time of the proposed event or activity").  Even so, whether "event security" and "police services," standing alone, include costs based on listeners' reactions is debatable enough that, without more, they might not support a likelihood of success on the merits.

But the tier 6 carveout in the last sentence of the provision tips the balance.  The last sentence expressly states that the city, not the organizer, "shall bear" the costs "necessary to prevent the disruption of or interference with a tier 6 event."  That exception applies only to tier 6 events—the most limited type of event—implying that such costs are not borne by the city with respect to other types of events.  *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107–12 (2012) (explaining the *expressio unius* canon).  The implication is that "the actual cost" that "the city will charge the event organizer" for all other events (tier 1-5 events) *includes* costs necessary to prevent disruption of or interference with the event.  If the city deems additional officers necessary to protect a non-tier 6 event from hecklers, § 41.5-114(b)(1) reads as requiring the event's organizer to bear the additional cost.

If it were not for the tier 6 carveout, it is not clear that this argument would be persuasive.  Whether "event security" and "police services" connote costs based on listeners' reactions is debatable.  The ordinance in *Forsyth County* clearly called for charging the cost of protection against listeners' reactions.  In *Forsyth County*, "[t]he board of commissioners justified the ordinance by explaining that 'the cost of necessary and reasonable *protection of persons participating in or observing* said parades, assemblies, demonstrations, road closings and other related activities exceeds the usual and normal cost of law enforcement for which those participating should be held accountable and responsible.'"  505 U.S. at 126 (emphasis added).  "[T]he county administrator was empowered to 'adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the *maintenance of public order* in the matter licensed.'"  *Id.* (internal quotation marks omitted) (emphasis added).  The Supreme Court explained: "The ordinance

39

itself makes plain that the costs at issue are those needed for 'necessary and reasonable protection of persons participating in or observing' the speech"; "there is no question that petitioner [the county] intends the ordinance to recoup costs that are related to listeners' reaction to the speech"; and "[a]t no point, in any level of proceedings, has petitioner intimated that it did not construe the ordinance consistent with its language permitting fees to be charged for the cost of police protection from hostile crowds." *Id.* at 135 n.12. In contrast, it is not clear that the terms of Aurora's ordinance—"event security" and "police services"—include costs based on listeners' reaction.

It is possible that by the costs "necessary to prevent the disruption of or interference with a tier 6 event," the ordinance covers only the costs of mitigating the generalized safety risk unfortunately inherent in holding a large, public event, as opposed to the costs of mitigating the particularized safety risk of a controversial event. The former can be shifted to a permittee if determined in a content-neutral manner; the latter cannot since those costs are inherently content based. However, the language is broad enough to include both.

Thus, Aurora Pride has shown a likelihood of success on the merits as to its challenge to § 41.5-114(b)(1).

Similarly, § 41.5-114(b)(4) allows the city to shift "[a]ny costs associated with the provision of additional city services beyond those contemplated by the original permit or provisional permit." This provision includes no limitations whatsoever and therefore likely allows shifting of costs based on listeners' reactions. Aurora Pride has shown a likelihood of success on the merits as to its challenge to § 41.5-114(b)(4).

## C.    Insurance

As discussed above, Aurora Pride challenges part of the insurance required by the ordinance.

The Seventh Circuit's decision in *Thomas*, which the Supreme Court affirmed, upheld an insurance provision because

> the amount of insurance required is not based on, or, so far as has been shown, influenced by, the nature of the event, and specifically by whether it involves controversial expressive activity likely to incite violence by onlookers or opponents. The required amount and the cost of the insurance depend only on the size of the event and the nature of the facilities involved in it (a bandstand, stage, tents, and so forth).

40

*Thomas I*, 227 F.3d at 925. Again, the concern was with shifting "heckler's veto" costs.

The insurance provision, § 41.5-115, has two subsections, (a) and (b). Aurora Pride does not challenge subsection (a), but it provides helpful context. Subsection (a) predates the 2023 amendments except for nonsubstantive changes. Subsection (a) requires an applicant to obtain insurance that includes the city as an additional insured; it ties the insurance amount required to the tier of an event and provides that the city's law department will determine annually the appropriate amount of insurance coverage for particular tiers of events. The ordinance distinguishes between event tiers based on neutral factors such as size, duration, and location. So subsection (a) is permissible under *Thomas*.

Aurora Pride challenges the insurance requirement in subsection (b). Subsection (b) was amended in 2023. This subsection allows the city to require *additional* insurance—above and beyond that required by subsection (a)—"due to the specific scope or nature of a proposed special event that distinguish it from other special events categorized in the same tier." However, it requires the coordinator to advise the organizer if additional insurance is required and the basis for that determination before the issuance of the permit. And it carves out coverage for injury caused or threatened by third parties in reaction to the special event (a "heckler's veto" carveout).

As to whether subsection (b) is constitutional: On one hand, the words "scope" and "nature" plausibly grant the coordinator broad discretion to consider the content of a permittee's message when determining how much "additional" insurance to require on top of that imposed by subsection (a). After all, subsection (a) already ties the standard insurance required to neutral factors like the size and complexity of an event by using the amended ordinance's tier system. § 41.5-115(a). And, in *Thomas*, the Seventh Circuit upheld a Chicago Park District insurance provision after noting that the required insurance was not based on the nature of an event itself, but "only on the size of the event and the nature of the *facilities* involved in it (a bandstand, stage, tents, and so forth)." *Thomas I*, 227 F.3d at 925.

On the other hand, subsection (b) cabins the coordinator's discretion in significant ways. First, it prohibits requiring additional insurance due to threatened injuries by third parties. *Thomas I* upheld a similar Chicago Park District's insurance requirement precisely *because* there was no evidence it had been tied to a potential heckler's veto. *Thomas I*, 227 F.3d at 925. Subsection (b) makes this explicit, while in *Thomas I*, the Seventh Circuit relied on an absence of

41

evidence. *See id.* Second, subsection (b) requires the coordinator to explain to an applicant the reasons the coordinator has determined that additional insurance is needed. § 41.5-115(b). This procedural hurdle makes it less likely that the coordinator will use content as a basis for requiring additional insurance.

The tier system in Aurora's special events ordinance gives further context for why two events within the same tier could have a different "scope" or "nature" such that they require different amounts of insurance, regardless of their content. An example is Judge Posner's 10,000-strong Girl Scout parade discussed in *City of Gary*. *See* 334 F.3d at 681–82. A 10,000-person parade in Aurora would be a tier 1 event. § 41.5-111(a)(3). Such a parade could reasonably require relatively less insurance based on neutral factors like the length of the route, the amount of time it would take, and the "nature" of the event, i.e., children parading through the streets. Contrast that with a different kind of event listed in the ordinance's examples of tier 1 events: a circus. § 41.5-111(b)(6), (7). Circuses in Aurora can last up to five days and, by implication in the ordinance, can involve animals. *See id.* Circuses involve the possibility of serious insurance claims due to the stunts performed, the "nature" of the animals involved, and the potential for damage to property surrounding the circus from attendees coming and going. Without respect to the *content* of the message of either event, the city could reasonably require more insurance for the circus than the Girl Scout parade because the "scope" and "nature" of a multi-day circus are different than that of even a large Girl Scout parade, even though both are tier 1 events under § 41.5-111(a). *Accord The Nationalist Movement v. City of York*, 481 F.3d 178, 184 (3d Cir. 2007). Section 41.5-115(b) codifies the commonsense principle that the city is not locked into requiring the same amount of insurance for every event within a single tier.

Aurora Pride's likelihood of success on its challenge to Section 41.5-115(b) is neutral to weak. Though the words "scope" and "nature" in the subsection connote some discretion, discretion is inevitable in any permitting scheme. *See Thomas II*, 534 U.S. at 324–25. Further, if the coordinator provides content-based reasons for imposing on Aurora Pride additional insurance for its 2023 parade, it can make an as-applied challenge at that point. *See id.* at 325 ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements."). As will be explained more fully when discussing the remaining preliminary injunction factors, the court declines to enjoin the application of subsection (b); the likelihood of success does not outweigh the potential harm to the city and the public interest from allowing Aurora Pride to

hold a parade with insufficient insurance given neutral factors that could distinguish it from other events in the eventual tier at which the parade occurs.

### D.    Indemnity

Aurora Pride challenges the provision requiring indemnity from liability connected to a special event, § 41.5-116(a).  That provision states:

> Except with respect to a tier 6 event, an applicant *shall, in addition to the application provided under this division* [sic]*, deliver to the city an agreement, as contained in the permit application, in writing holding the city harmless from all liability resulting from the operation of the special event, and, further, shall agree to indemnify the city from all liability resulting from any injury to patrons, bystanders, passerby or any individual as a result of the operation or maintenance of the special event, within the management, direction or control of the permittee, its invitees, or agents.*

§ 41.5-116(a) (emphasis added).

This provision requires an applicant to agree to: (1) "hold[ ] the city harmless from all liability resulting from the operation of the special event" and (2) "indemnify the city from all liability resulting from any injury to patrons, bystanders, passerby or any individual as a result of the operation or maintenance of the special event, within the management, direction or control of the permittee, its invitees, or agents."

Beginning with the first of the two requirements (holding the city harmless from "all liability resulting from the operation of the special event"), the Ninth Circuit explained with respect to similar language in a different ordinance: "The phrase 'any liability caused by the conduct of the event' is susceptible to a broad reading, encompassing liability caused by the acts or omissions of any person or entity involved in the event, including acts and omissions not only of the permittees but also of the City and third parties."  *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1039 (9th Cir. 2009).

The Ninth Circuit concluded that this permit condition was not narrowly tailored to serve a significant governmental interest for three relevant reasons.  *Id.* at 1040.  *First*, it required a permittee to reimburse the city for harms caused by third parties.  *Id.*  This risked raising the cost of a permittee's speech based on the reactions of hostile third parties, which the Supreme Court held unconstitutional in

*Forsyth County*. *Id.* (quoting 505 U.S. at 134–35 & n.12). *Second*, the permit application required permittees to waive their right to sue the city for physical harm and constitutional deprivations. *Id.* *Third*, the hold harmless provision required permittees to assume legal and financial responsibility for activities outside of their control, including those undertaken by the city or its agents. *Id.* The Ninth Circuit held that this condition burdened substantially more speech than the amount the Supreme Court found unconstitutional in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). *Long Beach Area Peace Network*, 574 F.3d at 1040–41. In *Claiborne Hardware*, the Supreme Court concluded that the First Amendment restricts imposition of damages liability on organizers of protected events unless the organizers "authorized, directed, or ratified specific tortious activity." 458 U.S. at 927.

The near-identical hold harmless clause in § 41.5-116(a) (its first half) likely suffers from the same three constitutional defects. Because it requires the permittee to "hold[] the city harmless from *all liability* resulting from the operation of the special event," this provision requires the permittee to absorb damages that hostile third parties cause if the injured party attempts to hold the city liable. § 41.5-116(a) (emphasis added); *see Long Beach Area Peace Network*, 574 F.3d at 1040 (quoting *Forsyth County*, 505 U.S. at 134–35 & n.12). The clause also requires permittees to trade their ability to sue the city in exchange for an event permit. The tradeoff likely burdens more speech than the First Amendment allows. *See Long Beach Area Peace Network*, 574 F.3d at 1040. Last, the hold harmless clause in § 41.5-116(a) requires permittees to pay damages for actions that they did not authorize, direct, or ratify, because they must hold the city harmless for "all liability," even if the city or its agents are the ones who caused it. § 41.5-116(a); *Claiborne Hardware*, 458 U.S. at 927. For these three reasons, the hold harmless provision likely violates the First Amendment.

The indemnity clause in § 41.5-116(a) (its second half) likely runs afoul of the First Amendment under *Claiborne Hardware*. This provision requires permittees to "agree to indemnify the city from all liability resulting from any injury to patrons, bystanders, passerby or any individual as a result of the operation or maintenance of the special event, within the management, direction or control of the permittee, its invitees, or agents." § 41.5-116(a). (The final clause ("within the management, direction or control of the permittee, its invitees, or agents") was added in the 2023 amendments.) The city reads the provision to require indemnification only in the event that injuries result from actions "within the management, direction, or control of the permittee," not the actions of hostile third parties. *Id.*; [52] at 13. However, the plain text of the provision does not support the city's interpretation.

44

The problem with this clause stems from the word "invitee," which Black's Law Dictionary defines as "someone who has an express or implied invitation to enter or use another's premises, such as a business visitor or a member of the public to whom the premises are held open." *Invitee*, BLACK'S LAW DICTIONARY (11th ed. 2019). The ordinance requires a permittee to indemnify the city if a spectator—an invitee under the ordinary definition—gets into an altercation and a bystander caught in the fracas sues the city for his injuries. The text of the ordinance requires the permittee to indemnify the city in this situation, even though the permittee had nothing to do with the altercation and did not "authorize, direct, or ratify" any tortious conduct. *Claiborne Hardware*, 458 U.S. at 927.

At bottom, the "invitee" language of the indemnity clause likely violates the First Amendment because it imposes liability on permittees as a condition of obtaining a permit, even if their acts do not cause the relevant injuries.

Required indemnification of the city for the conduct of a permittee's agents (as opposed to invitees) creates less constitutional concern. In general, an agent acting with actual or apparent authority binds his principal, and an agent's acts are lawfully imputed to his principal while the agent is acting within the scope of his authority. *See* RESTATEMENT (SECOND) OF AGENCY §§ 1, 12 (AM. L. INST. 1958). *Claiborne Hardware* recognized the distinction between imposing liability on event organizers for the acts of third parties and the acts of their agents. 458 U.S. at 930. The amended ordinance's required indemnification of the city for acts "within the management, direction or control of. . . [the permittee's] agents" hews closer to the First Amendment than the "invitee" portion of the provision. § 41.5-116(a). In fact, Aurora Pride does not specifically challenge required indemnification for acts "within the management, direction or control" of its agents; its briefing on this point focuses exclusively on the word "invitees." [34] at 27–29; [53] at 10 n.4; [57] at 8 (referring to [34]); [59] at 4 (*Claiborne Hardware*-related issues). If Aurora Pride has not forfeited the challenge to this narrow part of the indemnification clause, its challenge is unlikely to succeed on the merits.

Aurora Pride challenges another provision of the ordinance on similar grounds. Under § 41.5-114(b)(5), the city "will charge the event organizer the actual cost of . . . [a]ny loss or damage to city property." This cost-shifting provision requires permittees to pay for loss or damage to city property whether or not they caused the damage. If a hostile third party causes this damage, the city cannot shift the costs to the permittee under *Forsyth County*, 505 U.S. at 134–35, and *City of Gary*, 334 F.3d at 681–82. More broadly, if acts outside the permittee's control cause the damage, *Claiborne Hardware* does not allow the permittee to be held liable simply because the damage arose from its event. *See* 458 U.S. at 929–32.

45

Thus, § 41.5-114(b)(5) requires permittees to absorb costs that the Supreme Court's cases do not permit shifting to speakers as a condition of holding an event. The possibility that the city could impose such costs likely violates the First Amendment.

## II.   Other Preliminary Injunction Factors

Having addressed the likelihood of success on the merits, the court turns to the other preliminary injunction factors: irreparable harm, the balance of equities, and the public interest.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter*, 555 U.S. at 24). The plaintiff bears the burden of establishing not just a likelihood of success, but also that it is likely to suffer irreparable harm without preliminary relief, that the balance of the equities weighs in its favor, and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20.

The Seventh Circuit uses a "sliding scale" analysis. After the plaintiff meets its initial burden, the court, in its discretion, weighs how likely it is that the plaintiff will succeed on the merits against the relative harms of an injunction to the public interest and the nonmovant. *Cassell*, 990 F.3d at 545; *Christian Legal Soc'y*, 453 F.3d at 859.

Aurora Pride has met its initial burden on each of the four factors, except with respect to the ordinance's additional insurance provision. Both parties have presented strong arguments as to the balance of equities and the public interest, but Aurora Pride's likelihood of success on the merits in particular tips the balance of the factors in the sliding scale analysis, again except as to the additional insurance provision. *See Cassell*, 990 F.3d at 545.

### A.   Irreparable Harm

A successful applicant for preliminary relief must show that if the court denies relief, the applicant is likely to suffer irreparable harm before the court can issue a decision on the merits. 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2023).

In many First Amendment cases going back decades, the Seventh Circuit has presumed irreparable harm where the plaintiff demonstrated a likelihood of success on the merits. *See, e.g., Higher Soc'y of Ind.*, 858 F.3d at 1116; *Smith v. Exec. Dir. of*

46

*Ind. War Mem'l Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014); *Alvarez*, 679 F.3d at 589; *Christian Legal Soc'y*, 453 F.3d at 859; *accord Nat'l People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990); *Citizens for a Better Env't v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975) (citing *Schnell v. City of Chicago*, 407 F.2d 1084, 1086 (7th Cir. 1969) (permanent injunction case)); *cf. Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (RFRA). These cases often cite as the source for this proposition the plurality opinion in *Elrod v. Burns*, using the quotation, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," 427 U.S. at 373 (plurality opinion). The Seventh Circuit then describes the likelihood of success on the merits as often the "determinative factor." *Higher Soc'y of Ind.*, 858 F.3d at 1116 (quoting *Alvarez*, 679 F.3d at 589); *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

Most Seventh Circuit cases involving the First Amendment have not looked beyond the presumption of irreparable harm to the specific facts of the case. *Higher Soc'y of Ind.*, 858 F.3d at 1116; *Smith*, 742 F.3d at 286; *Alvarez*, 679 F.3d at 589; *Christian Legal Soc'y*, 453 F.3d at 859. But there are several reasons to consider doing so.

First, a Seventh Circuit opinion in a First Amendment-retaliation case recognized the standard presumption, but proceeded to do a fact-specific, in-depth analysis of whether the plaintiff was likely to suffer irreparable harm. *Int'l Ass'n of Fire Fighters Loc. 365 v. City of East Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022); *see also Joelner*, 378 F.3d at 620 ("it is sometimes necessary to inquire beyond the merits").

Second, the Supreme Court has done away with the presumption of irreparable harm in the area of patent infringement. In *eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Court overturned the Federal Circuit's longstanding practice of presuming irreparable harm where a plaintiff was likely to succeed on the merits of its patent infringement claim, *id.* at 393–94; *see also id.* at 394–95 (Roberts, C.J., concurring) (discussing traditions of equity). And in cases outside the First Amendment context, courts typically enforce the irreparable harm requirement and require plaintiffs to demonstrate that irreparable harm is likely using facts in the record. *See Auto Driveway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 679 (7th Cir. 2019); *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) ("The moving party must demonstrate that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief.") (citation and internal quotation marks omitted); *accord Winter*, 555 U.S. at 22–23.

47

Third, at least one scholar has questioned the soundness of collapsing the merits and irreparable harm prongs in public law cases where plaintiffs seek equitable relief. *See* Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 HARV. J.L. & PUB. POL'Y 743, 759–71 (2012). Professor DiSarro considers this approach logically inconsistent with Supreme Court precedent in other areas and lacking strong theoretical foundations. *See id.* at 763–71. He further notes that in some cases, other courts of appeals have taken a more nuanced view, requiring plaintiffs to *show* the likelihood of irreparable harm or demonstrate that the law they are challenging actually serves to restrict speech in their particular case. *Id.* at 774–75, 777 & nn.143–44, 155–57 (citing *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003); *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006); *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989); *Doe v. Reed*, 586 F.3d 671, 681 & n.14 (9th Cir. 2009) (criticizing a district court in dicta for failing to do factfinding on irreparable harm prong)).

Fourth, a Seventh Circuit case with some factual similarities, *MacDonald I*, cited the same passage of *Elrod* as the other Seventh Circuit cases cited above, but nevertheless held that the plaintiff had failed to demonstrate irreparable injury. 132 F.3d at 358 & n.4, 363 n.8. Even though the Chicago Park District had *denied* a permit application for a large rally, the Park District had then nonetheless allowed and assisted the rally "by opening bathrooms, providing garbage cans, and allowing MacDonald to use portable speakers to amplify sound." *Id.* at 357. Intending to hold further rallies, the plaintiff brought a facial challenge to the park district code in light of the denial. The Seventh Circuit acknowledged the presumption of irreparable harm but concluded that the specific facts of the case did not warrant such a finding: "[D]espite its earlier denial of MacDonald's permit application, the Park District has never prevented MacDonald from staging a rally on its property." *Id.* at 358. "After the district court denied MacDonald's request for a preliminary injunction addressed to the May 1997 rally, the Park District allowed the rally to go forward and even assisted MacDonald in a variety of ways." *Id.* The Seventh Circuit explained:

> [R]egardless of the validity or invalidity of the Park District's permit procedure, there is no indication that the procedure has ever resulted in the suppression of protected speech. In this case, moreover, because MacDonald was allowed to hold his August 1997 rally, it seems to us very unlikely that any of MacDonald's First Amendment rights will be infringed prior to the final resolution of his facial challenge. And to the extent that any harm may become imminent (e.g., if the Park District

48

should deny MacDonald a permit for his May 1998 rally and attempt to prevent that rally from occurring), he could apply to the district court for more limited relief addressed to that particular harm.

*Id.*

As to fee requirements, the Seventh Circuit pointed to the possibility that the plaintiff could recover money damages if any of the ordinance's fee provisions were ultimately held invalid.  *Id.* at 358 n.4, 363 n.8.

Absent later Seventh Circuit cases reinforcing the presumption of irreparable harm, *MacDonald I* at least raises questions about the application of the irreparable harm prong here.  However, the parties have not explored these issues in any depth.  That is understandable given the expedited preliminary injunction schedule.  And the Seventh Circuit has applied the general presumption of irreparable harm in a rule-like fashion both before and after *MacDonald I*, including in a more recent case involving a challenge to an event permitting system in a traditional public forum.  *Smith*, 742 F.3d at 286.  The court thus is left with that general presumption.  The parties may raise arguments about irreparable harm in the merits briefing with respect to a permanent injunction.  *See Ayres*, 125 F.3d at 1013 ("[A] preliminary injunction is not a decision on the merits of the plaintiff's suit.").

## B.    Balance of Hardships

The city asserts significant hardships that could result from an injunction, but ultimately the balance of hardships also tips in favor of an injunction.

The Seventh Circuit has recognized that like permit applicants, municipalities can suffer harm from injunctions against applications of their ordinances.  *See MacDonald I*, 132 F.3d at 358–61.  Further, municipal ordinances regulating competing uses of limited public spaces *promote* speech by conserving those limited public resources in an orderly fashion.  *Thomas I*, 227 F.3d at 924 (citing *Cox*, 312 at 574–76).

In this case, the city asserts significant hardships that could result from an injunction.  To begin, the city notes that under its longstanding collective bargaining agreement with the police union, it has no authority to order its officers to work a specific event when they are off duty.  The city contends that an injunction in this situation is in effect a mandatory injunction requiring it to break its contractual obligations under the relevant CBA.  The Chief of Police credibly

described the city's limited police resources and staffing challenges across the board, including having to reduce the scope of the 2022 Fourth of July parade. As the city explains, relief that enjoins the application of ordinance provisions could have deleterious effects on the city, such as degrading its relationship with its uniformed officers, and an injunction could create serious practical problems if the city is required to permit the Pride Parade to go forward on its proposed route without enough police available to work.

On Aurora Pride's side of the ledger, it explains the hardship of trying to plan for a First Amendment-protected event with likely unconstitutional requirements governing the permit application. And it further cites cases that explain that the balance of equities generally weighs in favor of an injunction that protects First Amendment rights. *E.g.*, *Christian Legal Soc'y*, 453 F.3d at 867; *Alvarez*, 679 F.3d at 589–90.

The city's concerns are serious and factor into both weighing whether to issue an injunction at all and writing the injunction. The court has written a genuinely prohibitory injunction that applies exclusively to Aurora Pride. The city is free to enforce the existing ordinance against other parties. The injunction merely prohibits the city from enforcing against Aurora Pride certain aspects of the ordinance specified in the separate injunction document. The injunction does not require any nonparty officers to work any specific event, nor does it require the city to alter its obligations under the collective bargaining agreement. The city is free to respond to the injunction however it chooses, so long as it complies with the injunction and its federal constitutional obligations as an arm of Illinois's state government. Ultimately, because enforcement of an unconstitutional ordinance is not a cognizable harm under the Seventh Circuit's cases, and the challenged aspects of the amended ordinance likely violate the First Amendment, the balance of hardships weighs in favor of granting the preliminary injunction. *Christian Legal Soc'y*, 453 F.3d at 867; *Alvarez*, 679 F.3d at 589–90.

## C.    Public Interest

The public interest prong also favors limited injunctive relief. Many of the arguments here overlap with those in the balance of hardships analysis. A few, however, take on more significance when considering the public interest.

Aurora Pride emphasizes cases holding that injunctions that protect First Amendment rights are "always in the public interest." *See Higher Soc'y of Ind.*, 858 F.3d at 1116; *Christian Legal Soc'y*, 453 F.3d at 859; *Joelner*, 378 F.3d at 620. Other courts assessing motions to preliminarily enjoin the enforcement of

potentially unconstitutional statutes and administrative regulations have sometimes found that such injunctions are not in the public interest, even in cases implicating First Amendment rights. *MacDonald I*, 132 F.3d at 360–61; 11A WRIGHT & MILLER, *supra* § 2948.4 n.7 (collecting cases); *Baines v. Dunlap*, 466 F. Supp. 3d 273, 286–87 (D. Me. 2020); *Silberberg v. Bd. of Election of the State of N.Y.*, 216 F. Supp. 3d 411, 420–22 (S.D.N.Y. 2016). Here, issuance of a limited preliminary injunction is in the public interest.

The public has a strong interest in safety generally, and a particularly strong interest in municipalities having effective systems and resources to promote safe participation in public events. In writing the injunction, the court has limited its application to the parties before the court only, and has left in place the city's ability to make staffing and emergency-planning decisions grounded in holding any event safely. The injunction does not "strike down" the ordinance in total or as to parties other than Aurora Pride. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021) (quoting *Borden v. United States*, 141 S. Ct. 1817, 1835 (2021) (Thomas, J., concurring)).

In addition, the injunction leaves in place the city's ability to recoup costs authorized by the ordinance, other than for event security and police services. The ordinance identifies a number of such costs, including for traffic control, fire safety, medical safety, the use of city equipment, and certain specified damage caused by the special event. § 41.5-114(b)(1)–(3). As noted above, Aurora Pride does not challenge the costs of traffic control, and last year, "the bulk" of the officers assigned were there for traffic control. Hr'g Tr., [56] at 52:18–24. Without an ability to recoup costs associated with hosting public events on the city streets, municipalities would be forced to pass those costs onto their citizens, requiring their citizens to subsidize the speech and expressive conduct of others. *Cf. Brandt v. Village of Winnetka*, 612 F.3d 647, 650 (7th Cir. 2010). The limited nature of the injunction also ameliorates some of the potential financial harm a broader injunction might cause.

Last, cases analyzing the public interest prong in First Amendment cases generally hold that preliminary relief in such cases is in the public interest where the plaintiff demonstrates a likelihood of success on the merits. *Higher Soc'y of Ind.*, 858 F.3d at 1116; *Christian Legal Soc'y*, 453 F.3d at 859; *Joelner*, 378 F.3d at 620. In *MacDonald I*, the Seventh Circuit reversed a district court's grant of a preliminary injunction in a case challenging Chicago's permitting scheme in its parks, in part based on the public interest prong. 132 F.3d at 361. But there, the injunction was far broader and would have interfered with the city's permitting scheme for all "First Amendment activities." *Id.* at 359–60.

In conclusion as to the public interest: The city raises strong and valid arguments. However, the injunction in this case is narrow and genuinely prohibitory. Thus, while the court recognizes that the city's obligations and efforts to regulate its commons for the benefit of its residents and the maintenance of public safety are critical, the public interest weighs in favor of granting limited preliminary relief in this case.

### D.    Sliding Scale

After the plaintiff meets its initial burden, the Seventh Circuit then weighs the relative strengths of the likelihood of success, the harms, and the public interest against each other in a "sliding scale" analysis. *Cassell*, 990 F.3d at 545; *Christian Legal Soc'y*, 453 F.3d at 859.

Although the defendants have raised real, significant harms, Aurora Pride's likelihood of success tips the balance. As discussed, the injunction is narrow and applies only to Aurora Pride. It leaves ample room for the city to respond as to this specific parade, and it does not require the city to change its longstanding policies or practices with respect to other parades or organizations.

As currently drafted, the ordinance allows content-based considerations by volunteers to affect whether an applicant can have an event at all, the kind of event an applicant can have, and how much the event costs. Further, the ordinance allows for police and security costs to fluctuate with third parties' reactions, and for the imposition of liability and costs on a permittee for damage caused by those outside the permittee's control. The high likelihood that these features violate the First Amendment outweighs even the significant harms the defendants describe. *Cf. Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). Thus, the "sliding scale" analysis weighs in Aurora Pride's favor. *Christian Legal Soc'y*, 453 F.3d at 859.

### E.    Additional Insurance Provision

Each of the previous three conclusions (on the balance of harms, public interest, and sliding scale) flips with respect to the amended ordinance's additional insurance provision, § 41.5-115(b). As discussed in an earlier section, Analysis Part I.C, *supra*, Aurora Pride's likelihood of success on its challenge to this provision is neutral to weak because read in the context of the whole ordinance, the additional insurance provision reasonably allows the coordinator to distinguish among events within the same tier based on content-neutral factors when deciding how much

added insurance to require. The balance of harms from enjoining this provision weighs in the city's favor as the city could suffer financial and reputational consequences from allowing a parade to go forward without insurance calibrated not just to its eventual tier, but also its specific nature without respect to its content. *See Thomas I*, 227 F.3d at 925. Further, if the city requires additional insurance for Aurora Pride due to the content of its message or because of the potential threat of hecklers, it can apply for that more limited relief in an as-applied challenge, so the harm to Aurora Pride from not enjoining the provision's application is fairly low at this juncture. *See MacDonald I*, 132 F.3d at 358. As to the public interest, the public has a strong interest in Aurora Pride carrying an appropriate amount of insurance to guard against uninsured claims. The sliding scale also tilts against an injunction with respect to this provision due to the low likelihood of success on the challenge to § 41.5-115(b).

The preliminary injunction factors weigh against granting preliminary relief enjoining the application of § 41.5-115(b).

## III. Remedy

The court concludes with a number of points about the remedy.

An injunction has three requirements: It must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not be referring to the complaint or other document—the act or acts restrained or required." *Auto Driveway Franchise Sys.*, 928 F.3d at 675–76 (quoting Fed. R. Civ. P. 65(d)(1)). The Seventh Circuit also requires an injunction to be "embodied in a standalone separate document." *Id.* at 676. The court will enter the standalone injunction order simultaneously with this opinion.

Beginning with the limits of the injunction: The injunction does not include a provision that Aurora Pride originally challenged, but for which Aurora Pride abandoned its challenge during the course of the litigation. As discussed above, Background, Part III.E.1, *supra*, under the ordinance, the city estimates the number of police officers (as well as emergency medical providers and fire department employees) required for a proposed event. *See* § 41.5-160(c). Initially, Aurora Pride challenged the city's determination of personnel requirements, but abandoned that challenge. Hr'g Tr., [56] at 17:24–18:4.

As to the provisions that Aurora Pride does challenge, the injunction enjoins the application of only the specific provisions that are likely to be unconstitutional in a direct fashion. For example, the provisions that tie the existence, scope, and

cost of an event to the availability of volunteers—§ 41.5-114(c)(4), (5), and (7)—are enjoined. Since Aurora Pride's failure to comply with those provisions can no longer constitute a basis to deny or revoke its permit, there is no need to also enjoin the provisions that govern the denial or revocation of a permit generally. Thus, the court declines to enjoin the application of any portion of § 41.5-134 (approval or denial) or § 41.5-180 (revocation). *E.g.*, §§ 41.5-134(b)(3), 41.5-134(c)(5), 41.5-180(a)(2), (5), 41.5-180(b), 41.5-180(d). Likewise, the court declines to enjoin the application of § 41.5-161(c); the challenge to that provision derives from the challenge to § 41.5-114(c)(4), (5), and (7), which the court has addressed.

Consistent with traditional severability principles, the court has enjoined the application of specific language within certain provisions if their texts can be plausibly separated into constitutional and unconstitutional applications. *See* DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT: THE FIRST HUNDRED YEARS, 1789-1888 394–95 & nn.175–76 (1985) (discussing, *inter alia*, *United States v. Reese*, 92 U.S. 214 (1876)). At the preliminary injunction hearing, the court asked the parties to comment on the severability of the ordinance. Hr'g Tr., [56] at 166:13–21. Severability is a matter of state law. *Plain Dealer Publ'g*, 486 U.S. at 772. In Illinois, severability is a question of legislative intent. *Waicekauskas v. Burke*, 784 N.E.2d 280, 284 (Ill. App. Ct. 2002). "Although general severability clauses carry less weight in ascertaining legislative intent than specific severability clauses, they do establish a presumption that the legislature intended for an invalid statutory provision to be severable." *Id.* "This presumption will be overcome and the entire act held unconstitutional if the legislative body would not have passed the statute with the invalid portion eliminated." *Id.* at 285. That is, the presumption will be overcome if the valid and invalid provisions are "essentially and inseparably connected in substance" as to warrant the conclusion that the legislature would have not passed the remainder of the law independently. *Id.*

Aurora Pride has pointed to a general severability provision in Aurora's Code of Ordinances. [59] at 7 n.7; Code Sec. 1-6, available at https://aurora-il.municipalcodeonline.com. The city has not specifically briefed the question of severability, but the court concludes that the ordinance's invalid provisions are severable from the valid aspects. The court presumes (including based on the city's arguments) that the city would prefer to have a special events ordinance in part rather than no ordinance at all. Thus, the court is enjoining the application of particular provisions of the ordinance rather than the entirety of Chapter 41.5. *See Waicekauskas*, 784 N.E.2d at 285; *Bell v. Keating*, 697 F.3d 445, 464 (7th Cir. 2012).

As to the enjoined applications of provisions (or, where severable, language within provisions), defendants are enjoined from enforcing those portions of the ordinance as to Aurora Pride only—and not other parties—because a valid Article III remedy "'operates with respect to specific parties,' not with respect to a law in the abstract." *See Arizona v Biden*, 33 F.4th 469, 483 (6th Cir. 2022) (Sutton, C.J., concurring) (quoting *California v. Texas*, 141 S. Ct. 2104, 2115 (2021)).

The injunction in no way undermines the city's ability to: (1) consider all potential public safety risks of an event (as well as the professional judgments of police and other officials about personnel, resources, and costs) in determining the number of police officers or security an event requires, *see* § 41.5-160(c); *Sullivan*, 511 F.3d at 37, (2) revoke a permit for any of the reasons set forth in the ordinance, including if the event poses a threat to public health or safety, *see* § 41.5-180(a)(5), or (3) deny a permit for any of the reasons set forth in the ordinance, including when holding the event would undermine the city's ability to provide essential services to the remainder of its population, *see* § 41.5-134(c)(2), (c)(4)(b).

Some of the provisions at issue might be rewritten or construed to address the issues identified here. For instance, the city might extend to tier 1-5 events the carveout in § 41.5-114(b)(1), which is currently limited to tier 6 events (the carveout provides that the city, not the organizer, "shall bear the costs of the personnel and equipment it determines is necessary to prevent the disruption of or interference with a tier 6 event"). Any such revisions, however, "are the City's to make"; the court cannot "inva[de] the legislative domain" or effectively rewrite the ordinance. *Bell*, 697 F.3d at 464.

More generally, this decision does not require any nonparty officers to work any specific event, require the city to institute a system of mandatory overtime, or require the city to renegotiate the collective bargaining agreement. The city remains free to respond to the injunction in a manner that avoids the hypothetical problems in its posthearing brief. Although the legality of any specific option is not before the court, the city's efforts might include increasing its own recruiting efforts or financial incentives (without passing the additional cost onto Aurora Pride), hiring private security, temporarily renegotiating the CBA or other agreements with the appropriate employee groups, or revising the ordinance to address the constitutional issues.

Aurora Pride must post a bond of $15,000 under Rule 65(c). "The purpose of requiring the party obtaining an injunction to post security is to compensate the enjoined party, if it prevails on the merits, for the pecuniary harm caused by a

55

preliminary injunction." *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007) (citing *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002)). The parties have not briefed the appropriate bond amount, but the court finds that $15,000 is a reasonable to hold as security if the defendants have been wrongfully enjoined. "When setting the amount of security," the Seventh Circuit has "instructed district courts to err on the high side." *Auto Driveaway*, 928 F.3d at 679 (citation and internal quotation marks omitted).

$15,000 is an estimate using two inputs derived from the city's charges and estimated costs for last year's Pride Parade.

*First*, the court uses the amount of "financial incentives" the city charged Aurora Pride for the 2022 Parade. The court infers that amount was $13,418.63. (This number is the difference between the city's original estimate of off-duty police costs (without the incentives) and the amount the city ultimately billed Aurora Pride (including the incentives). *See* [61-3] (25% of estimated off-duty police costs without the incentives was $5,401.86, so total estimated cost of off-duty police would have been $21,607.44); [61-13] (off-duty police costs after parade, including the incentives, was $35,026.07).) Because the city cannot pass the cost of these financial incentives to Aurora Pride for the 2023 Pride Parade due to the injunction, Aurora Pride must post it as a bond in case the court concludes later in the case that the injunction was improper, and that the city could have properly passed those costs. There is no guarantee that the city will use financial incentives to secure city employees to work the 2023 Pride Parade, or that the expense would be the same in 2022. However, in the absence of other record evidence, the expense incurred for the 2022 Pride Parade (a parade of a comparable size to the 2023 parade Aurora Pride has applied for) constitutes a reasonable estimate of potential damages.

*Second*, the court estimates the additional costs the city may calculate, but cannot pass to Aurora Pride, for "police services" and "event security." Last year, the city estimated that the combined cost for all police services—including traffic control—at the standard overtime rate (not the triple-time incentive) would be approximately $21,607.44. *See* [61-3]. Even with the injunction in place, the city may pass the costs for traffic control. *See* Analysis, Part I.B, *supra*. Last year, "the bulk" of the officers assigned were there for traffic control. Hr'g Tr., [56] at 52:18–24. Naturally then, "the bulk" of the $21,607.44 the city estimated for general police services was tied to traffic control. Without more evidence on which to base its calculation, the court estimates that approximately $1,600 of the $21,607.44 total was allocated to non-traffic "event security" and "police services," costs that the city cannot pass to Aurora Pride in compliance with the injunction.

56

The financial incentives (approximately $13,400) and general police services and event security (approximately $1,600) bring the total bond to $15,000. The court finds this amount is proper for the payment of costs and damages that may be suffered if defendants are found to be wrongfully enjoined. The court further finds that the potential harms relating to the injunction of the indemnification provisions are likely minor and too speculative to justify increasing the bond amount. *See Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 458 F. Supp. 3d 1044, 1065 (E.D. Wis. 2020); *Chambers v. Briggs & Stratton Corp.*, 863 F. Supp. 900, 907 (E.D. Wis. 1994). Either party may file an appropriate motion to adjust the bond "should the amount initially imposed prove either excessive or insufficient." *Inventus Power, Inc. v. Shenzen Ace Battery Co.*, No. 20-cv-3375, 2020 WL 3960451, at *15 (N.D. Ill. July 13, 2020).

## CONCLUSION

Aurora Pride's motion for a preliminary injunction, [31], is granted in part and denied in part. The defendants are enjoined from enforcing as to Aurora Pride only the provisions of the ordinance specified in the separate preliminary injunction order.

Dated: May 18, 2023          /s/ Martha M. Pacold

**APPENDIX**



STATE OF ILLINOIS )
COUNTIES OF KANE, DUPAGE, )
    KENDALL AND WILL )
CITY OF AURORA )

# CERTIFICATE

I, Maria Socorro Flores, DO HEREBY CERTIFY THAT I am the Deputy City Clerk of the City of Aurora, Kane, DuPage, Kendall and Will Counties, Illinois and, as such officer, I have the lawful power and duty to keep a record of all proceedings of the City Council of said City, and of all Ordinances and Resolutions presented to or passed by said City Council.

I DO HEREBY FURTHER CERTIFY that the foregoing document is a true, correct and complete copy of:

ORDINANCE NO: O23-004

AN ORDINANCE AMENDING CHAPTER 41.5 OF THE CODE OF ORDINANCES PERTAINING TO SPECIAL EVENTS.

which was approved on January 24, 2023, is on file in my office and that the proceedings of the City Council of said City at the meeting duly called and held on January 24, 2023, were in accordance with applicable laws, at which a quorum was present and acting throughout.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporate Seal of the City of Aurora, in the State of Illinois this 26th day of January 2023.



(SEAL)

_Maria S. Flores_

Maria Socorro Flores
Deputy City Clerk
City of Aurora, Illinois



CITY OF AURORA, ILLINOIS

ORDINANCE NO. 023-004

DATE OF PASSAGE *January 24, 2023*

An Ordinance amending Chapter 41.5 of the Code of Ordinances pertaining to Special Events.

WHEREAS, the City of Aurora has a population of more than 25,000 persons and is, therefore, a home rule unit under subsection (a) of Section 6 of Article VII of the Illinois Constitution of 1970; and

WHEREAS, subject to said Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs for the protection of the public health, safety, morals, and welfare; and

WHEREAS, the City Council adopted Chapter 41.5 to the Code of Ordinances, City of Aurora, to create an orderly process to facilitate the application for permits to conduct special events within the City; and

WHEREAS, the City Council finds that it is appropriate to periodically review portions of the Code of Ordinances to determine whether revisions are necessary or useful; and

WHEREAS, the City Council finds that, upon its review of Chapter 41.5, various revisions are necessary and useful to provide greater clarity of language, refinement of processes, and additional mechanisms to ensure the exercise of the rights protected by the First Amendment; and

WHEREAS, the City Council has reduced these revisions to writing as set forth in Exhibit A of this Ordinance, which is attached hereto and made a part of this Ordinance as if fully set forth herein

NOW, THEREFORE, BE IT ORDAINED by the City Council of the City of Aurora, Illinois, as follows: that the respective sections of Chapter 41.5 of the Code of Ordinances of the City of Aurora, Illinois, shall be and hereby are amended as set forth in Exhibit A of this Ordinance; and

BE IT ORDAINED, that the City Council finds that an urgency exists, due to the anticipated of numerous special events permit applications in the near future, such that

ORDINANCE NO. *023-004*

DATE OF PASSAGE *January 24, 2023*

this ordinance shall become effective immediately, if approved upon a vote of two-thirds of all of its members holding office.

ORDINANCE NO. _023-004_

LEGISTAR NO. _22-1069_

PASSED AND APPROVED ON _January 24, 2023_

AYES _12_ NAYS _∅_ NOT VOTING _∅_ ABSENT _∅_

| ALDERMAN | Vote |
|---|---|
| Alderman Llamas, Ward 1 | yes |
| Alderwoman Garza, Ward 2 | yes |
| Alderman Mesiacos, Ward 3 | yes |
| Alderman Donnell, Ward 4 | yes |
| Alderman Franco, Ward 5 | yes |
| Alderman Saville, Ward 6 | yes |
| Alderwoman Hart-Burns, Ward 7 | yes |
| Alderwoman Smith, Ward 8 | yes |
| Alderman Bugg, Ward 9 | yes |
| Alderwoman Baid, Ward 10 | yes |
| Alderman Woerman, At Large | yes |
| Alderman Jenkins, At Large | yes |

ATTEST:

_____
City Clerk — Deputy

_____
Mayor

Legistar 22-1069                Exhibit A                January 13, 2023

1   **Sec 41.5-100 Findings**

2   (a)   The city council finds that the city's festivals, races,

3         parades, and other special events contribute to the unique

4         character of the city. Special events throughout the city

5         range from small neighborhood-level events to large-scale

6         productions and these events held in the city can impact

7         public safety and the flow of pedestrian and vehicular

8         traffic.   As   such,   allowing   a   special   event   permit

9         application,   would   allow   public   safety   personnel   the

10        ability to plan and manage public safety personnel and

11        resources.

12  (b)   A underlined{unified} special event permit application process will

13        allow the city to manage the competing uses of its public

14        spaces and ensure that members of the public are able to

15        access public space for their events. The city council

16        finds that it is desirable to allow applicants to submit a

17        single   application   that   will   embrace   all   municipal

18        approvals   required   by   this   code   and   allow   the   special

19        events division to serve as a   ~~Many events have to apply~~

20        ~~for multiple permits and having an intergovernmental team~~

21        ~~acting as a~~ "one stop shop" for special events that will

22        provide a single point of contact for event organizers and

23        the public.

1

Legistar 22-1069                Exhibit A                January 13, 2023

1     (c)   The city council finds that certain classes of special

2          events, specifically processions and assemblies as

3          described in this ordinance, require substantially less

4          involvement by city staff, require fewer volunteers to

5          adequately support the event while providing adequate

6          alternative fora for other expressions of speech. The city

7          council further finds that such alternative fora provide a

8          more accessible and affordable means of permitting special

9          events that do not require the formality of larger, more

10         complex special events.

11   **Sec 41.5-102 Definitions**

12   The following words, terms and phrases, when used in this article,

13   shall have the meanings ascribed to them in this section, except

14   where the context clearly indicates a different meaning:

15     (a)   *Adjacent premises* means any land or parking area

16          immediately surrounding the special event that is occurring.

17     (b)   *Alcohol* under this chapter means events that serve or sell

18          alcohol must obtain the appropriate permitting under

19          chapter 6 as well as obtain police and/or security for

20          their event.

21     (c)   *Applicant* means an individual, resident, organization,

22          non-profit, governmental entity or any other entity

23          recognized by law that both sponsors the event and applies

24          for the permit to hold the special event in the city. The

Legistar 22-1069          Exhibit A          January 13, 2023

1         applicant will update the application with the current

2         contact person who will be in person at the event.

3  (d)    *Business day* means those days in which the city offices

4         are open for conducting city business. A "business day"

5         does not include Saturday, Sunday or the holidays observed

6         by the city.

7  (e)    *Carnival* means any aggregation of shows or riding devices,

8         games of skill or chance, or any combination of shows and

9         riding devices, or any combination of several enterprises,

10        such as revolving wheels, merry-go-rounds, giant swings,

11        panoramas, musical and theatrical entertainments or riding

12        devices, whether carried on or engaged in or conducted in

13        any field, park or in a building or enclosure, and whether

14        carried on, engaged in or conducted as one (1) enterprise

15        or by several concessionaires, and whether one (1)

16        admission fee is charged for admission to all such shows

17        or entertainments, or separate fee for admission is charged

18        for each amusement. The size of the carnival will determine

19        what tier the event will fall under. Any carnival will need

20        to have a security plan for adjacent premises to the

21        carnival. Carnivals may only operate until 8 p.m. Sunday

22        through Thursday and 9 p.m. on Friday and Saturdays with

23        last tickets selling 30 minutes prior to closing.

Legistar 22-1069        Exhibit A        January 13, 2023

1     (f)    *Circus* means a show consisting of acrobats, trained animals,

2            clowns, or similar forms of entertainment that is held in

3            an arena, which may be open air or enclosed in a tent or

4            building.

5     (g)    *City property* means any buildings, public street, alley,

6            sidewalk, right-of-way, city owned parks, parkway or

7            parking lot owned, controlled or managed by the city. City

8            property <u>does not include real</u> ~~excludes~~ property owned by

9            any other <u>governmental entity</u> ~~unit of local government~~.

10    (h)    *City services* means any services provided by <u>or through</u>

11            <u>the use of</u> city personnel including, but not limited to

12            <u>members of the community affairs, fire, police, public</u>

13            <u>works or other department or agency required by a special</u>

14            <u>event.</u> ~~public safety, crowd control, traffic control,~~

15            ~~management of the event site, road closures, garbage~~

16            ~~removal, inspection services, animal care and control~~

17            ~~services, demarcation of no-parking tow zones, and~~

18            ~~production of event materials and city website information.~~

19    (i)    *Coordinator* means the head of the division of special

20            events. ~~*Community events coordinator* means an individual~~

21            ~~hired as a city employee to coordinate applications for~~

22            ~~special events.~~

23    (j)    *Demonstration, march* or *vigil* means an assembly or protest

24            held for a specific cause or concern.

4

Legistar 22-1069                 Exhibit A                 January 13, 2023

1    (k)   *Permittee* means the holder of a permit or a provisional

2          permit for a special event issued under this chapter

3          responsible for conducting managing and organizing said

4          event. A permittee includes any of the officers, employees,

5          or agents of the holder. ~~Event organizer means any person~~

6          ~~who conducts, manages, or organizes a special event.~~

7    (l)   *Emergency action plan* means a plan that is submitted during

8          the application process that identifies emergency exits,

9          crowd managers, emergency notification methods, and how

10         organizers will deal with emergencies. These plans must

11         also include consideration for cancellation of an event

12         due to weather conditions that create a hazard.

13   (m)   *Film production* means a film production using public or

14         private property within the city, whether indoor or outdoor,

15         for the purpose of producing, filming or videotaping of

16         commercials, movies, television programs, or training

17         tapes or films and other moving picture media for

18         commercial, not-for-profit, educational or artistic

19         activities shall require a permit. A film production falls

20         under a tier 5 permit.

21   (n)   *Impact* means to impede, obstruct, impair, or interfere with

22         normal vehicular or pedestrian traffic or city services.

Legistar 22-1069                    Exhibit A                    January 13, 2023

1    (o)    *Interested person* means the property owner, property

2           management, or tenant of each property that fronts a

3           portion of the proposed right-of-way closure area.

4    (p)    *Legacy event* means a special event that has been held in

5           the city ~~City of Aurora~~ on or about a certain date, on a

6           substantially similar route, and in connection with a

7           specific holiday or consistent theme, in substantially the

8           same form for a minimum of three (3) consecutive years.

9    (q)    *Letter of intent* means a letter that an event organizer

10          would submit to the ~~special event~~ coordinator after

11          receiving a satisfactory evaluation following their event,

12          to reserve the same time and spot for the following year.

13   (r)    *Governmental* ~~*Municipal*~~ *event* means ~~an~~ a special event which

14          is conducted or sponsored by a <u>unit of federal, state, or</u>

15          <u>local government or a school district</u> ~~governmental unit~~ or

16          agency on publicly owned land or property. <u>A governmental</u>

17          <u>event includes an event organized by a not-for-profit</u>

18          <u>corporation acting as an agent for a special service area</u>

19          <u>established by the city council</u>;

20   (s)    *Musical event* means any show or act, or aggregation of

21          shows or acts, or any combination of shows or acts, or any

22          combination of several enterprises, which provides live

23          musical entertainment, whether carried on or engaged in or

24          conducted in any field, park or in any other way outdoors,

Legistar 22-1069                Exhibit A                January 13, 2023

1        and whether carried on, engaged in or conducted as one (1)

2        enterprise or by several concessionaires, and whether one

3        (1) or no admission fee is charged for admission to all

4        such shows or entertainments, or a separate fee for

5        admission is charged for each entertainment.

6  (t)  *Parade* means <u>an</u> ~~any march, procession or other similar~~

7        activity consisting of persons, animals, vehicles or things,

8        or any combination thereof, upon any public street,

9        sidewalk, alley or other public place, which requires a

10       street closing or otherwise requires authorized city

11       employees to stop or reroute vehicular traffic because the

12       parade will not or cannot comply with normal and usual

13       traffic regulation or controls.

14  (u)  *Parade unit* or *unit* means any one (1) vehicle, one (1)

15       float or one (1) marching group.

16  (v)  *Permit* means <u>a document issued by the coordinator</u>

17       <u>authorizing the permittee to conduct a special event in</u>

18       <u>accordance with the terms and conditions set forth on the</u>

19       <u>permit or as subsequently modified by the coordinator.</u> ~~the~~

20       ~~City of Aurora-issued document that is signed and dated by~~

21       ~~the community events office issued to and carried by the~~

22       ~~applicant, which will indicate to any person seeking~~

23       ~~verification that this applicant has achieved the necessary~~

Legistar 22-1069            Exhibit A            January 13, 2023

1      ~~approvals and paid the necessary fees to stage a special~~

2      ~~event in the city.~~

3   (w)  *Preliminary recommendation* means the initial review of a

4        special event application.

5   (x)  *Public notification* means a notification that is approved

6        by the ~~community events~~ coordinator or his or her designee.

7        Events that require road closures, or may cause disruption

8        for <u>city</u> ~~City of Aurora~~ residents, businesses, churches,

9        etc., must deliver notification to the affected parties.

10  (y)  *Race* means a competition between individuals to see which

11       is the fastest in covering a set course. For the purposes

12       of this ordinance, it excludes vehicle races.

13  (z)  *Residential block party/event* consists of a group of

14       neighbors wishing to block off their street for a "get-

15       together party". Permits are not issued for personal,

16       family or political events, i.e. birthday parties, weddings,

17       fund raisers or political gatherings, etc.

18  (aa) *Site restoration* means the act or process of returning the

19       site back to its original condition by either cleaning it,

20       repairing any damage or replacing surfaces or items.

21  (bb) *Special event* means an organized, nonpermanent, public or

22       private gathering ~~or assembly~~ that utilizes public spaces,

23       such as public roads, greenways, city services and public

24       parks or plazas. Special events are categorized by a tier

8

Legistar 22-1069          Exhibit A          January 13, 2023

1          system which is described on the special events application.

2          A special event does not include a funeral procession.

3    (cc)   *Special events review* means <u>the process undertaken by the</u>

4          <u>coordinator to submit a permit application for review by</u>

5          ~~that the community events coordinator and staff will send~~

6          ~~out the permit applications to~~ the appropriate departments

7          <u>for their recommendations thereupon</u> ~~to review the~~

8          ~~application and supply recommendations to the community~~

9          ~~events coordinator~~.

10   (dd)   *Sponsor* means any person who applies for the special event

11          permit and the person to whom a special event permit is

12          issued following successful application. The sponsor is

13          the contact person that will need to be in communication

14          with various city staff throughout the event as well as

15          after the event.

16   (ee)   *Spontaneous event* means <u>a special event for which an</u>

17          <u>application cannot be completed in accordance with this</u>

18          <u>ordinance because the event is in reaction to or</u> ~~an~~

19          ~~attendee or event organizer cannot provide the level of~~

20          ~~advance notice required by this chapter, such as an event~~

21          occasioned by recent news or current <u>matters of public</u>

22          <u>concern</u> ~~affairs~~, that is conducted solely <u>as a procession</u>

23          <u>or assembly as those terms are defined by this chapter</u> ~~on~~

24          ~~city right-of-way or city property~~.

Legistar 22-1069          Exhibit A          January 13, 2023

1    (ff)  *Procession* means a movement of persons in an orderly,

2          formal manner, other than a parade, from a point of origin

3          to a point of termination on a sidewalk, that does not

4          impede the normal flow or regulation of pedestrian or

5          vehicular traffic.

6    (gg)  *Provisional permit* means a document issued by the

7          coordinator to an applicant when that applicant has

8          successfully completed the application process, but that

9          applicant is unable to immediately demonstrate its ability

10         to fulfill all of its obligations under this chapter

11   (hh)  *Assembly* means a gathering of one or more persons on a

12         sidewalk or city property, other than a right-of-way by

13         the city that does not interfere with the regular use of

14         such sidewalk or park property, including pedestrian or

15         vehicular traffic.

16   (Ord. No. 019-002, § Exh. E, 1-22-19)

17   **Sec 41.5-110 Permit Required; Exceptions**

18   (a)   Except as provided in this section ~~subsection (b) and (c),~~

19         a special event permit issued under this chapter is

20         required to conduct, manage, or operate a special event.

21   (b)   A special event permit under this chapter is not required

22         for:

23         (1)   Governmental ~~Municipal~~ events.

24         (2)   Spontaneous events; and

Legistar 22-1069         Exhibit A         January 13, 2023

1        (3)     <u>Activities for which sec. 41.5-111 provides are</u>

2             <u>exempt from the permitting under this chapter.</u>

3   (c)    <u>In the case of spontaneous events, the</u> ~~A spontaneous event~~

4        ~~for which an attendee or event organizer cannot provide~~

5        ~~the level of advance notice required by this chapter, such~~

6        ~~as an event occasioned by recent news or current affairs,~~

7        ~~that is conducted solely on city right-of-way or parkland.~~

8        ~~A spontaneous event is subject to other law. To help ensure~~

9        ~~public safety, an~~ organizer ~~of a spontaneous event~~ shall

10       contact the police department ~~Aurora Police Department~~ and

11       if available, the ~~community events~~ coordinator, and provide

12       the date, time, place and an estimate of the approximate

13       number of person<u>s</u> who will be participating. The ~~community~~

14       ~~events~~ coordinator will have a form to assist a sponsor in

15       providing the necessary information.

16 (Ord. No. O19-002, § Exh. E, 1-22-19)

17 **Sec 41.5-111 Categories Of Special Events**

18   (a)   A special event application will be designated into ~~one (1)~~

19       ~~of four (4)~~ tiers in accordance with this section.

20   (b)   A tier 1 event is a special event that:

21       (1)     Is a special event that includes the use of City

22            streets, sidewalks, or right-of-ways; or

23       (2)     Is a multi-day event; or

Legistar 22-1069              Exhibit A              January 13, 2023

1   (3)  Is a special event that estimates more than one

2     thousand (1,000) attendees per day; or

3   (4)  Has an estimated need, based on its permit

4     application, for additional city services, staff time,

5     security or police services and equipment; or

6   (5)  Is a special event that will use fireworks.

7   (6)  Carnival and circuses: No carnival or circus shall

8     remain in operation in any one (1) location for a period

9     exceeding five (5) days. No carnival, regardless of

10    operator, shall be located on any one (1) particular

11    site more than two (2) times during any calendar year.

12    No circus, regardless of operator, shall be located on

13    any one particular site more than two (2) times during

14    any calendar year. An applicant for a circus which does

15    not include animals may apply for and receive up to four

16    permits for such events in any calendar year. ~~Exemption~~

17    ~~can be applied for through the community events~~

18    ~~application up to three additional times in a calendar~~

19    ~~year for a circus without animals.~~ The coordinator

20    ~~Community events~~ will evaluate whether there were

21    previous issues or if there are sufficient city services

22    available to allow for these additional special events.

23   (7)  Examples - Musical events, private parades,

24    carnival, circus, large runs.

12

Legistar 22-1069          Exhibit A          January 13, 2023

1     (c)  A tier 2 event is a special event that:

2          (1)    Is a gathering ~~an assembly~~ at a city property that

3              estimates attendance at less than one thousand (1,000)

4              attendees per day; or

5          (2)    Is a gathering ~~an assembly~~ lasting four (4) days or

6              less, that is held primarily on private property, and

7              that estimates attendance at less than one thousand

8              (1,000) attendees per day; or

9          (3)    Is stationary and impacts up to two (2) blocks of

10            a street, sidewalk, or city right-of-way; or

11         (4)    Examples - smaller musical events, smaller parades,

12            larger run/walks.

13   (d)  A tier 3 event is a special event that does not include

14        the consumption of alcohol, and:

15        (1)    Is stationary, impacts only one (1) block of a

16           sidewalk or a city right-of-way that is not a street; or

17           and only needs a permit issued for temporary street

18           closure.

19        (2)    Is a gathering ~~an assembly at~~ a city property, lasts

20           less than five (5) hours, and does not include food or

21           beverages or a request to increase the permanent

22           occupancy limit.

13

Legistar 22-1069            Exhibit A            January 13, 2023

1       (3)     Examples - races with over two hundred fifty (250)

2               attendees, including fun fairs, expos, and events held

3               on city property.

4   (e)  A tier 4 event is a special event that requires limited

5        city services as defined in section 41.5-102.

6       (1)     Is an event that is smaller in scale to a tier 3

7               event, is stationary, impacts only one (1) block of a

8               sidewalk or a city right-of-way that is not a street; or

9               only needs a permit for a temporary street closure.

10      (2)     Examples - runs with less than two hundred fifty

11              (250) attendees, vehicle exhibits or demonstrations.

12      (3)     Exemptions to tier 4 permitting process:

13              a. Private home parties shall be exempted from

14                 applying for a permit. A private home party is a

15                 are those social events or gatherings held solely

16                 at a private, single-family residence, featuring

17                 live musical entertainment arranged for by the

18                 resident owner and consisting of only one (1) band

19                 or performer, and at which no guest in attendance

20                 shall pay any admission fee or other required

21                 concession cost. Any noise restrictions outlined in

22                 this code the Code shall apply to these types of

23                 events.

Legistar 22-1069         Exhibit A         January 13, 2023

1          b. Residential block parties, as defined in section

2          41.5-102 must make an application and receive

3          approval through the alderman's office.

4   (f) A tier 5 event is for any film production as defined in

5      section 41.5-102.

6      (1) Any film production that will occur in the city for

7        commercial, not-for-profit, educational or artistic

8        activities shall require a permit.

9      (2) The following special events are exempt from the

10        permitting requirements of this chapter: Exemptions:

11        Film production for the filming of news events by the

12        media or by the city City of Aurora and other

13        governmental entities serving the community, shall not

14        require a special event permit. Additionally, a film

15        production event does not apply to individuals filming

16        on public or private property for personal, non-

17        commercial purposes. Additionally excluded are schools,

18        businesses, places of worship, and residents using their

19        own premises for producing films for their own

20        educational, family, or training purposes.

21   (g) A tier 6 event is an assembly or procession, as those terms

22        are defined by this chapter, that requires only basic city

23        support services and does not contemplate the need for

24        traffic control or is not anticipated to interfere with

15

Legistar 22-1069          Exhibit A          January 13, 2023

1    the normal use of public property upon which it occurs.

2    The sale of goods or services are not permitted at tier 6

3    events. As used in this paragraph, "basic city support

4    services" means city services provided through previously

5    scheduled and available personnel and resources or such

6    additional personnel and resources as may be required to

7    protect the event and persons attending from disruption or

8    interference.

9  **Sec 41.5-112 Special Event Permit**

10    (a)    Except as provided in section 41.5-110 (Permit required;

11    Exceptions), a person shall obtain a special event permit

12    issued by the coordinator ~~community events department~~ before

13    the person may conduct, manage, or operate a special event.

14    Applying for a permit for an event does not guarantee that

15    the event will be approved.

16    (b)    Special events permit applications are on a first-come,

17    first-serve basis and locations will be held only after the

18    coordinator ~~community events office~~ has received a complete

19    and executed ~~fully-executed application~~. Governmental

20    ~~Municipal~~ events have priority in use of any city property or

21    right-of-way.

22    (c)    The coordinator shall afford first priority to legacy

23    events ~~Legacy events are given first priority~~ to reserve the

24    same annual date, provided they receive an acceptable post-

Legistar 22-1069          Exhibit A          January 13, 2023

1       event evaluation from special events and submit a letter of
2       intent.

3           (1)     Special event permits are non-transferable.

4           (2)     As a condition of the special event permit, the
5               permittee event organizer must display the permit as
6               prescribed by the community events coordinator and
7               display the permit on request from any city employee
8               with enforcement or inspection duties related to the
9               special event. An electronic version of the permit is
10              permissible.

11  (d)     As a condition of the special events permit, the
12          permittee event organizer or a representative of the event
13          organizer must:

14          (1)     Provide access to a special event venue to any city
15              employee with inspection and enforcement duties related
16              to the special event;

17          (2)     Be present at all times during the operating hours
18              of the special event;

19          (3)     Provide the community events coordinator with
20              contact information for an individual who is responsible
21              for set-up and take-down of the special event;

22          (4)     Ensure compliance with all applicable ordinances,
23              statutes, rules, laws, and the special event permit; and

1      (5)    Accept all notices of violations, citations, and

2             closure orders.

3      (6)    Provide emergency operations plan as outlined in

4             section 41.5-160.

5      (7)    Attend any required meetings with city personnel.

6      (8)    A special event permit is only effective after the

7             event set-up has passed all required inspections.

8   (e)    Tier 6 site time, date, and location determinations

9      (1)    The coordinator shall annually prepare a list of

10            sites that he or she determines are generally

11            appropriate for tier 6 events, the dates and times that

12            each site is typically available and not otherwise in

13            use for public purposes, and the capacity of each site.

14     (2)    The coordinator shall issue a permit for a tier 6

15            event at the date, time, and location requested by the

16            applicant unless the coordinator has previously issued

17            a special event permit that conflicts with the pending

18            application or the site is not otherwise available on

19            the date or time requested or the police department

20            determines that it is unable to provide a sufficient

21            number of officers to protect the event and its attendees

22            from disruption or interference due to circumstances

23            specific to the particular time, date or site requested.

24            The coordinator or the police department, as the case

Legistar 22-1069        Exhibit A        January 13, 2023

1        may be, shall provide the applicant with a factual basis

2        for their determination in writing.

3     (3)     Whenever a permit cannot be issued in accordance

4        with paragraph (2) above, the coordinator or the police

5        department, as the case may be, shall make reasonable

6        efforts to assist the applicant in scheduling its

7        proposed event at an alternate time, date, or location

8        as consistent with its initial application as

9        practicable.

10  (Ord. No. O19-002, § Exh. E, 1-22-19)

11  **Sec 41.5-114 Limitations On The Provision Of City Services; Costs**

12  **And Fees**

13  (a)    Issuance of a special events permit or the approval of a

14        special event permit application does not obligate or

15        require the city to provide services, equipment, or

16        personnel in support of an event, however, subject to the

17        availability of the same, the permittee, at its own cost,

18        may contract with the city to provide such services,

19        subject to availability, in accordance with this Section.

20        Except when required in the case of a Tier 6 event for the

21        purpose of protecting an event and its attendees from

22        interference or disruption, the city does not guarantee

23        the participation of its personnel to provide services in

Legistar 22-1069                   Exhibit A                   January 13, 2023

1        support of the event if the size or scope of the event

2        requires the provision of city volunteers.

3    (b)   Except as provided in subsection (c) of this section, if

4        the city or its personnel provides services, equipment, or

5        personnel in support of a special event, the city will

6        charge the event organizer the actual cost of:

7        (1)   The wages or salaries ~~as set by departments~~ for

8            city personnel involved in traffic control, event

9            security, police services, fire safety, medical safety,

10           and any other facility or event support as established

11           by the applicable collective bargaining agreement or pay

12           plan adopted by the city council. The coordinator will

13           provide an applicant with a current copy of applicable

14           salary rate schedules. With respect to a tier 6 event

15           for which traffic control is not required, a permittee

16           shall be responsible only for the actual costs incurred

17           by the city for clean-up or trash collection related to

18           the special event. The city shall bear the costs of the

19           personnel and equipment it determines is necessary to

20           prevent the disruption of or interference with a tier 6

21           event. ~~(available from community events)~~;

22       (2)   The use of city equipment, city-contracted services,

23           and other non-personnel expenses;

1      (3)   Any damage caused by or site restoration directly

2      related to the special event, not otherwise provided by

3      the event organizer that is required to restore the area

4      to the same condition that existed prior to the special

5      event;

6      (4)   Any costs associated with the provision of

7      additional city services beyond those contemplated by

8      the original permit or provisional permit. Whenever it

9      appears to the coordinator that city services will be

10     required beyond those contemplated by the original

11     permit or provisional permit, the coordinator shall

12     promptly notify the permittee to discuss the need for

13     the additional services and afford the permittee an

14     opportunity to respond or propose alternatives ~~that~~

15     ~~recovery for additional police or extra resources that~~

16     ~~were needed but not originally designated for the~~

17     ~~special event~~;

18     (5)   Any loss or damage to city property; and

19     (6)   Any other agreed upon service.

20  (c)  Subject to advance city council approval, i~~f~~f the event is

21     a governmental ~~municipal~~ event or a special event which

22     city actively participates as a ~~the city is~~ co-sponsor ~~of~~

23     ~~a special event~~ or is otherwise substantially involved in

24     the organization and planning of city services, equipment,

Legistar 22-1069        Exhibit A        January 13, 2023

1      or personnel may~~, with city council approval,~~ be provided

2      to support a special event without charge.

3      (1)      The city may also <u>assess</u> ~~charge~~ any other fees as

4      set by separate ordinances <u>or resolutions</u> to recover

5      costs associated with special events.

6      (2)      If ~~an~~ <u>a permittee</u> ~~event organizer~~ requests an

7      estimate of the charges or fees described in subsection

8      (b), ~~community events~~ coordinator will provide an

9      estimate at least twenty (20) days before the start of

10      the special event.

11      (3)      ~~An~~ <u>permittee</u> ~~event organizer~~ shall pay to the city:

12      a. At least ten (10) days prior to the date of the

13      special event, twenty-five (25) percent of the

14      costs estimated by the ~~community events~~ coordinator

15      or up to one thousand dollars ($1,000.00),

16      whichever is less, to be the direct and reasonable

17      costs which will be incurred by the city to provide

18      services and equipment for the special event.

19      b. Within thirty to forty-five (30 – 45) days from the

20      date of the conclusion of the permitted event, the

21      direct and reasonable costs incurred shall be

22      billed to the <u>permittee</u> ~~event organizer~~ in an

23      itemized bill. This amount shall include

24      compensation for any loss/damage or site

Legistar 22-1069         Exhibit A         January 13, 2023

1               restoration to city property. Failure to remit

2               payment in full in accordance with this ordinance

3               and Code may impact the ability to hold future

4               events.

5     (4)    Whenever the scope of a permitted special event

6               requires or contemplates the recruitment of volunteers,

7               including, but not limited, to city employees not

8               otherwise assigned to the event by the city, the

9               applicant shall bear all responsibility for the

10               recruitment and retention of such volunteers, and in the

11               case of city employee volunteers shall be responsible

12               for the full hourly cost for their services.

13     (5)    Whenever it appears to a permittee that it will be

14               unable to recruit sufficient volunteers in connection

15               with a special event, it shall promptly notify the

16               coordinator. Willful failure by the permittee to

17               promptly notify the coordinator of a reasonably

18               anticipated volunteer shortage shall constitute cause to

19               restrict or deny a subsequent special event application.

20     (6)    Whenever it appears to a city employee that a

21               sufficient number of employees have not volunteered in

22               connection with a special event, the city employee shall

23               promptly notify the coordinator and the permittee of the

24               anticipated shortage.

Legistar 22-1069        Exhibit A        January 13, 2023

1       (7)     Upon notice of an anticipated volunteer shortage,

2          the coordinator shall make reasonable efforts to

3          encourage a sufficient number of city employees to

4          volunteer for the event and present to the applicant

5          such options as may be available to increase

6          participation or to narrow the scope of the event, as

7          the case may be. Prior to the offering of any financial

8          incentive beyond which the applicant has already agreed

9          to the coordinator shall provide the applicant with an

10         estimation of the cost involved and the applicant shall

11         agree in writing to assume full responsibility for such

12         costs. If the applicant declines to incur additional

13         expenses, the coordinator may reduce the scope of the

14         permit to conform to the anticipated availability of

15         volunteers. In reducing the scope of the permit, the

16         coordinator may require that the permittee shorten the

17         duration of the special event; conduct the special event

18         in a different location, along a different route, or in

19         a different manner than originally contemplated; or make

20         other such adjustments, based on the anticipated

21         availability of volunteers.

22 **Sec 41.5-115 Insurance Required**

23    (a)     An applicant for a special event shall ~~Special events~~

24        ~~are required to~~ secure an insurance policy for the event that

24

Legistar 22-1069        Exhibit A        January 13, 2023

1      includes the City of Aurora as an additional insured (as

2      primary, non-contributory additional insured. The law

3      department shall determine, annually, and based on the tier,

4      the appropriate insurance amounts required for special events

5      held in the city. The event organizer(s) shall purchase and

6      maintain this insurance, providing coverage for the event

7      with an insurance company authorized to do business in the

8      State of Illinois. Excluded from the insurance requirements

9      of this section are events that take place solely on private

10     property.

11     (b)      The city may require additional insurance coverage due

12     to the specific scope or nature of a proposed special event

13     that distinguish it from other special events categorized in

14     the same tier. ~~Additional insurance may be required depending~~

15     ~~on the tier of the event.~~ As part of the permit process, the

16     ~~community events~~ coordinator will advise event organizers if

17     additional insurance is required, and the basis upon which

18     the determination was made prior to the issuance of the permit

19     Notwithstanding the foregoing, no permittee shall be required

20     to obtain coverage to insure against any injury caused or

21     threatened by third parties in response or reaction to the

22     special event.

23   (Ord. No. O19-002, § Exh. E, 1-22-19)

Legistar 22-1069          Exhibit A          January 13, 2023

1   HISTORY

2   *Amended by Ord. O22-016 on 2/22/2022*

3   **Sec 41.5-116 Indemnity Of City Of Aurora**

4   (a)      <u>Except with respect to a Tier 6 event, an applicant</u> ~~The~~

5           ~~event organizer of a special event,~~ shall, in addition to the

6           application provided under this division, deliver to the city

7           an agreement, as contained in the permit application, in

8           writing holding the city harmless from all liability

9           resulting from the operation of the special event, and,

10          further, shall agree to indemnify the city from all liability

11          resulting from any injury to patrons, bystanders, passerby or

12          any individual as a result of the operation or maintenance of

13          the special event, <u>within the management, direction or</u>

14          <u>control of the permittee, its invitees, or agents</u>.

15  (Ord. No. O19-002, § Exh. E, 1-22-19)

16  **ARTICLE 41.5-III SPECIAL EVENT APPLICATIONS**

17  **Sec 41.5-130 Special Event Application Fees And Deadlines**

18  (a)      An <u>applicant</u> ~~event organizer~~ shall pay a non-refundable

19          application fee as set by separate resolution.

20  (b)      An <u>applicant</u> ~~event organizer~~ must submit a complete

21          special event application no later than the following number

22          of days prior to the first day of the proposed event:

23          (1)      Ninety (90) days for a tier 1 event; and

24          (2)      Sixty (60) days for a tier 2 event; and

26

Legistar 22-1069              Exhibit A              January 13, 2023

1      (3)    Sixty (60) days for a tier 3 event; and

2      (4)    Forty-five (45) days for a tier 4 event; ~~and~~

3      (5)    Thirty (30) days for a tier 5 event; and

4      (6)    Seven (7) days for a tier 6 event.

5    (c)    An application deadline for a special event application

6        may be waived by the ~~community events~~ coordinator if the

7        following conditions are met:

8      (1)    The applicant ~~event organizer~~ can show good cause;

9      (2)    The applicant ~~event organizer~~ has a complete

10         application to submit;

11      (3)    No unreasonable burden on the city will be created

12         by the waiver; and

13      (4)    The applicant pays an an additional fee ~~Additional~~

14         ~~late fee is paid~~ for a late permit application.

15    (Ord. No. O19-002, § Exh. E, 1-22-19)

16    HISTORY

17    *Amended by Ord. O22-016 on 2/22/2022*

18    **Sec 41.5-131 Contents Of Special Event Application**

19    (a)    All applications shall be submitted electronically in a

20         format approved by the coordinator. Whenever an applicant

21         is not a natural person, the applicant shall designate an

22         individual authorized to act on the applicant's behalf as

23         the primary point of contact with respect to the

24         application. ~~Event organizer must submit an electronic~~

Legistar 22-1069          Exhibit A          January 13, 2023

1   ~~application for a special event on a form approved by~~

2   ~~community events. The event organizer must be the applicant~~

3   ~~unless the event organizer designates another person in~~

4   ~~writing.~~

5   (b)  Except as provided in subsection (c), an application must

6        contain all of the information described in this section.

7   (c)  ~~The Community events coordinator may consider an~~ No

8        application for a tier 1 or tier 2 event shall be deemed

9        complete by the coordinator without the following:

10       (1)   Detailed information concerning the activities

11            included in the special event, including:

12            a. The number of bands or other musical units;

13            b. The name of the owner, owners, lessee, lessees,

14               proprietor, operator or manager of the subject

15               premises and the music festival and, in addition

16               thereto, the name of the proprietor, operator,

17               promoter or manager of each entertainment or

18               performance which collectively make up the music

19               festival, and the legal relationship of each to the

20               applicants of the music festival;

21            c. The number of theatrical performances;

22            d. The proposed size, location, and orientation of

23               speakers;

Legistar 22-1069          Exhibit A          January 13, 2023

1            e. The distance from any residential districts and how

2               noise will affect those districts (see 29-28

3               limitations);

4            f. The ancillary activities that will be associated

5               with the event;

6            g. The kinds of animals anticipated to be a part of

7               the event;

8            h. If the application is for ~~applicant is~~ a carnival

9               or circus, the applicant must provide proof that ~~it~~

10              ~~is~~ a not-for-profit organization that provides

11              services to the city or its ~~City of Aurora or Aurora~~

12              residents ~~that~~ is sponsoring the carnival or circus;

13            i. If the application is for ~~applicant is~~ a carnival

14              or circus, such carnival or circus ~~it~~ must meet all

15              the requirements under federal law, including but

16              not limited to the Animal Welfare Act (AWA), any

17              regulations issued by the USDA or Animal and Plant

18              Health Inspection Service (APHIS) as well as state

19              laws, including but not limited to 820 ILCS 270/1,

20              et seq., (Aerial Exhibitors Safety Act), 430 ILCS

21              85/2-1, et seq., (Amusement Ride and Attraction

22              Safety Act), 720 ILCS 5/48-10 and 11 (Dangerous

23              Animals), and any other county or city rules or

24              regulations.

Legistar 22-1069          Exhibit A          January 13, 2023

1           j. The types of non-emergency vehicles to be used for

2              the event; and;

3       (2)    Detailed information concerning:

4           a. Food and alcohol are required to comply with

5              chapters 6 and 25 of this Code, or any other

6              certificates issued locally, through the county or

7              state.

8           b. The proposed location of portable sanitation

9              facilities, including at least ten (10) percent

10             (and at least one (1)) being ADA compliant

11             (community events coordinator will provide event

12             organizer with formula of minimum required portable

13             sanitation facilities); and

14          c. Detailed information concerning public safety and

15             emergency preparedness including, but not limited

16             to:

17             1. Provisions for queuing event attendees on

18                streets, sidewalks, or other city right-of-

19                ways;

20             2. An emergency action plan described in section

21                41.5-160 (emergency action plan); and

22             3. Other equipment or services necessary to

23                conduct the event with due regard to public

24                health and safety.

Legistar 22-1069             Exhibit A             January 13, 2023

1          d. The ~~community events~~ coordinator shall establish a

2             deadline, which will depend on the tier of the event,

3             for the _permittee to provide_ information required

4             by subsection (c) ~~to be provided to community~~

5             ~~events coordinator~~.

6          e. An application for a special event permit may be

7             submitted no earlier than January 1st of the year

8             the special event will be held, unless (1) the same

9             event was held in the city during the prior calendar

10            year, in which case application letter of intent

11            for a special event permit may be submitted after

12            the event evaluation has been completed, or (2) the

13            application is submitted prior to January 1 in

14            order to comply with the requirements of Sec. 41.5-

15            130. In such case, an application may be submitted

16            not more than fourteen (14) days prior to the last

17            day an application submitted under Sec. 41.5-130

18            would be timely.

19    (Ord. No. O19-002, § Exh. E, 1-22-19)

20    **Sec 41.5-132 Special Event Application Review**

21    1. Nondiscrimination: The ~~community events~~ coordinator shall

22       consider each event permit application upon its merits and

23       shall not discriminate based upon race, creed, color,

24       ethnicity, religion, ancestry, sex, age, disability, national

31

Legistar 22-1069          Exhibit A          January 13, 2023

1      origin, sexual orientation, gender related identity,

2      political party affiliation (or lack thereof), familial

3      status, or marital status.

4    2. For a tier 3 or tier 4 event, the ~~community events~~ coordinator

5      will issue a preliminary recommendation to approve the

6      application provided that the following conditions are met:

7        1. No other approved or pending special events conflict

8          with the ~~event organizer's~~ proposed special event;

9        2. A prior special event permit or a permit issued under

10         any other chapter in this Code was not revoked by the

11         city in the preceding 12 months <u>as a result of</u>

12         <u>circumstances within the applicant's control</u>;

13       3. The city has sufficient resources to address public

14         health and safety concerns raised by the special event;

15         and

16       4. The event will not cause an unresolvable conflict in the

17         public right-of-way or at a public facility.

18   3. The ~~community events~~ coordinator is not required to process

19     more than one (1) application for a tier 3 or tier 4 event

20     per event organizer during any two-week period.

21   4. Except as otherwise provided, when multiple tier 3 or tier 4

22     events are requested for the same day and location, the

23     ~~community events~~ coordinator will prioritize applications

24     based on the number of years a special event has been

32

1       conducted in the city and receipt of a letter of intent. When

2       two (2) or more special events have been conducted for the

3       same number of years, applications will be reviewed on a first

4       come, first serve basis.

5       5. For a tier 3 or tier 4 event, the ~~community events~~ coordinator

6          will take final action to approve or deny an application two

7          (2) weeks prior to the first day of the special event.

8       6. For a tier 1 or a tier 2 event, the ~~community events~~

9          coordinator will take final action to approve or deny an

10         application no later than thirty (30) days after the

11         application is deemed complete.

12      7. During the application review period, the ~~community events~~

13         coordinator will engage in an interactive process with the

14         applicants.

15      (Ord. No. O19-002, § Exh. E, 1-22-19)

16      HISTORY

17      *Amended by Ord. 022-016 on 2/22/2022*

18      **Sec 41.5-133 Notification Of A Special Event Application**

19      (a)      As part of the special events permit application process,

20         an applicant shall~~, event organizers are required to~~ notify

21         all impacted businesses, interested persons, neighborhood

22         associations, places of worship, and places of learning prior

23         to their scheduled event. The timing of the notification and

24         the impact area will depend on the tier of the event and

Legistar 22-1069                Exhibit A                January 13, 2023

1   location of the event. An applicant event organizer shall

2   provide notification as proscribed in the special events

3   planning guide.

4   (b)    Completion of the notification process does not

5   guarantee approval of the special event.

6   (c)    The coordinator shall approve the form and content of

7   all notifications issued under this section Community events

8   coordinator or staff must approve of the notification prior

9   to dissemination.

10  (Ord. No. O19-002, § Exh. E, 1-22-19)

11  HISTORY

12  Amended by Ord. 022-016 on 2/22/2022

13  **Sec 41.5-134 Approval Or Denial Of A Special Event Application**

14  (a)    If the community events coordinator determines that none

15  of the conditions specified in subsection (b), (c), or (d) of

16  this section apply, the community events coordinator shall

17  approve a special event application.

18  (b)    The community events coordinator shall deny a special

19  event application if the applicant fails to:

20      (1)    Provide a complete application;

21      (2)    Provide the documentation required in section 41.5-

22          131 (contents of special events application);

23      (3)    Provide sufficient crowd control and safety

24          measures;

34

Legistar 22-1069                Exhibit A                January 13, 2023

1      (4)     Provide  sufficient  safety,  health,  or  portable
2              sanitation equipment, services, or facilities that are
3              reasonably necessary to ensure that the event will be
4              conducted   with   due   regard   for   safety   and   ADA
5              accessibility;

6      (5)     Provide sufficient waste management and recycling
7              services (community events coordinator may provide
8              formula);

9      (6)     Provide  sufficient  off-site  parking  or  shuttle
10             service,  or  both,  when  required  to  minimize  any
11             substantial  adverse  impacts  on  general  parking  and
12             traffic circulation in the vicinity of the event;

13     (7)     Meet the requirements for submitting an application
14             for a special event permit;

15     (8)     Obtain  the  approval  of  any  other  public  agency
16             within whose jurisdiction the special event or a portion
17             of the special event will occur;

18     (9)     Provide a sufficient emergency action plan based on
19             event risk factors;

20     (10)    Obtain all other required city permits or approvals;

21     (11)    Meet the conditions set forth in section 41.5-132
22             (special event application review); or

23     (12)    Provide   a   sufficient   plan   to   accommodate
24             individuals with disabilities at the event; or

35

Legistar 22-1069        Exhibit A        January 13, 2023

1      (13)    Make revisions to a pending application that the

2      ~~community events~~ coordinator requires <u>consistent with</u>

3      <u>this chapter</u>.

4 (c)     The ~~community events~~ coordinator shall deny a special

5      event application if it determines that:

6      (1)     The event will violate any local, county, state, or

7      federal law or regulation or administrative rule;

8      (2)     The resources required to ensure public safety

9      within the special event venue or impact area will

10      prevent the police, fire, or emergency medical services

11      departments from providing reasonable protections to the

12      remainder of the city;

13      (3)     The concentrations of persons, animals, or vehicles

14      within the special event venue or impact area will unduly

15      interfere with the movement of police, fire, ambulance,

16      or other emergency vehicles;

17      (4)     The event will substantially interfere with:

18      a. Any other special event for which a permit or

19      application has already been approved; or

20      b. The provision of city services required to support

21      scheduled or unscheduled government functions.

22      (5)     The <u>applicant</u> ~~event organizer~~ demonstrates an

23      inability or unwillingness to conduct an event in

Legistar 22-1069                Exhibit A                January 13, 2023

1              compliance with the requirements of this chapter or a

2              condition to a permit issued under this chapter; or

3         (6)    The applicant event organizer conducted a prior

4              special event in a manner that failed to receive a

5              positive post event evaluation in the past three (3)

6              years.

7    (d)    The community events coordinator shall approve an

8         application if:

9         (1)    None of the conditions in subsection (b) and (c)

10              apply.

11   (e)    The community events coordinator is not required to take

12        action on an incomplete or untimely application, except as

13        provided in section 41.5-131 (Contents of special events

14        application).

15   (f)    The community events coordinator may require application

16        modifications. In exercising this authority, the community

17        events coordinator will consider:

18        (1)    Scope of events;

19        (2)    Traffic;

20        (3)    Parking;

21        (4)    Other events or activities previously scheduled in

22              close proximity; and

23        (5)    Public safety concerns.

Legistar 22-1069　　　　　Exhibit A　　　　　January 13, 2023

1　　(g)　　If the ~~community events~~ coordinator denies an

2　　　　application, the ~~community events~~ coordinator shall notify

3　　　　the event organizer in writing as soon as practicable. A

4　　　　notification sent by electronic mail complies with this

5　　　　subsection.

6　　(h)　　Applications that are inactive for a period of forty-

7　　　　five (45) days are automatically denied and the applicant

8　　　　must re-apply for a special events permit.

9　　(i)　　Whenever an applicant for a special event, other than a

10　　　　tier 6 special event is unable to demonstrate at the time of

11　　　　application that it is able to immediately satisfy all of the

12　　　　requirements of this chapter, but is likely to do so by the

13　　　　date of the special event, the coordinator may issue a

14　　　　provisional permit to the applicant to facilitate the ongoing

15　　　　planning of the event. The issuance of a provisional permit

16　　　　reserves the time, place, and location of a proposed special

17　　　　event to the applicant, and may authorize particular aspects

18　　　　of the application, but does not guarantee the subsequent

19　　　　approval of all aspects of the application unless the

20　　　　coordinator is satisfied that the applicant can comply with

21　　　　all of the requirements of this chapter. A provisional permit

22　　　　is subject to ongoing modification and review by the

23　　　　coordinator based on the applicant's demonstration, or

Legistar 22-1069        Exhibit A        January 13, 2023

1       failure to demonstrate, its ability to comply with all of the

2       requirements this chapter.

3       (j)     In lieu of denying an application for a special event

4       permit, other than a tier 6 special event, to an otherwise

5       qualified applicant who has failed to demonstrate that it is

6       able to comply with the requirements of this chapter, the

7       coordinator, shall upon the request of the applicant, issue

8       the applicant a permit authorizing a tier 6 special event. A

9       permit for a tier 6 special event issued by the coordinator

10      under this paragraph shall convey no additional rights or

11      privileges, nor impose greater obligations on the permittee

12      than otherwise authorized by this chapter.

13      (Ord. No. O19-002, § Exh. E, 1-22-19)

14      HISTORY

15      *Amended by Ord.* 022-016 *on 2/22/2022*

16      **Sec 41.5-135 Appeal Of Special Event Application Denial**

17      (a)     If ~~community events~~ coordinator denies a special event

18      application, the event organizer may appeal the denial to the

19      ~~city~~ administrative hearing officer in accordance with

20      chapter 3 of this code and this section.

21      (b)     Reserved.

22      (c)     The applicant ~~event organizer~~ must deliver an appeal to

23      the city clerk, in writing, no later than five (5) regular

1　　　business days after the event organizer is notified that the

2　　　application was denied, or such appeal shall be deemed waived.

3　　(d)　　The law department, upon notification of appeal, shall

4　　　promptly set a time and date for a hearing. The applicant

5　　　shall be given an opportunity to be heard by the hearing

6　　　officer upon any such denial or revocation within fourteen

7　　　(14) days of filing an appeal.

8　　(e)　　At such hearing, the hearing officer shall give the

9　　　applicant ~~violator~~ an opportunity to be personally heard and

10　　　to present witnesses and information relevant to the issue.

11　　　The hearing officer shall also hear from the city and its

12　　　witnesses and information relevant to the issue.

13　　(f)　　The hearing officer must act on the appeal within three

14　　　(3) business days following the conclusion of any hearing and

15　　　may uphold or reverse the denial.

16　　(g)　　In considering the appeal, the hearing officer shall

17　　　apply the same criteria as the ~~community events~~ coordinator

18　　　under section 41.5-134 (approval or denial of special event

19　　　application).

20　　(h)　　The applicant shall receive written notice of the

21　　　hearing officer's decision, which shall be a final decision

22　　　for the purposes of administrative review under the Illinois

23　　　Administrative Review Act, 735 ILCS 5/3-101, et seq.

24　(Ord. No. O19-002, § Exh. E, 1-22-19)

Legistar 22-1069        Exhibit A        January 13, 2023

1   HISTORY

2   *Amended by Ord. 020-032 on 5/26/2020*

3   *Amended by Ord. 022-016 on 2/22/2022*

4   **Sec 41.5-136 Notice Of Proposed Legacy Special Event Dates**

5    (a)     An applicant for a permit to host a legacy event may

6      submit a notice of proposed special event dates for up to a

7      three (3) year period on a form approved by the ~~community~~

8      ~~events~~ coordinator.

9    (b)     A legacy event must still comply with section 41.5-130

10      (special event application fees and deadlines) and section

11      41.5-131 (contents of a special event application) each year

12      of the event.

13   (Ord. No. O19-002, § Exh. E, 1-22-19)

14   HISTORY

15   *Amended by Ord. 022-016 on 2/22/2022*

16   **ARTICLE 41.5-IV OPERATION**

17   **Sec 41.5-150 Special Events Reports To The Public Health, Safety**

18   **And Transportation Committee**

19   The ~~community events~~ coordinator shall supply a report to the

20   public health, safety and transportation committee of upcoming

21   events and the portions of the city that are impacted.

22   (Ord. No. O19-002, § Exh. E, 1-22-19; Ord. No. O19-080, § Exh. A,

23   12-10-19)

Legistar 22-1069　　　　　　　Exhibit A　　　　　　　January 13, 2023

1　HISTORY

2　*Amended by Ord. 022-016 on 2/22/2022*

3　**Sec 41.5-151 Unpermitted Special Events Prohibited**

4　A person may not conduct, operate, or manage a special event

5　without a special event permit required by this chapter, except

6　subject to the exceptions provided herein.

7　(Ord. No. O19-002, § Exh. E, 1-22-19)

8　**Sec 41.5-152 Compliance With Permits, Approval, And Plans**

9　A permittee ~~An event organizer~~ shall conduct, operate, or manage

10　the special event in compliance with the special event permit,

11　other city permits and approvals, and approved plans.

12　(Ord. No. O19-002, § Exh. E, 1-22-19)

13　**Sec 41.5-153 Post-Event Evaluations**

14　(a)　Following the conclusion of a special event permitted

15　under this chapter, the coordinator shall undertake a

16　performance review of the event if (1) the event was a tier

17　1 or tier 2 event, (2) the city or the permittee experienced

18　problems staging the event, including those related to crowd

19　or traffic control, responses to emergency situation, or acts

20　or omissions by the permittee; (3) the city or the permittee

21　were required to devote greater resources to the event than

22　anticipated or (4) the permitted engaged in or permitted the

23　violations of the conditions of the permit by persons under

24　its control. ~~The community events office will complete an~~

42

Legistar 22-1069        Exhibit A        January 13, 2023

1      ~~event evaluation form following the majority of special~~

2      ~~events, that are tier 1 or 2 or events that have issues or~~

3      ~~use numerous city resources, which will include a performance~~

4      ~~score measuring the success of event organizers in conforming~~

5      ~~to all policies and permitted activities.~~

6      (b)      In conducting the performance review required by this

7          section, the coordinator shall determine, based on the

8          totality of circumstances whether the special event

9          materially complied with the requirements of the permit, was

10          appropriately managed, that appropriate communication was

11          maintained among the permittee, the coordinator, and relevant

12          city personnel throughout the process, and that the permittee

13          has fully reimbursed the city for any costs it agreed to

14          reimburse the city. ~~Events with an unsatisfactory evaluation~~

15          ~~may have additional requirements imposed for future years or~~

16          ~~may be denied for future events.~~

17      (c)      If upon conclusion of the evaluation described in

18          paragraph (b) the coordinator determines that that the

19          special event or the permittee did not materially comply with

20          the requirements of this chapter, the coordinator may impose

21          additional requirements upon subsequent special event

22          applications by the permittee to mitigate the effects of the

23          permittee's performance, or limit a permittee to a tier 6

24          event.

Legistar 22-1069                 Exhibit A                 January 13, 2023

1   (Ord. No. O19-002, § Exh. E, 1-22-19)

2   HISTORY

3   *Amended by Ord. O22-016 on 2/22/2022*

4   **Sec 41.5-154 The Sale Of Goods And The Provisions Of Food And**

5   **Beverages Within A Special Event**

6   (a)      Except as provided in subsection (b), a person may not

7          sell goods on city property, or on a city street, sidewalk,

8          or right-of-way within the area permitted for a special event.

9   (b)      The sale of goods may occur if:

10         (1)      The ~~Community events~~ coordinator approves the sale

11              of goods on city property, or on a city street, sidewalk,

12              or right-of-way within the area permitted for the

13              special event; or

14         (2)      The permittee ~~event organizer~~ obtains a closure

15              permit under section 41.5-111; or

16         (3)      The vendor is authorized under chapter 25 of this

17              Code.

18  (c)      Except as provided in subsection (d), a person may not

19         provide food or beverages, including alcohol, at a special

20         event.

21  (d)      At a special event, a person may provide food or

22         beverages, including alcohol, only if the person is

23         authorized to under chapter 6 (Alcoholic Liquor) and chapter

24         25 (Licenses, Permits, and Misc. Business Regs.).

Legistar 22-1069             Exhibit A             January 13, 2023

1    (e)     The provision of food or beverages at a special event

2         shall comply with the requirements under any applicable

3         chapter of this Code.

4    (Ord. No. O19-002, § Exh. E, 1-22-19)

5    HISTORY

6    *Amended by Ord. 022-016 on 2/22/2022*

7    **Sec 41.5-155 Sound Equipment For Outdoor Special Event Venues**

8    (a)     In this section, an outdoor special event venue is a

9         venue that is not fully enclosed by permanent, solid walls,

10        and a roof.

11   (b)     Except as provided by subsection (c), the use of sound

12        equipment is prohibited at an outdoor special event venue.

13   (c)     Sound equipment may be used at an outdoor special event

14        venue only if approved by the community events coordinator.

15   (d)     No person shall use, operate or cause to be used or

16        operated any radio receiving set, loudspeaker, sound truck,

17        amplifier or other similar device upon or along the streets

18        in the city, for the purpose of advertising or inviting a

19        person to the event without first obtaining a permit from the

20        community events coordinator. The permit fees for this

21        section shall be determined, from time to time, by separate

22        ordinance or resolution of city council.

Legistar 22-1069          Exhibit A          January 13, 2023

1   (e)     The ~~community events~~ coordinator may approve the use of

2       sound equipment in a right-of-way closure area between 7:00

3       a.m. and 10:00 p.m.

4   (f)     The ~~community events~~ coordinator may approve the use of

5       sound equipment at an outdoor special event venue that is

6       located on city property:

7       (1)     Between 7:00 a.m. and 9:00 p.m. Sunday through

8               Wednesday; or

9       (2)     Between 7:00 a.m. and 10:00 p.m. Thursday, Friday,

10              Saturday or the night before New Year's Day, Memorial

11              Day, Independence Day or Labor Day.

12      (3)     Governmental ~~Municipal~~ events are exempt from the

13              sound equipment restrictions.

14  (g)     A sound impact plan may be required and must be approved

15      by the ~~community events~~ coordinator. The elements of a sound

16      impact plan include:

17      (1)     Sound-mitigating design features;

18      (2)     Operating hours for sound equipment;

19      (3)     Contact information for the individual responsible

20              for operating the sound equipment during the special

21              event;

22      (4)     Site plan;

23      (5)     Distance from residential districts; and

Legistar 22-1069          Exhibit A          January 13, 2023

1      (6)    Any other elements required by the ~~community events~~

2           coordinator.

3   (h)    A permittee ~~An event organizer~~ must require an

4        individual to be present and responsible for operating sound

5        equipment during the operating hours for the special event.

6   (Ord. No. O19-002, § Exh. E, 1-22-19)

7   HISTORY

8   *Amended by Ord. 022-016 on 2/22/2022*

9   **Sec 41.5-156 Additional Requirements**

10   (a)    A permittee shall ~~An event organizer must~~ provide

11        sufficient portable toilets, both ADA accessible and non-

12        accessible facilities in the immediate area of the event site

13        based on the estimated number of attendees at the special

14        event. This requirement shall not apply to a tier 6 event

15        with a duration of fewer than three hours.

16   (b)    A permittee shall ~~An event organizer must also~~ provide

17        a plan to accommodate enough handicap parking spots in the

18        vicinity of the event based on the estimated number of

19        attendees at the special event. This requirement shall not

20        apply to tier 6 events.

21   (c)    During a special event held at a city facility or on

22        city streets, sidewalks, or right-of-way, a permittee ~~an~~

23        ~~event organizer~~ may not provide or distribute, or allow

47

Legistar 22-1069                Exhibit A                January 13, 2023

1      another to provide or distribute glass containers or

2      Styrofoam.

3   (d)     If applicable, a permittee ~~an event organizer~~ shall

4      post a sign at each entrance and exit to a special event venue

5      with a right-of-way closure area that is visible to all

6      patrons entering the area that includes the amount of the

7      entry fee, if any, standardized rules, along with language

8      notifying patrons that if rules are violated they are subject

9      to removal from the event and the rules of access to the

10     right-of-way closure area. If applicable, a permittee ~~an~~

11     ~~event organizer~~ must post the sign required by this subsection

12     during the time the entry fee is in effect.

13  (e)     If an entry fee is charged for a special event, a

14     permittee ~~an event organizer~~ may not charge an entry fee for

15     a person that needs access to a residence within the special

16     event impact area or right-of-way closure area or a business

17     within a special event impact area or right-of-way closure.

18  (f)     An Americans with Disabilities Act (ADA) compliance plan

19     is required for any special event that interferes with

20     accessibility on city streets, sidewalks, right-of-way, or

21     city facilities. This plan must also comply with: 71 IL Admin

22     Code, Section 400.

23  (Ord. No. O19-002, § Exh. E, 1-22-19)

48

Legistar 22-1069             Exhibit A             January 13, 2023

1   HISTORY

2   *Amended by Ord. 022-016 on 2/22/2022*

3

4   **ARTICLE 41.5-V PUBLIC SAFETY**

5   **Sec 41.5-160 Emergency Action Plan**

6   (a)   An emergency action plan is required for any special event

7         and must be approved by the ~~community events~~ coordinator.

8   (b)   A permittee ~~An event organizer~~ shall prepare an emergency

9         action plan for a special event that is based on the

10        estimated number of attendees and, at a minimum, includes:

11        (1)   On-site security for attendees and property;

12        (2)   On-site medical coverage, number of a level of

13              certification of emergency medical responders, and the

14              911 access that will be utilized for the special event;

15        (3)   Fire safety plan;

16        (4)   Weather related evacuation and cancellation plans;

17              and

18        (5)   Documents required in section 41.5-131 (Contents of

19              Special Events Application).

20  (c)   When required for a special event, the number of police

21        officers, emergency medical providers, and fire department

22        employees required for a special event must be based on

23        guidelines established by each separate department. Each

24        department's guidelines shall be reduced to writing and

49

Legistar 22-1069              Exhibit A              January 13, 2023

1    available for public inspection. In developing such

2    guidelines, a department shall consider the size and nature

3    of the proposed special event; the anticipated number of

4    attendees; available staffing on the date and time proposed;

5    traffic conditions, including the number of intersections

6    required to be closed; security threats associated with

7    special events regardless of their nature; and any other

8    objective law enforcement or public safety consideration.

9    (d)   At least thirty (30) days prior to the start of a tier 1

10         or tier 2 special event, a permittee ~~an event organizer~~

11         shall provide the ~~community events~~ coordinator a written

12         description of all non-city public safety resources that

13         the permittee has retained for ~~will be used at~~ the special

14         event.

15   (Ord. No. O19-002, § Exh. E, 1-22-19)

16   HISTORY

17   *Amended by Ord. 022-016 on 2/22/2022*

18   **Sec 41.5-161 Personal Security And Property Security**

19   (a)   A permittee ~~An event organizer~~ may hire private security,

20         for personal safety or property security during a special

21         event to supplement the services provided by the ~~Aurora~~ Police

22         Department. The ~~Aurora~~ Police Department will have the final

23         authority for security measures. Additionally, if the

24         permittee elects to hire private security ~~is hired~~, the

50

Legistar 22-1069             Exhibit A             January 13, 2023

1          permittee shall ensure that its contractors ~~they are to~~ work

2          with ~~Aurora~~ the Police Department on a safety plan prior to

3          the event and provide whether the guards will be armed or not

4          armed.

5     (b)      Private security employed pursuant to subsection (a)

6          must:

7               (1)     Be   in   uniform   and   provide   special   events

8                   application  with  a  description  and  photo  of  their

9                   uniform;

10              (2)     Be able to contact city police, fire, or emergency

11                  medical services if necessary;

12              (3)     Remain on-site during the special event, including

13                  while  the  special  event  is  completed  and  through  the

14                  take-down process;

15              (4)     Be licensed by the State of Illinois and provide a

16                  copy of said license in the special events application;

17              (5)     Provide necessary documents to show they have been

18                  insured and bonded in the special events application;

19              (6)     Not consume any alcoholic beverages or participate

20                  in the special event; and

21              (7)     Meet  and  confer  with  the  ~~Aurora~~  Police  Department

22                  prior to the start of the event to establish guidelines

23                  and point of contact.

Legistar 22-1069          Exhibit A          January 13, 2023

1    (c)     The supervising police officer at or prior to a special

2          event may, at his or her discretion, reduce or increase the

3          number of peace officers posted at a special event. When the

4          cost of such peace officers is to be borne by the permittee,

5          the supervising peace officer shall explain the objective

6          basis   for   the   change   in   posting   in   accordance   with

7          departmental guidelines.

8    (d)     Unless a peace officer has been authorized by the police

9          chief or designee, or is otherwise on duty and acting in an

10          official capacity of their agency, only peace officers or

11          police cadets commissioned by the city City of Aurora shall

12          be used for traffic control on City streets or in City right-

13          of-way for special events, as defined by this chapter. In

14          making a determination for authorization, the police chief

15          shall   consider   the   officer's   familiarity   with   local

16          ordinances and rules of the city, and the proximity of the

17          officer's primary jurisdiction to the city. Additionally, the

18          police chief, may, Exemption: The police chief or designee

19          can make the determination, based on an evaluation of the

20          safety and security concerns unique to an of the event, for

21          certain events to allow volunteers trained by the police

22          department or by the Aurora Emergency Management Agency, for

23          to participate in traffic control.

52

Legistar 22-1069         Exhibit A         January 13, 2023

1     (e)      Volunteers under the supervision of the Aurora Emergency

2        Management Agency may work under the supervision of the ~~Aurora~~

3        Police Department to assist at special events.

4   (Ord. No. O19-002, § Exh. E, 1-22-19)

5   HISTORY

6   *Amended by Ord. 022-016 on 2/22/2022*

7   **Sec 41.5-162 Fire Safety**

8     (a)      A permittee ~~An event organizer~~ shall comply with all

9        applicable International Fire Code requirements as adopted

10       and amended in chapter 17 of this Code (Fire Protection and

11       Prevention), as well as requirements under chapter 12

12       (Buildings and Building Regulations) under this Code

13       including but not limited to:

14       (1)      Fire lanes and public safety access;

15       (2)      Tents and temporary membrane structures;

16       (3)      Fireworks, pyrotechnics, open flames;

17       (4)      Theatrical flame or laser performances;

18       (5)      Occupant loads, exiting, and egress;

19       (6)      Use of decorative materials and finishes;

20       (7)      Use, location, storage of propane or other fuel

21        type equipment; and

22       (8)      Crowd management.

1    (b)    A permittee ~~An event organizer~~ shall comply with all

2          applicable ~~City of Aurora~~ Fire Department guidelines related

3          to street closures.

4    (Ord. No. O19-002, § Exh. E, 1-22-19)

5    **Sec 41.5-163 Medical Service**

6    (a)    A permittee ~~An event organizer~~ may hire medical

7          providers, including licensed medical providers that are not

8          employed by the city ~~City of Aurora~~, for medical support for

9          a special event to supplement the services provided by the

10         ~~Aurora~~ Fire Department.

11   (b)    Unless otherwise directed by the fire chief, only

12         medical service responders employed by the city ~~City of Aurora~~

13         may respond to 911 requests within a special event or provide

14         medical transport from a special event.

15   (Ord. No. O19-002, § Exh. E, 1-22-19)

16   **ARTICLE 41.5-VII REVOCATION OF SPECIAL EVENT PERMIT**

17   **Sec 41.5-180 Revocation Of Special Event Permit**

18   (a)    The ~~community events~~ coordinator may revoke a special event

19         permit if the ~~community events~~ coordinator determines:

20         (1)    The ~~community events~~ coordinator issued the special

21               event permit in material violation of this chapter ~~error~~;

22         (2)    The permittee ~~event organizer~~ is conducting the

23               event in a manner that does not comply with the terms of

24               its ~~special event~~ permit;

54

Legistar 22-1069             Exhibit A             January 13, 2023

1      (3)   The permittee ~~event organizer~~ fails to maintain

2      insurance as required in this chapter.

3      (4)   The permittee ~~event organizer or any person~~

4      ~~associated with the special event~~ has failed to obtain

5      any other permit required by the city; or

6      (5)   The event poses a threat to public health or safety.

7      In the case of a tier 6 special event, a permit shall

8      not be revoked pursuant to this subparagraph unless the

9      threat to public health or safety is imminent and the

10      risk thereof cannot be effectively mitigated by the city

11      or the permittee, including instances severe or extreme

12      weather conditions, emergencies or disasters requiring

13      diversion of city resources, and specific and credible

14      threats of violence or terrorism.

15  (b)  Except as provided in subsection (c), the ~~community events~~

16      coordinator may revoke a special event permit after he or

17      she issues a notice of intent to revoke. The notice of

18      intent will be in writing; specifically set forth the

19      reasons for revocation; specify the corrective measures

20      required for compliance, and to prevent revocation; and

21      provide a time period for compliance. The notice shall

22      afford the permittee an opportunity to propose alternative

23      corrective measures to mitigate the effects of its failure

24      to comply with the provisions of this chapter or the terms

1    of its permit. The notice shall also afford the permittee

2    the opportunity to request that coordinator cancel the

3    existing permit and issue as a permit for a tier 6 event.

4  (c)  Verbal notification by the coordinator to the permittee is

5    sufficient if an emergency that poses a threat to public

6    health or safety requires immediate revocation. The

7    ~~community events~~ coordinator may provide a warning to the

8    permittee ~~event organizer~~ prior to an immediate revocation.

9  (d)  If a permittee ~~an event organizer~~ fails to take the

10    corrective measures identified in the notice of intent

11    within the time period provided, or propose alternative

12    means of mitigating the effects of its failure to comply

13    with the provisions of this chapter or the terms of its

14    permit, the special event permit will be ~~is~~ revoked without

15    further action by the ~~community events~~ coordinator.

16  (e)  If the ~~community events~~ coordinator revokes a special event

17    permit prior to the start of the event, the permittee ~~event~~

18    ~~organizer~~ may request an appeal hearing in the same manner

19    as set forth in section 41.5-135.

20  (f)  A revocation described in subsection (c) that occurs during

21    a special event is effective until the condition causing a

22    threat to public health or safety is remedied and the

23    special event no longer poses a threat to public health or

24    safety.

Legistar 22-1069                Exhibit A                January 13, 2023

1    (g)   Whenever a permittee requests pursuant to the notice set

2          forth in paragraph (b) of this section that the coordinator

3          cancel its existing permit and issue a permit for a tier 6

4          in lieu thereof, the permittee shall conduct its special

5          event accordance with the requirements of this chapter. A

6          permit for a tier 6 special event issued by the coordinator

7          under this paragraph shall convey no additional rights or

8          privileges, nor impose greater obligations on the permittee

9          than otherwise authorized by this chapter. (Ord. No. O19-

10         002, § Exh. E, 1-22-19)